## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br>and<br>STATE OF NEW JERSEY<br>Ex rel. LEE WASSERMAN<br>181 Rt 46<br>Mine Hill, New Jersey 07803 | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs/Relator | ) Civil Case No.: _____<br>) JURY TRIAL DEMAND |
| v. | )<br>) |
| ICF INCORPORATED, INC.<br>And its wholly owned subsidiary<br>ICF INCORPORATED L.L.C<br>9300 Lee Highway, Room 736<br>Fairfax, VA 22031 | )<br>)<br>) **THIS ENTIRE DOCUMENT IS**<br>) **FILED UNDER SEAL PURSUANT**<br>) **TO THE FALSE CLAIMS ACT,**<br>) **31 U.S.C. § 3730 (b)** |
| AECOM (formerly URS)<br>And its wholly owned subsidiary,<br>   AECOM USA, INC.<br>1999 Avenue of the Stars, Suite 2600<br>Los Angeles, CA 90067 | )<br>)<br>)<br>) **DO NOT PUT ON PACER**<br>) |
| GILBANE, INC.<br>7 Jackson Walkway<br>Providence, RI 02903 | )<br>)<br>)<br>) |
| McDERMOTT INTERNATIONAL, INC.<br>successor in interest by merger to<br>Chicago Bridge & Iron Company N.V.<br>a/k/a CB&I<br>4424 West Sam Houston Parkway North<br>Houston, Texas 77041 | )<br>)<br>)<br>)<br>)<br>) |
| APTIM ENVIRONMENTAL &<br>   INFRASTRUCTURE, INC.<br>F/K/A  CB&I ENVIRONMENTAL &<br>   INFRASTRUCTURE INC. a/k/a CBI<br>F/K/A  SHAW ENVIRONMENTAL, INC.<br>4171 Essen Lane, 8th Floor<br>Baton Rouge, LA 70809 | )<br>)<br>)<br>)<br>)<br>)<br>) |
| APTIM CORP.<br>10001 Woodloch Forest Drive, Suite 450<br>The Woodlands, TX  77380 | )<br>)<br>) |

APTIM GOVERNMENT SOLUTIONS, LLC )
F/K/A CB&I GOVERNMENT )
  SOLUTIONS, LLC )
F/K/A CB&I GOVERNMENT )
  SOLUTIONS, INC. )
F/K/A SHAW ENVIRONMENTAL & )
  INFRASTRUCTURE, INC. )
4171 Essen Lane )
Baton Rouge, LA 70809 )
  )
And )
  )
VERITAS CAPITAL FUND MANAGEMENT, )
  L.L.C. )
t/a Veritas Capital )
9 West 57th Street )
New York, NY 10019 )
  )
             Defendants. )
_____)

## **COMPLAINT**

The United States of America and the State of New Jersey, by and through *qui tam* Relator,

LEE WASSERMAN ("Relator" or "Mr. Wasserman") bring this action under 31 U.S.C. §§ 3729-

32 (the "False Claims Act"), as well as N.J. Stat. Ann. §§ 2A:32C-1—32C-18 (the "New Jersey

False Claims Act"), to recover from defendants, multiple United States government contractors

and their parent corporations/successors in interest, specifically ICF Incorporated, Inc. and its

wholly owned subsidiary, ICF Incorporated, L.L.C. (collectively "ICF"), AECOM (formerly URS)

("URS/AECOM"), Gilbane, Inc. ("Gilbane"), McDERMOTT    INTERNATIONAL, Inc.,

VERITAS CAPITAL FUND MANAGEMENT, L.L.C., the various Aptim entities f/k/a or t/a

CB&I and/or Shaw (collectively "CBI")  – all defendants collectively referred to hereinafter as

"Defendants" – all damages, penalties and other remedies available either to the United States and

Lee Wasserman under the False Claims Act and at common law or to the State of New Jersey and

Lee Wasserman under the New Jersey False Claims Act and at common law; and state as follows:

## PRELIMINARY STATEMENT

1.      This is a civil fraud action brought by *qui tam* Relator, Lee Wasserman by and on behalf of the United States of America (the "United States") and the State of New Jersey ("New Jersey") (or collectively, the "Government") against Defendants under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*, to recover damages sustained by, and penalties owed to, the United States and/or New Jersey as the result of multiple illegal actions committed by the Defendants in having knowingly concealed, and knowingly and improperly charged the Government for, work that was improperly, unsatisfactorily and illegally performed, or not performed at all, in connection with the rehabilitation and restoration of properties in the State of New Jersey that had been damaged in October 2012 by Superstorm Sandy, insofar as such work fraudulently ignored and obviated certain requirements that were known, acknowledged and agreed to by the Defendants, that were expressly required under law and that were set out in the awarding and issuance of block grants by the U.S. Department of Housing and Urban Development ("HUD"), with the result that all Defendants were unjustly enriched.

2.      Moreover, each of the Defendants (a) had actual or constructive knowledge of the impropriety, unsatisfactoriness and illegality of the work done for – and of the related charges made to – the Government; (b) benefited from such wrongful conduct; and (c) nevertheless failed to reimburse or inform the United States and/or New Jersey for or about the illicit amounts that Defendants charged to and received from the Government.

3.      The Relator is the President of LEW Corporation which is a licensed contractor in the State of New Jersey certified to perform lead hazard risk assessments and lead abatement services in connection with the repair, rehabilitation and/or restoration of improved real properties in New Jersey. Relator has personal knowledge of the facts contained herein by virtue of its work

with the Defendants. The Relator did not derive from "public disclosures" (as that term is defined in the False Claims Act) any of the allegations of wrongdoing set out in the paragraphs that follow. Furthermore, the Relator is an "original source" (as that term is defined in 31 U.S.C. §3730(e)(4)) of the information on which the allegations contained herein are based.

4.      Before filing this suit, Relator pre-disclosed the core facts and claims contained herein to the United States Attorney for the District of New Jersey on May 24, 2018.

5.      Relator made a similar pre-disclosure to the Attorney General of New Jersey on June 5, 2018.

## **PARTIES**

6.      Relator, Mr. Wasserman, is a nationally recognized environmental industry leader with over 25 years of expertise in property oriented environmental issues. He is currently the founding CEO and President of LEW Corporation, which was established in 1991. During his two decades of environmental experience, Mr. Wasserman has performed municipal, commercial and residential inspections, monitored projects and conducted risk management assessments, created management and abatement programs and Operation and Management (O&M) plans, conducted industry training, and completed all types of remediation, including extensive lead remediation work.

7.      Relator has worked on thousands of multi-family housing units, private residential homes, schools, houses of worship, daycare facilities, military sites, industrial and commercial facilities, universities and healthcare entities, and has successfully completed assignments for the U.S. Department of Housing and Urban Development (HUD), the U.S. Environmental Protection Agency (EPA), and numerous housing authorities.

8.      He was a member of the HUD Task Force committee for "EFFECTIVE AND TIMELY IMPLEMENTATION OF SECTION 1012/1013 OF TITLE X" (the regulations governing lead safety in federally assisted housing). He is currently recognized by HUD to be one of several national examiners of The HUD Guidelines (May 2012 ver.). As a nationally selected HUD trainer, Mr. Wasserman was one of the first to train the federally required LSWP (Lead Safety Work Practices) & RRP (Renovation, Repair and Painting) rules. LEW Corporation has trained tens of thousands of participants in multiple environmental regulatory requirements and disciplines.

9.      In his capacity as President of Lew Corporation, Mr. Wasserman had, and continues to have, personal knowledge of and access to certain non-public information, including the World trac database, that led him to conclude that ICF and the other Defendants were misspending certain federally-distributed, disaster-relief funds in knowing violation of the law.

10.     Defendant, ICF Incorporated L.L.C. also doing business as ICF Incorporated, is a Delaware Limited Liability Company with a principal business address of 9300 Lee Highway, Fairfax, VA 2203. ICF Incorporated L.L.C is a wholly owned subsidiary of publicly traded Defendant, ICF International Inc. (hereinafter collectively "ICF"). At all times relevant hereto, it has possessed a high degree of control over the actions and inactions of its wholly owned subsidiary, AECOM USA, INC. so as to constitute a single business enterprise for purposes of the wrongdoing alleged herein.

11.     Since 2006, Defendant ICF has been an international company that, according to its publicly accessible website, specializes in the provision of various "service offerings" to governments and governmental organizations ranging from "advisory services to execution, implementation, and improvement." The firm, a publicly traded company listed on the NASDAQ market under the symbol "ICFI," further states on its website, "With more than 40 years of

consulting experience, ICF is a global, diversified firm that combines the entrepreneurship and dynamism of a new company with a solid reputation and expertise in the consulting industry— offering solutions that help clients worldwide solve their biggest challenges to achieve their most formidable goals."

12.     More specifically, for purposes of the present matter, ICF is a United States government contractor that has provided – and continues to provide – disaster relief management services, including the management and disbursement of large-scale, disaster relief funds received into state government coffers in the form of block grants provided by the federal government. This civil fraud action concerns ICF's illicit, intentional and fraudulent management and disbursement of such types of monies received by the State of New Jersey from the United States government.

13.     The other Defendants are also United States government contractors, working in concert with ICF,  that likewise mismanaged and intentionally, improperly disbursed large-scale, federal disaster relief funds deposited into state and/or city government treasuries. More specifically, these Defendants managed and disbursed in illicit and fraudulent fashion such monies provided by the United States to the State of New Jersey.

14.     Defendant, AECOM  is the successor by merger to URS Corporation with a principal business address of 1999 Avenue of the Stars, Suite 2600, Los Angeles, CA 90067 (hereinafter "AECOM").

15.     Defendant, Gilbane Inc., is a privately held company with a principal business address of  7 Jackson Walkway,  Providence, RI  02903 ("Gilbane").

16.     In May 2018, Defendant, Chicago Bridge & Iron Company, N.V. also known as CBI merged into Defendant, McDermott International, Inc. with McDermott as the surviving entity ("McDermott").

17.    In 2017 CBI sold its Capital Services business unit to private equity firm Veritas Capital Fund Management, LLC trading as Veritas Capital for 755 million dollars. Veritas rebranded the unit under the APTIM name including entities CB&I Environmental & Infrastructure Inc. formerly known as Shaw Environmental, Inc. and CB&I Government Solutions, LLC formerly known as CB&I Government Solutions, Inc. and formerly known as Shaw Environmental & Infrastructure, Inc.

18.    Defendant, APTIM Corp., is Delaware corporation and upon information and belief is the parent company to and or manager of Defendant Aptim Environmental & Infrastructure, Inc., Defendant, Aptim Government Solutions, LLC.  and  the various Aptim subsidiaries (hereinafter collectively "APTIM/CBI").  At all times relevant hereto, Aptim Corp has possessed a high degree of control over the actions and inactions of its wholly owned subsidiaries, so as to constitute a single business enterprise for purposes of the wrongdoing alleged herein.

19.    In particular, the State of New Jersey received large-scale, federal disaster relief funds in the form of block grants sent by the United States Treasury to its respective state treasury. Officials in New Jersey then outsourced the management and disbursement of such federal monies to the Defendants who then fraudulently flouted and contravened their continuing statutory, regulatory, contractual and common law duties to ensure that all such funds provided by the United States were utilized and spent in wholly legal and non-fraudulent ways.

20.    In sum, lead-based paint hazards were detected on the premises of thousands of properties in New Jersey, New York and other states that had been damaged by Superstorm Sandy and for whose restoration federal funding had been granted ("Sandy rehabilitation funds"). In New Jersey, the distribution of Sandy rehabilitation funds were to be overseen and managed by Defendants pursuant to certain bid contracts and sub contracts awarded to them by HUD through the State of New Jersey and its manager, ICF.  Nevertheless, inadequate – or, in myriad instances,

no – lead abatement services were performed by certified lead abatement professionals, as required both by law and by Defendants' contractual obligations to New Jersey and/or HUD; nor were mandatory lead dust-wipe clearances conducted, again by the requisite licensed and approved lead remediation contractors, prior to allowing general home-improvement contractors onto the premises to complete the restoration, rebuilding and rehabilitation of such Sandy-damaged properties. Furthermore, having recognized their fraudulent failures to properly remediate and abate these myriad known and still existing lead hazards, Defendants elevated their fraud to an even greater – indeed shocking – extent, by engaging in a purposeful, intentional and deceitful cover-up of their fraud, and by fabricating a record trail in many instances meant to mislead any inquisitive government officials that lead abatements that had not been properly performed either supposedly were performed or, at least, the obligation and liability for such performance was accepted and "signed off" by the respective homeowners willingly and in advance.

21.    Conversely, the management of Sandy relief funds in New York and New York City was controlled directly by the respective governments of each entity (rather than a private entity such as ICF). As part and parcel of that effort, the federally mandated lead remediation was identified as a required activity.

22.    For instance, the New York City administered program is called "Build it Back". http://www1.nyc.gov/site/cdbgdr/about/about.page. Its website states:

> **Why is the Damage Assessment Team testing for lead-based paint?** If your home was built prior to 1978, Federal regulations **require** that Build It Back identify lead-based paint hazards. Lead-based paint that is not flaking or chipping is generally not a hazard. However, lead-based paint may become a hazard if it starts to flake or chip and falls to the floor as dust or chips. **If Build It Back performs repairs on your home, lead-based paint hazards will be mitigated by licensed professionals.** http://www.nyc.gov/html/recovery/html/faq/faq.shtml#h6

23.    CB&I, AECOM, URS are all contractors for the NYC "Build it Back" program.

http://www1.nyc.gov/site/cdbgdr/documents/contracts.page

24.     Similarly, the state of New York also has had, and continues to have, a self-managed program entitled, "New York Rising", administered through the Governor's Office of Storm Recovery (GOSR).  https://stormrecovery.ny.gov/

25.     On July 18, 2014, the New York Rising Recovery Program publicly issued a "lead warning" which stated:

> a. "Housing built before 1978 may contain lead-based paint.
> b. Lead exposure is especially harmful to young children and pregnant women.
> c. Lead from paint chips and dust can pose health hazards if not taken care of properly.
> d. Homeowners need to be aware that lead-based paint may be found on any surfaces throughout a home both on the inside and outside.
> e. Lead-based paint may be disturbed during rehabilitation, repair work and painting. These activities can create and release lead dust.
> f. NY Rising Housing Recovery Programs require all painted surfaces to be disturbed or replaced during rehabilitation in homes built before 1978 to be tested for lead see 24 CFR 35.390 (a).
> g. If lead is found it must be addressed  following the U.S. Department of Housing and Urban Development Lead Safe Housing Rule (24 CFR Part 35). . .
> h.  NY Rising Housing Recovery Programs will pay for both the testing and the abatement.
> i. Please note: All Lead Renovators must be certified by EPA or an EPA authorized state and all workers must have completed a HUD-approved course, or the crew must be supervised by a Renovator certified by EPA or an EPA authorized state who is also a Certified Lead Abatement Supervisor and untrained workers must receive on the job training from the Certified Renovator."

https://stormrecovery.ny.gov/sites/default/files/uploads/20140718_lead_mold_warning_st atement_-_v2.pdf

26.     In New Jersey, Defendants failed to follow the federally mandated lead inspection and remediation program as acknowledged and described, in part, in the NYC "Build it Back" and the New York state "New York Rising" Sandy relief programs.    Defendants' collective and individual legal and contractual failures defrauded the Government and unnecessarily put at risk many, perhaps thousands of, New Jersey citizens and residents – in particular young children most susceptible – to dangerous and ongoing lead-paint contamination. By repeatedly receiving in full

the federal funds awarded directly to Defendants pursuant to their related oversight and management duties under their contracts with New Jersey, Defendants thereby made multiple false claims upon the federal treasury and received monies they should not have received or should have returned but did not.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C §§ 1331, 1337 and 1345, 31 U.S.C. § 3730 (a) and 31 U.S.C. § 3732(a) and (b), the last of which specifically confers jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730, as well as related actions for the recovery of funds under state law on behalf of the various states, including New Jersey.   More specifically, any action under § 3730 may be brought in any federal judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by § 3729 occurred. This court has supplemental jurisdiction over the common law cause of action under 28 U.S.C. § 1367(a)

28.     This court has personal jurisdiction over Defendants and venue lies in this District pursuant to 31 U.S.C. § 3732(a) and (b), traditional long arm principles, and 28 U.S.C. §§ 1391(b)(2) and (3) because defendants committed the acts and inactions alleged in this district, transacted business in this district from which the claims arise, contracted to perform and in fact, did perform the underlying  rehabilitation work in this district, and received payment for unlawful services provided in this district.

## STATUTORY BACKGROUND

### The False Claims Act

29.     The False Claims Act ("FCA") imposes civil liability to the United States on any person who, *inter alia*: (a) knowingly presents, or causes to be presented, to an officer or employee

of the United States Government a false or fraudulent claim for payment or approval; and (b) knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government, 31 U.S.C. §§ 3729(a)(l)(A) and (B); as well as (c) conspires to violate the FCA. *Id.* at§ 3729(a)(l)(C).

30.     The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest .... " *Id.* at § 3729(b)(2).

31.     The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* at § 3729(b)(1)(A). The FCA does not require proof of specific intent to defraud. *Id.* at § 3729(b)(l)(B).

32.     The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at § 3729(b)(4).

33.     Any person who violates the FCA is liable for a mandatory civil penalty for each such claim, plus three times the damages sustained by the Government. *Id.* at§ 3729(a)(l).

## The New Jersey False Claims Act

34.     The New Jersey False Claims Act ("NJFCA"), which was enacted in 2008, provides

in pertinent as follows:

> A person shall be jointly and severally liable to the State for a civil penalty
> of not less than and not more than the civil penalty allowed under the [New
> Jersey] False Claims Act . . . for each false or fraudulent claim, plus three
> times the amount of damages which the State sustains, if the person commits
> any of the following acts:
>
> > a.  Knowingly presents or causes to be presented to an employee,
> >     officer or agent of the State, or to any contractor, grantee, or
> >     other recipient of State funds, a false or fraudulent claim for
> >     payment or approval; [or]
> >
> > b.  Knowingly makes, uses, or causes to be made or used a false
> >     record or statement to get a false or fraudulent claim paid or
> >     approved by the State; [N.J. Stat. Ann. § 2A:32C-3]

35.     For purposes of the NJFCA, the terms "knowing" and "knowingly" mean that a

person, with respect to information: "(1) has actual knowledge of the information; or (2) acts in

deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of

the truth or falsity of the information. No proof of specific intent to defraud is required." [N.J. Stat.

Ann. § 2A:32C-2]

36.     The "State" is defined in the NJFCA as "any of the principal departments in the

Executive Branch of State government, and any division, board, bureau, office, commission or

other instrumentality within or created by such department; and any independent State authority,

commission, instrumentality or agency." [N.J. Stat. Ann. § 2A:32C-3]

37.     New Jersey's Department of Community Affairs is a Department of the Executive

Branch of the State government for purposes of the NJFCA.

## FACTUAL BACKGROUND

### Superstorm Sandy, Her Aftermath
### and The Governmental Response

38.     On October 29, 2012, an historic hurricane that had already been nicknamed by weather forecasters "Superstorm Sandy" (hereinafter, "Sandy") made landfall near Atlantic City, New Jersey. The hurricane's storm surge, which measured 8.9 feet at its highpoint in Sandy Hook, inundated and severely affected regions of the State's shore from Cape May to Raritan Bay, including the barrier islands and many areas along the Hudson River. Other overland flooding, wind damage and an ensuing snowstorm further damaged these communities as well as multiple other locations throughout New Jersey. Given the extensive and unprecedented damage caused by Sandy to New Jersey's housing, business, infrastructure, health, social service and environmental sectors, then President Obama's disaster declaration on October 30, 2012 designated all 21 of the State's counties as "major disaster areas." In sum, Sandy had affected, in some way, virtually every household, business and community in New Jersey.

39.     In the immediate aftermath of the superstorm, New Jersey quickly embarked on the road to recovery. Along with government officials in local communities and the citizens of New Jersey themselves, the State undertook countless steps to revitalize and restore itself, its communities and its citizenry, in large part with the support of federal agency partners. More specifically, State officials committed themselves to implementing a thoughtful and comprehensive strategy that would expeditiously, efficiently, effectively and safely address the entirety of the State's long-term recovery, rebuilding and revitalization needs.

40.     To assist New Jersey's and other disaster-impacted states' recovery efforts, the United States Congress enacted the Disaster Relief Appropriations Act of 2013 (Public Law 113-2, approved January 29, 2013). This Act appropriated monies targeted for disaster recovery to

various federal agencies. Among such monies, the federal government appropriated to HUD $16,000,000,000 in Community Development Block Grant Disaster Recovery ("CDBG-DR") funds to be split among States that experienced natural disasters which the President had declared to be "Major Disasters" and which had occurred in 2011, 2012 or 2013.

41.     These CDBG-DR funds were to be administered by HUD and were to be used to address unmet disaster recovery needs, *i.e.* funding needs not satisfied by other public, governmental or private funding sources or by private insurance. Pursuant to an evaluation conducted by HUD, the State of New Jersey was earmarked to receive a total of $5,400,000,000 in federal CDBG-DR funds to assist the State's recovery efforts in the aftermath of Sandy, which monies were to be administered by the State's Department of Community Affairs ("DCA").

42.     To date, a total of $4,174,429,000 has been provided to New Jersey, through three separate tranches. On February 6, 2013, HUD announced its initial allocation of CDBG-DR funds to Sandy-impacted states, awarding $1,829,520,000 to New Jersey. On April 29, 2013, HUD approved New Jersey's CDBG-DR Action Plan outlining the State's intended uses of the first of three CDBG-DR funding allocations. New Jersey was able to begin accessing the first tranche of CDBG-DR funds in May, with the stipulation that the initial $1.8-plus billion awarded was required to be spent by the State within two years, unless HUD provided an extension.

43.     To assist in the ongoing recovery effort, on October 28, 2013, HUD announced the second allocation of CDBG-DR funds to Sandy-impacted states, awarding New Jersey another $1,463,000,000. Demand for state programs in New Jersey that had been funded with the first tranche of CDBG-DR monies had far outpaced available funding. Nearly all programs had long waitlists or unfunded pipelines. With the additional $1,463,000,000 of second tranche CDBG-DR funds allocated by HUD to New Jersey, the State planned to continue to respond to critical storm-

related unmet needs across various sectors, and to provide additional funding to several existing programs. Approximately one year later, on October 16, 2014, HUD issued Federal Register Notice FR-5696-N-11 (effective October 21, 2014), allocating $881,909,000 of third round CDBG-DR funds to New Jersey, bringing to $4,174,429,000 the total of federal Sandy-relief monies actually awarded and distributed to New Jersey.

44.     Upon receiving its initial allocation of CDBG-DR funds, the State quickly implemented a portfolio of programs targeting critical unmet needs. In setting up the programs, the State leveraged CDBG-DR funds with other funding sources to: (a) help homeowners and renters with unanticipated, non-construction storm-related expenses; (b) repair or replace damaged owner-occupied and rental housing; (c) provide much-needed capital to affected small businesses and investments in economic development and revitalization; (d) allow for post-storm community planning; and (e) support hardest hit and financially strained municipalities to ensure essential services continue to be provided to residents.

45.     In awarding the CDBG-DR funds, HUD required of New Jersey in particular that at least 80 percent of the first and second tranche monies be targeted to the nine counties most severely impacted by Sandy: Atlantic, Bergen, Cape May, Essex, Hudson, Middlesex, Monmouth, Ocean and Union Counties.

46.     More specifically, for purposes of assisting eligible homeowners in New Jersey to repair or rebuild their Sandy-impacted homes, the State established the Reconstruction, Rehabilitation, Elevation and Mitigation ("RREM") Program under the auspices of the DCA to oversee and implement the disbursement and spending of the CDBG-DR funds earmarked for housing recovery and set aside a total of more than $1.344 billion for the RREM Program alone. Once up and running, the RREM Program provided grant awards to the primary residences of

homeowners for activities necessary to restore their storm-damaged homes, including reconstruction, rehabilitation, elevation and/or other mitigation activities.

47.     The RREM Program was authorized to provide eligible homeowners with grant awards of up to $150,000 in an effort to "fill the gap" between the cost of repairs and other funds that such owners had received to restore their primary residence. The calculation of any financial assistance provided by RREM took into consideration the cost of repairs and amounts each homeowner had received for home restoration from other sources such as insurance, the Federal Emergency Management Agency, the Small Business Administration and non-profit organizations.

48.     To assist homeowners who decided to apply for federal funds through the grant process, the RREM Program provided to each such owner a Housing Advisor and an RREM Project Manager. The Housing Advisor was designated to help homeowners navigate the RREM Program and assist with eligibility determination, application processing and execution of grant awards. The RREM Project Manager was assigned to provide critical program and project details to the homeowners and to offer technical assistance for the completion of the homeowners' scope of work to ensure that they complied with all of the RREM construction standards, including requirements for lead hazard risk assessment and lead abatement. The RREM Project Manager was also charged with the duties of both inspecting all related construction while it was in progress and approving payment requests as the construction was completed. The New Jersey specific RREM program homeowner information is contained in a non-public database called the World trac system. At all times relevant to this action, relator has had access to the Worldtrac data base.

49.     On July, 1, 2014, the DCA issued a press release stating as follows: "Continuing its ongoing efforts to give homeowners flexibility to rebuild their Sandy-damaged homes, the Christie Administration simplified procedures effective today under which all eligible applicants in the federally-funded Reconstruction, Rehabilitation, Elevation and Mitigation (RREM) Program can

select the contractor they want to use, provided they are registered and licensed in the State of New Jersey. 'A majority of the more than 3,000 homeowners who have signed RREM grant awards have decided to rebuild their homes with their own contractor,' said Commissioner Richard E. Constable, III of the New Jersey Department of Community Affairs, which administers the RREM Program. 'As a result, we have modified the RREM Program so that for grant awards signed starting today, July 1, 2014, all homeowners will select their own contractor.'"

50.     Furthermore, "While homeowners can choose from a myriad of qualified contractors throughout New Jersey, the State will make available to all eligible RREM applicants a list of contractors that are participating in the RREM Program's qualified builder pool and that have gained experience in the RREM process. . . . Each homeowner is assigned a RREM Program Manager who will provide the details of the scope of work, review and validate the construction contract and contractor, review construction invoices, perform a site visit upon completion, and monitor for project closure. *The homeowner's RREM Program Manager* will also provide a briefing on construction requirements and *will give each homeowner a recommended Contractor Addendum to include in their contract to ensure all program and federal requirements are met as necessary in receiving these rebuilding grant funds*." (Emphases added)

51.     In May 2013, the State of New Jersey, in particular, the State's "Housing Program Implementation Strategy Advisor for the State of New Jersey Department of Community Affairs," and ICF had entered into and executed a "GSA Contract" effective May 25, 2013 through May 24, 2015 (the "ICF Initial Contract") pursuant to which ICF was obligated to perform disaster relief "Project Management Services," for which services ICF was to be paid an estimated sum of $5,000,000.00 (five million dollars) per year, for a total of $10,000,000 (ten million dollars).

52.     On information and belief, the other Non ICF Defendants entered into similar, Superstorm Sandy, project management services contracts either as sub-contractors to ICF or as direct contractors with the State of New Jersey.

53.     Appended to and included in the Initial Contract were the "State of New Jersey Standard Terms and Conditions," which stipulated, "Unless the bidder/offeror is specifically instructed otherwise in the Request for Proposals (RFP), the following terms and conditions shall apply to all contracts or purchase agreements made with the State of New Jersey" (¶ 1); that "any contracts and/or orders placed as a result of [this proposal] shall be governed and construed and the rights and obligations of the parties hereto shall be determined in accordance with the laws of the STATE OF NEW JERSEY" (¶ 2.11); and that any consent given by the State for subcontracting "shall not relieve the contractor of any of his responsibilities under the contract, nor shall it create privity of contract between the State and any subcontractor. If the contractor uses a subcontractor to fulfill any of its obligations, the contactor shall be responsible for the subcontractor's: (a) performance; (b) compliance with all of the terms and conditions of the contract; and (c) compliance with the requirements of all applicable laws." (¶ 5.8(a)).

54.     In May 2015 and then again in May 2016, the Initial Contract between New Jersey and ICF was extended through May 2017 by mutual agreement, pursuant to which ICF was to be paid additional, estimated annual sums of $5,000,000.00 (five million dollars).

55.     ICF itself has characterized the work that its personnel performed under these contracts in the following manner:

> a)      "New Jersey Superstorm Sandy Recovery. CLIENT: State of New Jersey Department of Community Affairs (DCA). ICF maximized Community Disaster Block Grant Disaster Recovery (CDBG-DR) funds for residents and communities impacted by Superstorm Sandy in New Jersey. When Superstorm Sandy hit, the state of New Jersey had the monumental

task of responding to the immediate, critical needs of citizens as well as establishing a comprehensive, long-term recovery process."

b)        "Although the U.S. federal government allocated funding for Sandy recovery, assigning these resources quickly and effectively required expert guidance in the management of CDBG-DR funds. Managing funding to the satisfaction of federal requirements was fundamental to New Jersey's ability to meet the needs of Sandy-impacted residents and communities."

c)        "While a primary concern was housing, more than 20 programs were ultimately established across all sectors to promote recovery, resumption of business, long-term sustainability, and improved resilience."

(https://www.icf.com/projects/ community-development/new-jersey-superstorm-sandy-recovery)

56.    In further describing its company's efforts to assist New Jersey's recovery from

Superstorm Sandy, ICF's has stated:

a)        "Among the ways ICF helped New Jersey's [DCA] implement the state's $4.1 billion Superstorm Sandy Disaster Recovery Program include: . . . Provided subject matter expertise on CDBG-DR . . . [and] Set up more than 130 staff to augment DCA staff at headquarters and nine Housing Recovery Centers to help expand capacity quickly." (ICF DISASTER RECOVERY CASE STUDY at 1)

b)        In addition, "When Superstorm Sandy hit in October 2012, New Jersey's state and local governments were faced with the monumental task of responding to the immediate, critical needs of citizens while establishing a comprehensive, long-term recovery process. In March 2013, the federal government allocated funding for Sandy recovery, but assigning these resources as quickly and effectively as possible required expert guidance in the management of Community Disaster Block Grant Disaster Recovery (CDBG-DR) funds."

c)        "New Jersey needed to know how to: . . . best use the resources available to balance competing priorities with speed[;] stand up the functions and programs required for recovery[; and] remain compliant with Federal regulations and reporting requirements. The cost of non-compliance would compound an already dire situation and add to the risk that the State would not be able to fund important recovery efforts for its communities." (*Id.*)

57.    Lastly, the primary defendant here has boasted as follows:

a)        "ICF's 25-years of work with the U.S. Department of Housing and Urban Development (HUD) gave them the experience and expertise to help New Jersey staff navigate the CDBG-DR and Federal Emergency Management Agency (FEMA) requirements. After an initial

advisory role, ICF's responsibilities were expanded to provide a full suite of end-to-end services. . . . "

b)    "Recovering and rebuilding strong communities following the unprecedented damage of Superstorm Sandy required New Jersey state officials to work through the highly complex, natural disaster aftermath efficiently and effectively.

c)    "Expert policy knowledge and in-depth understanding of the regulatory context in which disaster recovery programs are implemented ensured CDBG-DR funding was deployed where it was most needed and helped maximize the use of CDBG-DR funds for matching." (*Id.* at 2)

### The Legal Framework for Allocation and Spending of Sandy-Related Disaster-Relief Funds: the Requirement of Lead-Hazard Risk Assessments and Lead Abatement

58.    In 1992, the Residential Lead-Based Paint Hazard Reduction Act, also known as Title X (hereinafter, "Title X"), was passed by the United States Congress and signed into law by President George H.W. Bush.  While the general intent of Title X was to protect families from potentially toxic exposure to lead from paint, dust, and soil, the law more specifically sought to establish the framework to eliminate or substantially reduce lead poisoning in the United States within 20 years, that is, by the year 2012.

59.    In attempting to effect these goals, Section 1012(a)(3) of Title X stipulates that, for any federally funded housing rehabilitation project conducted on residential property built prior to 1978, certain requirements must be met, "at a minimum," including:

"(C) *inspection for the presence of lead-based paint* prior to federally-funded renovation or rehabilitation that is likely to disturb painted surfaces;

(D) *reduction of lead-based paint hazards* in the course of rehabilitation projects receiving less than $ 25,000 per unit in Federal funds; [and]

(E) *abatement of lead-based paint hazards in the course of substantial rehabilitation projects receiving more than $25,000 per unit in Federal funds* . . . ." (Emphases added.)

60.    Relator and other LEW company personnel have been informed by New Jersey officials on multiple occasions that all of the housing rehabilitation projects processed through the

RREM Program were deemed to be subject to the ***lead abatement*** requirement set out under subsection (C) above insofar as the average of all such projects undertaken with respect to Sandy-damaged properties in New Jersey exceeds the "$25,000 per unit" qualifying minimum.

61.     Title X defines "lead-based paint hazards" and "abatement" as follows: "The term 'lead-based paint hazard' means any condition that causes exposure to lead from lead-contaminated dust, lead-contaminated soil, lead-contaminated paint that is deteriorated or present in accessible surfaces, friction surfaces, or impact surfaces that would result in adverse human health effects as established by the appropriate Federal agency" §1004(15); and "The term 'abatement' means any set of measures designed to permanently eliminate lead-based paint hazards in accordance with standards established by appropriate Federal agencies. Such term includes . . . the removal of lead-based paint and lead-contaminated dust, the permanent containment or encapsulation of lead-based paint, the replacement of lead-painted surfaces or fixtures, and the removal or covering of lead contaminated soil; and . . . all preparation, cleanup, disposal, and post-abatement clearance testing activities associated with such measures." §1004(1).

62.     In the implementation of Title X, the "HUD Lead Safe Housing Rule" was added to the Code of Federal Regulations in 1996 under 24 CFR 35, subpart J of which was further added in 1999, for the express purpose "to establish procedures to eliminate as far as practicable lead-based paint hazards in a residential property that receives Federal rehabilitation assistance under a program administered by HUD." (24 CFR § 35.900(a)(1)). Furthermore, with respect to "the CDBG Entitlement program, the requirements of this subpart shall apply to all residential rehabilitation activities . . . for which funds are first obligated on or after September 15, 2000" (24 CFR § 35.900 (a)(3)); and, "The grantee or participating jurisdiction may assign to a subrecipient or other entity the responsibilities set forth in this subpart." (24 CFR § 35.900 (b)) Such an

assignment of responsibility – for ensuring that the requirements of the HUD Lead Safe Housing Rule were met in the spending of the CDBG-DR funds awarded to New Jersey as grantee – occurred in the State's execution of its aforementioned contracts with ICF.

63.     The presence of lead paint is assumed in the law. These same federal regulations and HUD Rule further require that the "grantee or participating jurisdiction shall *either perform paint testing* on the painted surfaces to be disturbed or replaced during rehabilitation activities or *presume that all these painted surfaces are coated with lead-based paint*." (24 CFR § 35.930 (a)) (Emphases added).  In connection with meeting such requirements, Title X itself mandates as follows: "Lead-based paint inspections *shall be* performed in accordance with methods and standards established . . . by a State . . . program authorized by the EPA . . . [and] Paint testing to determine the presence or absence of lead-based paint on deteriorated paint surfaces or surfaces to be disturbed or replaced shall be performed by a certified lead-based paint inspector or risk assessor." § 35.1320(a) (Emphasis added). New Jersey implemented such requisite methods, standards and certifications through the "Lead-Based Paint Hazard Abatement and Lead-Based Paint Abatement Contractor Certification Act" with respect to companies, codified under the New Jersey Administrative Code ("N.J.A.C.") § 5:17 and administered by the State's DCA; and through the "Standards for Lead Certification" with respect to individuals, codified under N.J.A.C. § 8:62 and administered by the State's Department of Health.

64.     As stated earlier, ICF eventually won the bidding process to help DCA implement, administer and manage New Jersey's utilization of HUD's $5.4 billion block grant to the State. Aside from its apparent decades-long participation in managing disaster relief services and assisting federal block grant recipients of federal disaster relief funds, ICF, through the very bidding process for managing New Jersey's spending of the Superstorm Sandy CDBG-DR funds, was clearly made aware – and explicitly stated its understanding – of the requisite adherence to

and compliance with all applicable federal regulations and requirements relating to lead-based paint hazards and lead abatement in undertaking and performing such management of federal disaster relief funds.

65.     The Grant Application distributed by HUD to New Jersey had identified a number of requirements for grantees receiving CDBG-DR funds that were to be distributed in response to Hurricane Sandy, stating, for instance, that:

(a) "activities eligible under this Notice may be carried out, subject to State law, by the State through its employees, through procurement contracts, or through assistance provided under agreements with subrecipients or recipients. Notwithstanding this waiver, State grantees continue to be responsible for civil rights, labor standards, and environmental protection requirements contained in HCD Act and 24 CFR part 570, as well as ensuring such compliance by subgrantees;" and

(b) "The *grantee certifies* that its activities concerning lead-based paint will comply with the requirements of 24 CFR part 35, subparts A, B, J, K, and R" and, "The grantee certifies that it will comply with all applicable laws." (Emphasis added)

66.     As detailed below, this certification was material to the Government and was false when made – and remained false through the present -- as ICF had no intention of complying, and indeed has not so complied, with the lead-based remediation requirements as it had decided that to do so would be too costly.

67.     In presenting New Jersey's Grant Submission, the State's response to the Grant Application, DCA had provided to HUD certain information, stipulations and assurances, including: (a) "The storm created multiple public health issues, including environmental hazards (e.g., mold, lead and asbestos) and unsafe debris;" (b) "Superstorm Sandy created potential public health issues, including . . . lead and asbestos hazards within storm debris;" (c) "an estimated $32,700,000 is needed for hazard mitigation projects identified to date . . . [and] New Jersey has an unmet public health and safety infrastructure need of approximately $53,500,000;" and (d) "All HUD regulations regarding lead-based paint, asbestos removal, environmental, housing quality standards, procurement and other applicable standards apply to these programs."

68.     Once HUD pledged to award $5.4 billion to New Jersey in CDBG-DR funds, the State had published a "Request for Quotation for Housing Program Implementation Strategy Advisor for the State of New Jersey Department of Community Affairs" ("RFQ"), inviting bidders to submit proposals for managing the disaster relief funds pledged by HUD. New Jersey provided several critical clarifications for potential bidders in the RFQ itself and in later written responses to certain submitted questions, among them: (a) "The State of New Jersey Standard Terms and Conditions ('NJSTC'), as well as the Community Development Block Grant Disaster Recovery ('CDBG-DR') regulations and the New Jersey DCA CDBG-DR Action Plan ('Action Plan'), as approved by Department of Housing and Urban Development ('HUD'), shall apply to all contracts or purchase agreements made with the State of New Jersey;" (b) the Staff Task Orders of the successful bidder included (i) "All tasks related to the implementation of the HUD Action Plan," which expressly incorporated the HUD Lead Safe Housing Rule, (ii) "Provide for the implementation of the environmental and historic review responsibilities in the disaster setting," (iii) "Continue to address and assist with the oversight of housing recovery strategies," and (iv) "Oversee grant administration;" (c) the "Experience of Bidder" had to include "expertise in all CDBG-DR rules and regulations;" (d) within "Bidder Responsibilities" it was explained, "The State requires a single Contractor as the result of any Contract negotiation, and that Contractor is responsible for all deliverables referenced in the RFQ and quote as well as the acts and liabilities created by personnel or subcontractors providing products or services as part of the Contractor's quote;" (e) "The contractor shall assume responsibility for all work under the RFQ, including that work performed by any subcontractors;" and (f) "The successful bidder will perform an advisory function which could include project management."

69.     In submitting its response to New Jersey's RFQ, ICF represented its experience and unique expertise in, among other things, lead based paint disaster recovery. It stated in part, "ICF

International has more than 350 staff with decades of applied expertise in disaster recovery, housing, economic development, special needs and services programs, and infrastructure. *We literally wrote HUD's books on disaster recovery, CDBG, affordable housing, economic development, and numerous federal requirements such as lead based paint, fair housing, and income documentation.* We are also experts in the FEMA programs, having assisted grantees in understanding how these funds can be combined with CDBG. We have applied this knowledge to state and local government grantees nationwide, assisting them in managing and implementing federally assisted programs." (Emphases added)

70.     ICF had also assured, "*Our team* currently supporting HUD and DCA in New Jersey are part of a larger line of business that *helps CDBG grantees* design and improve their programs . . . and *comply with other federal requirements such as . . . lead paint regulations*. We've developed numerous program policy and procedures handbooks, monitoring plans and checklists, and performance reporting systems for housing rehabilitation programs, small business loan programs and other CDBG-eligible activities." (Emphases added). It is further noteworthy that, in making these representations in its application to New Jersey to assist in the State's management of the Superstorm Sandy CDBG-DR funds, ICF itself incorporated them into the contract pursuant to FAR § 52.204-19, which states, "The Contractor's representations and certifications, including those completed electronically via the System for Award Management (SAM), are incorporated by reference into the contract."

71.     Shortly after HUD dispersed the first $1.8 billion-plus tranche of CDBG-DR funds to New Jersey and ICF began to perform its duties under its initial contract with the State in the Spring of 2013, several large firms were additionally engaged by the State to oversee more directly and manage the RREM Program in different parts of New Jersey, including ensuring the performance of requisite lead-based paint testing, risk assessments and, where necessary, lead

abatements on houses whose owners had applied to the RREM Program for federally funded rehabilitation of their Sandy-damaged properties. Included among such firms were all three of ICF's co-defendants: URS/AECOM, Gilbane and CB&I – for the last of which Relator LEW itself acted as an additional subcontractor.

72.     Both URS/AECOM and Gilbane initially did not have any subcontractors or internal staff that owned the X-Ray Fluorescence ("XRF") equipment required to directly test paint in pre-1978 houses so as to conduct a certifiable lead-hazard risk assessment. Accordingly, at least in the beginning of the testing stage, the personnel of URS/AECOM and Gilbane elected to exercise the "presumption standard" of 24 CFR § 35.930(a) instead of actually testing and determining if lead-based paint or lead-paint hazards in fact existed in the houses they tested. Accordingly, all of the thousands of pre-1978 houses damaged by Sandy and assessed by URS/AECOM and Gilbane were presumed to have contained surfaces that were coated with lead-based paint and that were, therefore, required to be abated by a licensed and certified New Jersey Lead Abatement Contractor.

73.     The same certified lead abatements were, of course, likewise required to be conducted on all the properties on which lead-paint testing was actually performed and where lead-based paint hazards or even lead-dust hazards were identified and detected. For instance, out of 4,000 lead-hazard risk assessments performed by LEW as a subcontractor for CB&I since 2013, approximately 1000 houses were identified as containing such risks that required abatement.

74.     On information and belief, however, lead abatements legally required in connection with New Jersey's and ICF's spending of the CDBG-DR funds, on account of the presumed or identified presence of lead-based paint hazards and lead-dust hazards in thousands of New Jersey residential properties, were wholly or at least largely ignored and never performed, thereby putting

the State's residents at risk of significant harm and injury.  Indeed, Relator LEW has actual knowledge that there were numerous properties that had lead-dust hazards present and, yet again, the proper, legally required lead abatements were ignored and never performed.

75.    Moreover, Relator knows that very few lead-abatement permits, in absolute numbers, and for only a minimal percentage of the innumerable pre-1978 properties where lead hazards were either found or presumed, were applied for and obtained from State construction officials during the RREM's implementation, largely through Defendants' employees, of the Sandy-rebuilding and rehabilitation project and efforts.  In fact, a limited review was performed byRelator into specific properties where lead-based paint hazards had been detected and where lead abatement services were therefore required to have been performed by certified professionals; yet, it was learned by Relator that the requisite lead-abatement permits were never issued nor even applied for.

76.    Further evidence of the  Defendants' decision to cut corners  to the detriment of New Jersey families, including vulnerable children, lies in the State's description and tracking of its allocation, disbursement and spending of the $4.1 billion-plus CDBG-DR funds awarded by HUD since 2013.  For instance, in amending the "Action Plan" required to be undertaken by the State in order to first qualify for – and then continue to utilize – those federal disaster relief funds, New Jersey announced in March 2014 its "Creation of the Lead Hazard Reduction Program."

77.    More specifically, in its "Action Plan Amendment Number 6," the State explained, "The Department of Health received Social Services Block Grant (SSBG) funding for a Lead Risk Assessment Program for Young Children. This program provides funding for community outreach and testing of young children, pregnant women, and adults performing physical recovery work for blood lead levels and case management services. However, the SSBG funding does not cover lead

assessment and remediation. To address this need, DCA proposes to implement a Lead Hazard Reduction Program with a primary focus on providing funding for lead assessment, lead hazard reduction, and clearance. Homes targeted for hazard reduction will be homes impacted by Superstorm Sandy. Paint will typically begin to flake once surfaces that were submerged in water begin to dry. As a result, flooded homes built prior to 1978 are more likely to experience increased lead and other health hazards. This program will fall under Section 4.5 Supportive Services Programs. The program is funded with $5,000,000 reallocated to the program from the Landlord Incentive Program."

78.    New Jersey's sixth amendment of its action plan further stated, "The program will be inserted into the Action Plan as below: 4.5.1 Lead Hazard Reduction Program Lead Agency: Department of Community Affairs Allocation for Activity: $5,000,000 Eligible Entities: Community based organizations and units of local and county government with experience in administering lead hazard reduction and/or weatherization programs. Process: DCA will issue a request for proposals to identify qualified nonprofit community based organizations and local public agencies to conduct lead hazard reduction programs. Eligible Activities: Assessment of lead based paint hazards in single and multi-family residential units; Abatement, remediation or reduction of lead paint hazards in residential units[.] DCA may also elect to allow other moderate levels of repair to occur in combination with the lead paint abatement, including addressing other environmental hazards such as mold, as well as other ancillary costs to performing the abatement. Eligibility: Section 105(a)(4) and (a)(25) National Objective: Low and moderate income; *urgent need*." (Emphases added.)

79.    Per HUD requirements, the State's amendment of its Superstorm-Sandy action plan was made available for public comment over a thirty-day period. In its release of the amendment, the State noted that one "[c]ommenter stated that the proposed Substantial Amendment does not

provide sufficient information regarding how the voucher program or Lead Hazard Reduction Program will operate." The DCA issued the following "Staff Response: The Action Plan, and by extension this proposed Substantial Amendment to the Action Plan, is intended to describe the basic framework for proposed programs. More specific programmatic details are set forth in the policies and procedures created after HUD has approved the basic framework. The policies and procedures for each program will be available on the DCA website, as they are for other Sandy recovery programs, once the Action Plan Amendment is approved by HUD and the policies and procedures are developed."  To date, no such information appears to have been released to the public via the DCA's website as to exactly how – or on what – the spending of the $5 million allocated for lead-hazard reductions and/or abatements has been undertaken or implemented.

80.     More generally, however, in one of New Jersey's periodic updates, on October 31, 2016, of its "Sandy Recovery Program Dashboard," the State's thusly dedicated website, it is reported that, out of the $4.174 billion in CDBG-DR funds awarded to New Jersey, only $5.8 million was ever allocated for "Lead Hazard Risk Reduction."  Upon information and belief, a significant portion of those funds were used for inspections such as those performed by LEW Corporation, rather than actual lead remediation and/or post lead remediation inspections.  That such a tiny percentage (less than 0.14%) of the total federally allocated funds was used  for what the State recognized to be an "urgent need" – the assessment, reduction and abatement of lead-hazard risks of  thousands of pre-1978 residential properties badly damaged by Superstorm Sandy – alone demonstrates the haphazard, inadequate and indeed illegal misconduct that ICF, as the State's disaster relief administrator, committed in spending the federal monies awarded by HUD.

81.     Even worse and more damning is that, as of March 31, 2018, , The $5.8 million that had been allocated to "lead hazard risk reduction" was reduced to $5 million. Moreover, of that reduced amount, only $1,190,823  has actually been disbursed as of March 31, 2018  for purposes

of assessing, abating and inspecting (post abatment) the known lead-hazard risks for thousands of damaged homes under the New Jersey CDBG-DR program. http://www.renewjerseystronger.org/transparency/sandy-recovery-program-dashboard/.

82.     Accordingly, less than 24% of the money allocated for lead-hazard risk reduction was spent more than five years after the federally appropriated, Superstorm Sandy disaster-relief funds were first disbursed to the State of New Jersey. Moreover, it is unquestionable that only a portion of these already inadequate expenditures for lead-hazard risk assessment and lead abatement went to <u>actual</u> reduction or elimination of the certain, indeed identified lead hazards thrust by Superstorm Sandy upon New Jersey's residents, whom the U.S. Government most directly sought to protect when it granted the State over $4.1 billion in CDBG-DR funds.

## The Defendants' False Claims and Underlying Activities

83.     As a general matter, thousands of residential properties in New Jersey were built prior to 1978. Under federal regulations, all such damaged homes are presumed to contain on their premises lead-based paint hazards that are required by law to be abated by licensed and certified companies and professionals such Relator and LEW personnel. More specifically, Relator is aware that thousands of New Jersey homes for which lead hazard risk assessments were conducted by ICF and or its subcontractors URS and Gilbane were presumed to require lead abatement insofar as no actual certified lead-paint testing was because the companies lacked the necessary equipment. Hundreds of such homes were found to have lead hazards present, likewise requiring abatement.

84.     On information and belief, however, very few abatements of lead-based paint were actually performed for the thousands of New Jersey properties damaged by Superstorm Sandy. Indeed, Relator has personal knowledge that, for numerous specific, identifiable properties with

lead paint disturbances, lead abatements were either not done properly or were not done at all. For instance, Relator has knowledge that for a few properties where required lead abatement procedures were undertaken, lead dust hazards still remained afterwards yet were not themselves corrected. Moreover, final clearance sampling that occurred during the Spring and Summer of 2016 revealed that there are now many homes in New Jersey whose residents are currently living with elevated levels of lead dust on their property.

85.     For instance, see the sampling of homes set forth in ¶¶ 104-106 below, where lead paint was found to be present but where no evidence of proper and lawful lead remediation or post lead remediation inspection can be found.

86.     Insofar as so few lead abatement permits were ever applied for or issued in those counties most seriously affected by Sandy, it is clear that the requisite, properly licensed lead abatement contractors – either companies certified by DCA or individuals certified by DOH – were not engaged as required and did not in fact perform lead abatement work as required by the federal and state regulations and ICF's contract; and, consequently, many residential properties in New Jersey were exposed and potentially contaminated by toxic lead paint and/or dust above the maximum clearance and risk assessment levels deemed tolerable by federal and state authorities.

87.     On further information and belief, for some rehabilitation projects processed through the RREM Program, a non-lead abatement certified home improvement contractor performed the restorative work on almost all components of the property, including both those requiring and those not requiring lead abatement, leaving only one component requiring lead abatement to be restored by a licensed and certified lead abatement contractor. Hence, only one lead abatement component would have been properly abated by a New Jersey licensed lead abatement contractor and the related lead abatement clearance conducted after such abatement could then be reflected in the project paperwork even though such lead abatement had been undertaken for *only one* of the property's components. Again, these instances of improperly

performed lead abatements on certain properties were a direct, material violation of the governing regulations and the ICF contract and moreover may likewise have resulted in the continued presence of lead hazards and/or actual lead dust, thereby endangering the good health of the residents of any such properties, especially those inhabited or frequently visited by children under the age of six, who are especially vulnerable to some particularly debilitating effects of lead poisoning.

88.     In keeping with such a lead abatement "masking scheme," devised as a cover-up by ICF and its co-defendants, and where all property components but one requiring lead abatement by a certified specialist were performed by non-certified home improvement contractors, LEW personnel began to receive requests for rather small and/or singular lead abatements, involving for instance the abatement of just one window or just one door. True to form, on one occasion, LEW personnel completed a minimal, single-component lead abatement project for one homeowner who admitted that a non-certified contractor had done all the required lead abatement except for the one item, to ensure that: (a) a lead abatement permit would be issued; (b) the requisite RREM Program paperwork could be closed out; and (c) final payment of the awarded CBDG-DR funds would be approved.

89.     Lastly, as a result of ICF's actions, many homes were left with confirmed lead hazards and these resulted in not only harm to the Government, which paid for services that were not lawfully rendered or not rendered at all, but also safety and health risks and harm to the homeowners, including children.

90.     Given the Defendants' widespread violation of material  federally mandated lead abatement requirements, it is highly likely that many occupants of non-lead abated housing have heightened blood lead levels. In fact, many occupants, especially children, may already be suffering adverse, and in some cases, irreversible health effects from lead poisoning. In 1991, the United States Center for Disease Control ("CDC") formally revised its statement on "Preventing

Lead Poisoning in Young Children" , reducing its "level of concern" for childhood lead poisoning from the previous threshold of 25 micrograms/decilieter (µg/dL) to 10 µg/dL based on overwhelming scientific evidence that adverse health effects can occur at levels as low as 10 µg/d.

91.    Recently, the CDC has indicated that further research suggests that adverse health effects occur at levels well below 10µg/dL (CDC ACCLPP, 2012). *See also* CDC, 2012a (announcing that CDC adopted the core recommendation of eliminating the term "level of concern" from its future policies, guidance documents, and other CDC publications, and it will use a childhood blood lead level (BLL) reference value based on the 97.5th percentile of the population BLL in children ages 1-5, a measurement of just 5 µg/dL as of May 16, 2012).

92.    Indeed, the extreme danger of lead poisoning for all individuals – including adults but especially children under the age of six – is now well-documented and undeniable. As United States Congressman Frank Pallone, Jr. wrote to the Acting Commissioner of the New Jersey Department of Health just two years ago, "Lead exposure can cause serious damage to the heart, kidneys, reproductive system, and brain. [*citing* Centers for Disease Control and Prevention, *Very High Blood Levels Among Adults – United States, 2002-2011*, Morbidity and Mortality Weekly Report (Nov. 29, 2013)] According to the World Health Organization (WHO), at its most severe exposure levels, lead attacks the brain and central nervous system to cause coma, convulsions, and even death. [*citing* World Health Organization, Lead Poisoning and Health (www.who.int/mediacentre/factsheets/fs379/en/) (accessed Feb. 3, 2016)] Lead exposure is particularly harmful to the developing brains and nervous systems of young children – even low levels of exposure are associated with irreversible neurologic damage and behavioral disorders. [*citing* Centers for Disease Control and Prevention, *Educational Interventions for Children Affected by Lead* (Apr. 2015) (online at www.cdc.gov/nceh/lead/publications/Educational_ Interventions_Children_Affected_by_Lead. pdf)]

93.    In 2012, the Centers for Disease Control and Prevention (CDC) lowered the "reference level" for lead poisoning from 10 micrograms per deciliter to 5 micrograms per deciliter, in recognition of a growing scientific consensus that no amount of lead in the blood is safe for children. The CDC recommends follow-up and interventions to reduce lead exposure for children with blood lead levels at 5 micrograms per deciliter or more. [*citing* Centers for Disease Control and Prevention, *Fact Sheet: Blood Lead Levels in Children* (online at www.cdc.gov/nceh/lead/acclpp/lead_levels_in_children_fact_sheet. pdf) (accessed Feb. 3,2016)] (Letter from The Honorable Frank Pallone, Jr. to Ms. Cathleen Bennett, February 22, 2016.)

94.    There thus exists a significant probability that, because improper, woefully insufficient or no mandatory lead abatement was conducted, numerous adults and children residing in some of the thousands of residences damaged by Superstorm Sandy are at greater risk for lead poisoning or may in fact have already incurred adverse health effects from ingesting lead dust that was not properly contained, cleaned and/or cleared as required by relevant provisions of law, particularly those made applicable and binding pursuant to HUD's release of the CDBG-DR funding at issue in the present matter.

95.    As the aftermath of Sandy unfolded and the implementation and disbursement of federal disaster relief funds by New Jersey and its chief disaster relief management partner, ICF, were undertaken, Relator eventually became aware that ICF personnel began themselves to recognize a number of the foreseeable problems resulting from their intentional decision to omit lead abatement: the RREM Program had not properly complied with HUD lead paint abatement requirements for the spending of CDBG-DR funds; ICF had breached critical components of the CDBG-DR agreement/grant with HUD that were binding conditions of such funding; and ICF itself had breached its service contracts with the State of New Jersey by failing to ensure, as was the company's responsibility under the law and under the contracts themselves, that all the

rehabilitation projects undertaken through the RREM Program complied with federal lead paint requirements, including lead hazard risk assessments and lead abatements.

96.     ICF personnel assigned to the RREM Program were thus faced with a terrible predicament, a modern-day Hobson's Choice: (a) either wholly ignore and continue their noncompliance with HUD's federal funding requirements; or (b) attempt to cover up and conceal their noncompliance by duping individual homeowners who availed themselves of the federal funding made available through the RREM Program to sign written declarations that they had decided to engage in "owner occupied lead abatement."

97.     As these issues began to come to light during the months following HUD's disbursements of the successive tranches of CDBG-DR funds, LEW personnel themselves were beginning to question why there were so few requests for any lead abatement projects of any kind at all, let alone for major restoration and rehabilitation projects of Sandy-damaged homes, especially given their knowledge that, for the CDBG-DR funds awarded by HUD to New Jersey to be properly and lawfully utilized, strict compliance was required with respect to all federal laws and regulations relating to lead hazards – for paint, dust and soil.

98.     Mr. Wasserman became aware of ICF's scheme to knowingly defraud the United States government by setting out in the Summer of 2015 to discover more directly why very few if any contracts for the legally required lead hazard risk assessments and/or lead abatement services were being negotiated and/or executed in New Jersey during the more-than-two full years at that point that had followed the onslaught of Sandy and the initial distribution of $1.8 billion in CDBG-DR funds.

99.     For instance, Mr. Wasserman spoke repeatedly to one Kevin Roddy ("Mr. Roddy"), who was a manager with ICF and was familiar with HUD's Office of Lead Hazard Control and Healthy Homes ("OLHCHH").

100.    On or about September 16, 2015, Mr. Wasserman attended a "Town Hall RREM Hurricane Sandy Open Discussion Forum," at the Brigantine Community Center in Brigantine, New Jersey. Mr. Roddy was also present.

101.    On that occasion, after the formal presentation was completed, Mr. Wasserman spoke  privately with Mr. Roddy, who he had learned was a top-level executive with ICF assigned the duty of approving restoration contracts under New Jersey's DCA-RREM program, which had been designated by Governor Christie as the State's agency responsible for ensuring that the CDBG-DR funds were properly and lawfully spent, at least with respect to housing.

102.    When Mr. Wasserman asked Mr. Roddy whether any lead abatement services had been performed in connection with the restoration contracts already approved by ICF and completed by the assigned contractors, Mr. Roddy told him that, in many instances, such services were in fact not performed.

103.    When Mr. Wasserman further inquired how ICF planned to ensure that such services were going to be performed as required by law, particularly in light of the fact that such services could be performed only *before* completion of the actual restorations already completed by the assigned contractors, Mr. Roddy stated that ICF had devised a suitable "workaround."

104.    In trying to clarify what he meant, Mr. Roddy further explained to Mr. Wasserman that, if homeowners approved for federal funding through RREM Program could not provide proof of their hiring of a firm or individual certified for lead abatement and/or a lead abatement permit issued for the project, the homeowners, as a mandatory condition of their receipt of the release of their federal funds, were going to be forced to sign a document stating that they had performed the lead abatement themselves. Mr. Roddy indicated that each such homeowner would be incentivized

to sign the document because such homeowner would not receive the balance of rehabilitation funds approved for them unless and until he or she signed the document.

105.     Finally, Mr. Roddy admitted to Mr. Wasserman that such signatures would be compelled from homeowners on the appropriate forms even though it was undeniable – even admitted by Mr. Roddy himself – that such lead abatement had in "most instances" not actually been completed.

106.     In this last instance, Mr. Roddy and his company, ICF and the co-Defendants, effectively committed multiple FCA violations, in not only failing to ensure that all lead abatements were performed as required but also in not affirmatively reporting this violation to government officials in New Jersey and/or HUD – which had originally doled out the CDBG-DR funds – and in not returning all funds to the Government that were expressly given on the condition of compliance. The Federal Acquisition Regulations explicitly require contractors of grantees of federal disaster-relief funds to report all known FCA violations: "The Contractor shall timely disclose, in writing, to the agency Office of the Inspector General (OIG), with a copy to the Contracting Officer, whenever, in connection with the award, performance, or closeout of this contract or any subcontract thereunder, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed . . . [a] violation of the civil False Claims Act (31 U.S.C. 3729-3733)." FAR § 52.203-13(b)(3)(i)(B)

107.     On personal knowledge, information and belief, homeowners finding themselves in this predicament foisted upon them by ICF and its co-Defendants have been told that all remaining monies owed to them by or through the RREM Program would not be paid unless they either documented the performance of the legally required lead abatement or would sign the proposed form alleging their having opted to conduct "do-it-yourself" lead abatement. Furthermore, ICF's personnel were charged not only with the responsibility of developing the form itself but also with the task of ensuring that all homeowners who took advantage of the RREM

Program complied by providing either proof of certified lead abatement or their signatures on the proposed form, which, once developed, was dubbed the "Lead Abatement Applicant Liability Acceptance" form (which is sometimes described as the "LHAS" form).

108.    In addition to the drafting and distribution of the LHAS form, a "flow chart" was circulated, upon information and belief  at the direction of CB&I personnel, explaining how to handle the processing of properties in the RREM Program that did not have proper lead abatement performed, which flow chart instructed that, if certified lead abatement did not occur as required, then the LHAS form needed to be executed by the respective homeowner(s). Accordingly, the legal responsibility and assumption of liability for the State's and ICF's failure to fulfill the federal requirements for accessing and using CDBG-DR funds were unfairly inflicted upon the uninformed, financially strapped and/or ethically compromised homeowners who were simply seeking to receive their final payment form the RREM Program.

109.    This "workaround" – which was devised by ICF, and about which Mr. Roddy, the company's chief administrator assigned to the RREM Program, spoke to Mr. Wasserman – thus constituted the creation of a fallacy fraught form, the compulsory employment and execution of which required property owners in New Jersey whose properties had been restored using CDBG-DR funds without the required lead abatements having been performed to sign – essentially under penalty of perjury – a falsity in most cases, as demonstrated by the wording itself of the LHAS form

110.    Specifically, the LHAS form first warns as follows: "The RREM Program requires that a Lead Risk Assessment be undertaken of each residential housing unit constructed prior to 1978 to identify lead-based paint hazards. If lead-based paint hazards are identified as the result of this assessment, only contractors that are either certified in abatement [in cases where a lead

hazard is identified] or trained in lead-safe work practices [in cases where non-hazardous lead-based paint is identified] may engage in lead hazard reduction activities.  If a property owner undertakes lead hazard reduction activities on their own property, s/he is not required to be either certified or have undergone lead safe work practice training. If a property owner engages a contractor that is neither certified in abatement nor trained in lead-safe work practices for lead hazard reduction activities, s/he is required to accept all responsibility and liability associated with the construction work to remove lead hazards from the property."

111.    The LHAS form, which is not presented to most if not all  homeowners until after construction work has been completed, additionally requires the signing homeowners to initial and attest to each of the following statements: "I certify that active measures were taken to abate any lead hazards in my home while performing construction activities[;] I understand that I will **not** be reimbursed by the RREM Program for any costs incurred for removing lead hazards from my home as per RREM Program Policy[;] I accept all responsibility and liability associated with any work listed in my Scope of Work to abate lead hazards from my home[; and] I acknowledge and accept that, having completed lead hazard abatement activities in my home without the use of a certified lead abatement contractor or one trained in lead-safe work practices, I will not hold liable the State of New Jersey or any party associated with the RREM Program for any damages that derive from or relate to such as renovations, lead hazard abatement activities."

112.    Finally, the LHAS form includes the following oath: "We/I certify that the foregoing statements are true. We/I am aware that by knowingly and willingly making false or fraudulent statements we/I am subject to appropriate civil or criminal penalties allowed by law, including but not limited to, the DCA and/or State of New Jersey, bringing action to recover all or a portion of the amount of HUD funds received under this agreement. This information will be used to protect the Government's financial interest and to verify the accuracy of information

furnished and it may be released to appropriate Federal, State, and local agencies when relevant to any civil, criminal, or regulatory investigators, attorneys and/or prosecutors."

## Sample Documentation of Defendants' Noncompliance
## with Lead-Based Paint Legal and Regulatory Requirements

113.    Included among the recorded documents for many individually owned properties in New Jersey rehabilitated and restored in part with the CDBG-DR funds at issue here is a "Lead-Safe Housing Rule – Applicability Form" (hereinafter, "LSH Form"). This form is used to identify any properties subject to mandatory inspection for potential lead-based paint hazards – to be followed by mandatory lead abatement where any such hazards are found – on the basis of three conditions: (a) that the "Property is receiving Federal Funds;" (b) that the "Unit was built prior to 1978;" and (c) that the property is not subject to any one of eleven exemptions from lead-based paint regulations set out under 24 CFR § 35.115, for instance because the "property will not be used for human residential habitation," or an earlier "inspection performed to HUD standards found the property contained no lead-based paint and no lead hazards," or the "rehabilitation will not disturb any painted surface," or the "property has no bedrooms," or the "property is currently vacant and will remain vacant until demolition."

114.    For some properties identified through the LSH Form to be subject to lead-based paint regulations, the database also includes a "Lead Risk Assessment Report," which specifies the particular lead hazards present on a property (for instance, lead paint, lead dust and/or lead soil) and denotes whether a "Lead Clearance Report" will be eventually be required for that property. Rather importantly, each Lead Risk Assessment Report presents in Appendix D a "Questionnaire for a Lead Hazard Risk Assessment of an Individual Occupied Dwelling Unit . . . [t]o be completed by [the assigned] risk assessor via interview with owner-occupant or, if a rental unit, an adult resident . . .." Key inquiries on this questionnaire require the lead-hazard risk assessor to denote whether "any children under age 6 live in the home or visit frequently," if "yes, how

many," and what is the "Age . . . Blood lead level . . . [and] Month/year of blood level test" for each such child identified.

115.   Another form included for some properties in this database is a "Lead-Based Paint Evaluation Report," which specifically delineates the findings of a certified lead-hazard risk assessor's as to the subject property's "Summary of Test Results" as well as the presence and particular location of any "Lead Hazards, . . . Building Components With Lead-Based Paint, . . . Dust Lead Hazards, . . . [and/or] Soli Lead Hazards." In addition, this Evaluation Report sets out all the relevant "Regulatory Requirements, . . . Procedures & Methodology, . . . [and] Lead Hazard Control," including all "Abatement Options."

116.   This database also contains for some properties a completed LHAS Form, as described above in paragraphs 97 through 102, which again reflects the signed acceptance by the respective property owner of any liability stemming either from the owner's "self-abatement" of known lead hazards or from the owner's failure to ensure the otherwise proper abatement of any such lead hazards, necessarily performed by a contractor "certified in NJ lead abatement."

117.   Lastly, for some properties, there are found within this database a post-remediation or post-abatement "Lead-Based Paint Clearance" along with a related invoice charging for such a "Lead RREM Final Clearance," as well as representative invoices for "Lead Testing-NJ Sandy Testing" and/or for "Lead Paint Abatement." The inclusion, however, of all such documents for any single property – out of the thousands of properties contained within this database – is quite rare, less than a handful, once again reflecting the utter failure in most instances by the Defendants to ensure that all legal, regulatory and contractual requirements concerning lead-based paint hazards were properly met and fulfilled in the federally funded restoration and remediation of thousands of Sandy-damaged properties in New Jersey. Moreover, these documents are not

missing due to faulty recordkeeping; they are missing because the required lead testing and abatement was intentionally not performed by the Defendants in order to save money.

118.   For instance, the database does contain two properties (the house located at 1531 Central Morris Cain Place in Atlantic City and owned by Carol Kelly, as well as the home owned by her neighbor, Yulanda Weather, located at 1522 Central Morris Cain Place) whose paperwork does show that Lead-Based Paint Clearances were successfully obtained by the homeowners. Even so, it is unclear as to whether the lead abatements performed for these two properties were conducted by the homeowners themselves, by an ICF subcontractor or by some other licensed, lead-remediation specialist. Moreover, it is unclear whether either of those two properties were inspected post lead remediation to ensure that the lead had, in fact, been properly and safely remediated.

119.   In stark contrast, a sampling of the database reveals many properties whose paperwork reflects that each house in question, based upon a completed LSH Form, was subject to inspection for lead-based paint hazards because the property (a) was receiving federal funds, (b) was built prior to 1978 and (c) was not qualified for any of the 11 available regulatory exemptions.

120.   For instance, a sample of 14 properties (described below) in the database reflects that lead-based paint hazards were detected for each of these 14 properties. Yet, for all such sampled properties, the database does not contain any further indication of any performance of the requisite lead abatement by a certified lead-remediation specialist or a post lead remediation inspection. Even worse, for half (7) of the 14 sampled properties, the Lead Risk Assessment Report found in the database denotes in Appendix D the presence of one or more children under the age of six.

121.    More specifically, the paperwork contained – or not contained – in the database for these 14 properties, all located in Atlantic City (as described earlier, one of the locations in New Jersey most savagely devastated by Superstorm Sandy), demonstrates as follows. The LSH Form for each property indicates that all were required to undergo an inspection for lead hazards. The ensuing Lead Risk Assessment Report for each property specifies the presence of one or more such lead hazards. Yet, for one property, the house located at 1462 West Riverside Drive and owned by Michael Atkinson, the lack of any further related database entries reflects that the required lead abatement was never performed.

122.    For six other properties (namely, 307 Grammercy Place owned by Gary Warrington; 117 North Kingston Avenue owned by Marianne Kehner; 2916 Sunset Avenue owned by Dawn Belamarich; 18 South Florida Avenue owned by Wei Chen; 221 North California Avenue owned by Pinglei Ou; and 204 North Florida Avenue owned by Edith Burgos), the database contains a signed LHAS Form, again indicating that these homeowners accepted liability either for having performed the requisite lead abatements on their own – hardly a likely proposition – or for failing to ensure that such mandatory lead remediation was properly performed by a contractor licensed and certified to conduct such a specialized service.

123.    For the seven remaining houses of the sampled 14, the lack of any further related database entries reflects that the required lead abatement was never performed either by these homeowners on their own behalf or for them by a certified contractor. Moreover, and perhaps most worryingly, the database for these properties indicates that one or more children either resided in the home or frequently visited it; and were, therefore, subject to potential and highly dangerous lead poisoning. More specifically, at the time the respective Lead Risk Assessment Reports were completed, three children ages 3, 4, and 5 were present at 202 North Montpelier Avenue owned by Anjum Malik; three children ages 2, 4, and 5 were present at 515 North New York Avenue

owned by Shirley Brower; one child age 1 was present at 1428 North Ohio Avenue owned by George Irby; likewise, one child age 1 was present at 444 North New Jersey Avenue owned by Zaida Cordova; one child age 4 was present at 1516 North Arkansas Avenue owned by Ursula Martinez; one child age 3 was present at 107 North Columbia Avenue owned by Ziaur Rahman; and, lastly, one child also age 3 was present at 4509 Ventnor Avenue owned by Shamsul Huda. Accordingly, for these 14 sampled properties alone, 11 children were endangered by Defendants' unlawful failures to fulfill their contractual, legal and regulatory obligations to ensure that New Jersey's RREM Program was conducted in full compliance with binding lead-paint remedial procedures and abatements.

124. In sum, by and through all the forgoing positions, activities and events, ICF and its fellow Defendants perpetrated numerous False Claims that were in essence submitted for payment to the United States Government or its designee through the Defendants' repeated practice of approving usage of CDBG-DR funds for the restoration, rebuilding and refurbishment of real properties in New Jersey that should have included – and by law were required to include – certain services, namely lead hazard risk assessments and/or lead abatement services. ICF and its co-Defendants nevertheless continually and intentionally failed to ensure that such lead hazard risk assessments and/or lead abatement services were performed even though essentially billed to the Government, thereby defrauding the United States and United States taxpayers.

125. More specifically, the critical duty to avoid lead poisoning of the citizenry; the specific and explicit legal and regulatory provisions requiring the performance of lead-based paint hazard assessments and lead abatements, where applicable, when managing and disbursing federal, disaster-relief funds; the Defendants' mandatory compliance with such legal and regulatory lead-based paint requirements; and the Defendants' express acknowledgements of and agreements to comply with those requirements when managing and disbursing the CDBG-DR monies at issue in

this matter rendered such duties and compliance by the Defendants to be material obligations on their part in fulfilling the contracts they made with and/or through HUD and the State of New Jersey. Moreover, given the Government's explicit requirements of lead-paint regulatory compliance, based upon the significant dangers posed by potential lead-paint poisoning to the citizenry of New Jersey, in particular children under the age of six, who were all trying to recover from the devastation, havoc and suffering already caused by Superstorm Sandy's historic damage to life, limb and property, it is undoubted that payment would not have been made had officials either at HUD or in New Jersey been aware or advised of the Defendants' material noncompliance, fraud and attempted cover up.

126.    Accordingly, the Defendants' repeated failures to properly comply with all such legal and regulatory requirements while managing and disbursing the Superstorm Sandy HUD grants at issue here constitute multiple violations of the False Claim Act and the New Jersey False Claims Act.

## STATEMENT OF CLAIMS

### COUNT I
False Claims Act Violations, 31 U.S.C. §3729(a)(1)(A)
(Presenting False Claims)

127.    Relator hereby incorporates and re-alleges herein all of the previous paragraphs as if fully set forth herein.

128.    Defendants knowingly (as that term is defined in 31 U.S.C. § 3729 (b)(1)) presented or caused to be presented false or fraudulent claims for payment or approval to an officer, employee or agent of the United States, within the meaning of 31 U.S.C. §3729(a)(1)(A), which claims were paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(l)(A).

**129.** Defendants' conduct was a substantial factor in causing damages in an amount subject to proof. The United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT II
False Claims Act Violations, 31 U.S.C. §3729(a)(1)(B)
(Making or Using False Records or Statements Material to
Payment or Approval of False Claims)

130. Relator hereby incorporates and re-alleges herein all of the previous paragraphs as if fully set forth herein.

131. Defendants knowingly (as that term is defined in 31 U.S.C. § 3729 (b)(1)) made, used or caused to be made or used false records or statements material to false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(l)(B).

132. The false records or statements made by Defendants constituted a substantial factor in causing damages in an amount subject to proof. The United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT III
False Claims Act Violations, 31 U.S.C. §3729(a)(1)(C)
(Conspiracy to Commit Violations)

133. Relator hereby incorporates and re-alleges herein all of the previous paragraphs as if fully set forth herein.

134. Defendants knowingly (as that term is defined in 31 U.S.C. § 3729 (b)(1)), conspired to commit substantive violations of the False Claims Act, including but not limited to sub paragraphs (A), (B), and (G) of 31 U.S.C. § 3729.

135. Defendants conspired to: (1) knowingly present false records and statements to the U.S. Government, and (2) knowingly make, use and/or cause to be made or used false records and statements to be submitted to the U.S. Government.

136.    Defendants' conduct violated 31 U.S.C. §3729(a)(1)(C) and was a substantial factor in causing damages in an amount subject to proof.

## COUNT IV
False Claims Act Violations, 31 U.S.C. §3729(a)(1)(G)
(Retention of Proceeds to Which Not Entitled)

137.    Relator hereby incorporates and re-alleges herein the all of the previous paragraphs as if fully set forth herein.

138.    Defendants knowingly (as that term is defined in 31 U.S.C. § 3729 (b)(1)) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

139.    Defendants' conduct violated 31 U.S.C. §3729(a)(1)(G) and was a substantial factor in causing damages in an amount subject to proof.

## COUNT V
New Jersey False Claims Act Violations, N.J. Stat. § 2A:32C-1 *et seq.*

140.    Relator hereby incorporates and re-alleges herein the all of the previous paragraphs as if fully set forth herein.

141.    This is a *qui tam* action brought by Relator on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.*

142.    N.J. Stat. § 2A:32C-3 provides, in part, liability for any person who:

a. Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b. Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

> c. Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State; ... or

> g. Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

143.    Defendants furthermore violated New Jersey law, including N.J. Stat. § 2A:32C-1 et seq. by: (a) knowingly causing thousands of false claims to be made, used and presented to the State; (b) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (c) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; and (d) concealing the fraud.

144.    The State of New Jersey, using monies provided by the federal government through HUD, and by and through various state agencies, including the DCA and RREM Program, paid numerous claims for such monies caused to be submitted by Defendants in connection with their responsibilities for the management and disbursement of certain CDBG-DR funds – a result intended by the Defendants.

145.    In order to validly receive and disburse such funds, the Defendants were required – yet failed to – to comply with the applicable lead-paint laws and regulations at both the federal and state levels, cited herein.

146.    Numerous claims submitted to the RREM Program in connection with the Defendants' management of that program therefore violated federal and state laws and regulations and should not have been paid. Moreover, each such claim included an express and/or implied certification of compliance with federal and State law, regulations and contracts. Each such certification was false because federal monies, specifically CDBG-DR funds, were being utilized and spent despite the fact that mandatory lead-paint hazards had knowingly, purposefully and fraudulently not been satisfied despite such compliance being a necessary condition precedent to the valid and lawful payment of any such claim.

147.    Knowingly submitting or causing the submission of claims for reimbursement of housing restoration or rehabilitation through the RREM Program when such restoration or rehabilitation did not include any mandatory lead-paint hazard abatement creates liability under

the NJFCA. Thus, these claims to the State of New Jersey for reimbursement through CDBG-DR funds caused to be submitted by Defendants constitute violations of the NJFCA.

148.   Each false claim submitted for payment or approval or caused to be submitted for payment or approval by the Defendants, as well as each false record or statement made, used or caused to be made or used to get a claim paid by the Defendants constitutes a separate violation under the NJFCA, N.J. Stat. § 2A:32C-1 *et seq.*

149.   The State of New Jersey was unaware of this fraud, its scope and effect, and could not have uncovered the Defendants' scheme absent this disclosure by the Relator.

150.   Had the State of New Jersey known that Defendant was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded CDBG-DR funds or were premised on false and/or misleading information, it would not have paid the claims submitted by the Defendants.

151.   As a result of the Defendants' violations of federal and New Jersey law, the State has been damaged in an amount subject to proof.

152.   Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.J. Stat. § 2A:32C-1 *et seq.* on behalf of himself and the State of New Jersey.

153.   This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claims, and merely asserts separate damage to the State of New Jersey in the receipt, management and disbursement of the CDBG-DR funds provided by HUD.

## COUNT VI
Unjust Enrichment/Constructive Trust/Money Had and Received
(All Defendants)

154.   Relator hereby incorporates and re-alleges herein the previous paragraphs as if fully set forth herein.

155.    The Defendants' collectively and individually benefitted from ICF's and/or their own overbilling of the United States Government.

156.    The Defendants' acceptance of monies that were "earned" through the fraudulent and unlawful activity alleged herein, make it inequitable for the Defendants to retain those funds or the benefit thereof, without the repayment of the unlawful amounts back to the United States Government.

157.    The United States claims the recovery of all monies by which the Defendants have been unjustly enriched because of the unlawful conduct alleged herein.

158.    The Defendants were unjustly enriched, and are liable to account and pay such amounts, which are to be determined at trial, to the United States.

159.    By this claim, the United States requests a full accounting of all revenues and costs incurred by Defendants, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

## PRAYER

WHEREFORE, the Relator, on behalf of itself, the State of New Jersey and the United States Government, prays for judgment in its favor and against the Defendants, jointly and severally, and prays:

(a) That this Court adjudge and decree that the Defendants have violated the False Claims Act and the New Jersey False Claims Act;

(b) That this Court enjoin the Defendants from further violation of the False Claims Act and the New Jersey False Claims Act in the manner described by this Complaint;

(c) That, on Counts I through IV under the False Claims Act, this Court enter judgment against the Defendants, jointly and severally, in the amount equal to three (3) times the amount of damages the United States has sustained because of Defendants' action, plus a civil

penalty of up to $21,916, s adjusted by the Federal Civil Penalties Inflation Adjustment Act of

1990 (28 U.S.C. § 2461) for each false statement made to the United States government;

(d) That, on Count V under the New Jersey False Claims Act, this Court enter

judgment against the Defendants, jointly and severally, and award damages as follows:

To the State of New Jersey:

(1) Three times the amount of actual damages which the State of New Jersey has sustained as a result of the Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which the Defendants caused to be presented to the State of New Jersey;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to N.J. Stat. § 2A:32C-1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) That Relator be awarded the maximum amount allowed as a Relator's Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable; and

(e) That, on Count VI for Unjust Enrichment, this Court enter judgment against

the Defendants for the damages sustained and/or amounts by which the Defendants retained

illegally obtained monies, plus interest, costs, and expenses, and such further relief as may be

just and proper.

(f) That this Court award the Relator all costs and expenses incurred, and

reasonable attorneys' fees;

(g) That in the event the United States Government intervenes in this Action, the

Relator be awarded an amount for bringing this action of 25%, but in no event less than

15%, of the proceeds of the resulting judgment or settlement of this civil action;

(h) That in the event the United States Government does not intervene in this

action, the Relator be awarded 30%, but in no event less than 25%, of the proceeds of

the resulting judgment or settlement of this civil action; and

(i) That the United States Government and the Relator receive all relief,

both at law and at equity, to which they may reasonably appear entitled.

## JURY DEMAND

Under Rule 38 of the Federal Rules of Civil Procedure, Relator demands a jury trial for all

issues that can be triable by the jury.

Respectfully submitted,

/s/ James R. Zazzali
James R. Zazzali, Esq.
Bar No 216641963
jzazzali@zazzali-law.com
Robert A. Fagella, Esq.
Bar No. 01877197
rfagella@zazzali-law.com
Zazzali, Fagella, Nowak, Kleinbaum & Friedman
570 Broad Street, Suite 1402
Newark, New Jersey 07102
Telephone: 973.623.1822
Facsimile: 973 623.2209

John J. Beins, Esq.
JBeins@beinsgoldberg.com
(*pro hac vice* admission pending)
Seth D. Goldberg, Esq.
(*pro hac vice* admission pending)
sethg@beinsgoldberg.com
Beins Goldberg LLP
2 Wisconsin Circle, Suite 700
Chevy Chase, MD 20815
(240) 235-5040
(240) 235-5038 (f)

Veronica Nannis, Esq.
vnannis@jgllaw.com
(*pro hac vice* admission pending)
Jay P. Holland, Esq.
jholland@jgllaw.com
(*pro hac vice* admission pending)
Joseph Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
(301) 220-2200

*Attorneys for Relator Lee Wasserman*