Robert A. Fagella, Esq.
Bar No. 01877197
rfagella@zazzali-law.com
James R. Zazzali, Esq.
Bar No 216641963
jzazzali@zazzali-law.com
Zazzali, PC
570 Broad Street, Suite 1402
Newark, New Jersey  07102
Telephone:  973.623.1822

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| and | ) | |
| STATE OF NEW JERSEY | ) | |
| Ex rel. LEE WASSERMAN | ) | |
| 181 Rt 46 | ) | |
| Mine Hill, New Jersey 07803 | ) | |
| | ) | |
| Plaintiffs/Relator | ) | Civil Action No. 18-10330 (ES) (MAH) |
| | ) | JURY TRIAL DEMAND |
| v. | ) | |
| | ) | |
| ICF INTERNATIONAL, INC. | ) | |
| Individually and t/a its wholly owned subsidiary, | ) | |
| ICF Incorporated L.L.C. | ) | |
| 1902 Reston Metro Plaza | ) | |
| Reston, VA 20190 | ) | |
| | ) | |
| ICF INCORPORATED L.L.C | ) | |
| 1902 Reston Metro Plaza | ) | |
| Reston, VA 20190 | ) | |
| | ) | |
| GILBANE, INC. | ) | |
| Individually and t/a as its wholly owned subsidiary | ) | |
| Gilbane Building Company | ) | |
| 7 Jackson Walkway | ) | |
| Providence, RI 02903 | ) | |
| | ) | |
| GILBANE BUILDING COMPANY | ) | |
| 7 Jackson Walkway | ) | |
| Providence, RI 02903 | ) | |
| | ) | |
| APTIM ENVIRONMENTAL & | ) | |
| INFRASTRUCTURE, LLC | ) | |
| F/K/A  APTIM ENVIRONMENTAL & | ) | |

INFRASTRUCTURE, INC.                              )
F/K/A CB&I ENVIRONMENTAL &                        )
   INFRASTRUCTURE INC. a/k/a CBI                  )
F/K/A SHAW ENVIRONMENTAL, INC.                    )
1200 Brickyard Lane, Suite 202                    )
Baton Rouge, LA 70802                             )
                                                  )
APTIM CORP.                                       )
F/K/A CSVC ACQUISTION CORP.                       )
1200 Brickyard Lane,  Suite 202,                  )
Baton Rouge, Louisianna 70802                     )
                                                  )
APTIM GOVERNMENT SOLUTIONS, LLC                   )
F/K/A CB&I GOVERNMENT                             )
   SOLUTIONS, LLC                                 )
F/K/A CB&I GOVERNMENT                             )
   SOLUTIONS, INC.                                )
F/K/A SHAW ENVIRONMENTAL &                        )
   INFRASTRUCTURE, INC.                           )
1200 Brickyard Lane, Suite 202,                   )
Baton Rouge, LA 70802                             )
                                                  )
                 Defendants.                      )
_____  )

## AMENDED COMPLAINT

The United States of America and the State of New Jersey, by and through *qui tam* Relator,

LEE WASSERMAN ("Relator" or "Mr. Wasserman") bring this action under 31 U.S.C. §§ 3729-

32 (the "False Claims Act" or "FCA"), as well as N.J. Stat. Ann. §§ 2A:32C-1-32C-18 (the "New

Jersey False Claims Act" or "NJFCA"), to recover from defendants, multiple United States

government contractors and their parent corporations/successors in interest, specifically ICF

INTERNATIONAL INC.. and its wholly owned subsidiary, ICF INCORPORATED,  L.L.C.

(collectively "ICF"), GILBANE INC.. and its wholly owned subsidiary GILBANE BUILDING

COMPANY ("Gilbane"), APTIM  CORP  and  its  subsidiaries  APTIM  GOVERNMENT

SOLUTIONS, LLC and APTIM ENVIRONMENTAL & INFRASTRUCTURE, LLC and the

various  Aptim  entities    f/k/a  or  t/a  CB&I  and/or  Shaw  (collectively  "CB&I/Shaw"),  –  all

defendants collectively referred to hereinafter as "Defendants" – all damages, penalties and other

remedies available either to the United States and Lee Wasserman under the False Claims Act or to the State of New Jersey and Lee Wasserman under the New Jersey False Claims Act; and state as follows:

## PRELIMINARY STATEMENT

1.      This is a civil fraud action brought by *qui tam* Relator, Lee Wasserman by and on behalf of the United States of America (the "United States") and the State of New Jersey ("New Jersey") (or collectively, the "Government") against Defendants under the False Claims Act, 31 U.S.C. § 3729 *et seq*., and the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.*, to recover damages sustained by, and penalties owed to, the United States and/or New Jersey as the result of multiple illegal actions committed by the Defendants in having knowingly concealed, and knowingly and improperly charged the Government for, work that was improperly, unsatisfactorily and illegally performed, or not performed at all, in connection with the rehabilitation and restoration of properties in the State of New Jersey that had been damaged in October 2012 by Superstorm Sandy, insofar as such work fraudulently ignored and obviated certain requirements that were known, acknowledged and agreed to by the Defendants, that were expressly required under law and that were set out in the awarding and issuance by the U.S. Department of Housing and Urban Development ("HUD") of certain Community Development Block Grants for Disaster Recovery ("CDBG-DR"), with the result that all Defendants were unjustly enriched. All such requirements directly arose from controlling statutory and regulatory obligations as well as explicit contractual duties agreed to by Defendants; and Defendants' separate and collective failures to meet, satisfy and/or comply with such obligations and duties each and all constituted violations of both the federal FCA and the NJFCA.

2.      Moreover, each of the Defendants (a) had actual or constructive knowledge of the impropriety, unsatisfactoriness and illegality of the work done for – and of the related charges and

false claims made to or caused to be submitted to – the Government; (b) benefited from such wrongful conduct; and (c) nevertheless failed to reimburse or inform the United States and/or New Jersey for or about the illicit amounts that Defendants had charged to and received from the Government.

3.      In 2014, the Relator was the President of LEW Corporation which is a licensed contractor in the State of New Jersey certified to perform lead hazard risk assessments and lead abatement services in connection with the repair, rehabilitation and/or restoration of improved real properties in New Jersey. Relator has personal knowledge of the facts contained herein by virtue of its work with the Defendants. The Relator did not derive from "public disclosures" (as that term is defined in the False Claims Act) any of the allegations of wrongdoing set out in the paragraphs that follow.  Furthermore, the Relator is an "original source" (as that term is defined in 31 U.S.C. §3730(e)(4)) of the information on which the allegations contained herein are based.

4.      Before filing this suit, Relator pre-disclosed the core facts and claims contained herein to the United States Attorney for the District of New Jersey on May 24, 2018.

5.      Relator made a similar pre-disclosure to the Attorney General of New Jersey on June 5, 2018.

## **PARTIES**

6.      Relator, Mr. Wasserman, is a nationally recognized environmental industry leader with over 30 years of expertise in property-oriented environmental issues.  He was the founding CEO and President of LEW Corporation, which was established in 1991. During his decades of environmental experience, Mr. Wasserman has performed municipal, commercial and residential inspections, monitored projects and conducted risk management assessments, created management

and abatement programs and Operation and Management (O&M) plans, conducted industry training, and completed all types of remediation, including extensive lead remediation work.

7.    Relator has worked on thousands of multi-family housing units, private residential homes, schools, houses of worship, daycare facilities, military sites, industrial and commercial facilities, universities and healthcare entities, and has successfully completed assignments for HUD, the U.S. Environmental Protection Agency ("EPA"), and numerous housing authorities.

8.    He was a member of the HUD Task Force committee for "EFFECTIVE AND TIMELY IMPLEMENTATION OF SECTION 1012/1013 OF TITLE X" (the regulations governing lead safety in federally assisted housing). He is currently recognized by HUD to be one of several national examiners of The HUD Guidelines (May 2012 ver.). As a nationally selected HUD trainer, Mr. Wasserman was one of the first to train the federally required LSWP (Lead Safety Work Practices) & RRP (Renovation, Repair and Painting) rules. LEW Corporation has trained tens of thousands of participants in multiple environmental regulatory requirements and disciplines.

9.    In his capacity as President of Lew Corporation, Mr. Wasserman had, and continues to have, personal knowledge of and access to certain non-public information, including the WorlTrac database (more fully described later), that led him to conclude that ICF and the other Defendants were misspending certain federally-distributed, disaster-relief funds in knowing violation of the law.

10.    Defendant, ICF Incorporated L.L.C., also doing business as ICF Incorporated, ICF, Inc., and ICF Consulting, is a Delaware Limited Liability Company with a principal business address of 9300 Lee Highway, Fairfax, VA 2203. ICF Incorporated L.L.C is a 100% wholly owned subsidiary of publicly traded Defendant, ICF International Inc.

11.     At all times during its involvement in the New Jersey Superstorm Sandy RREM program, ICF Incorporated L.L.C. ("ICF LLC") was the alter ego of  its parent corporation, ICF International, Inc.  ("ICF International") in that ICF LLC was entirely under the management and control of the board, officers, members, managers and employees of ICF International. For instance, ICF LLC's initial May 17, 2013 best and final offer on the New Jersey Superstorm Sandy RREM program was made on ICF International's letterhead and signed by an ICF International Vice President using ICF International's address, phone number, website and email addresses. Moreover, ICF, LLC's acceptance of New Jersey's initial May 2013 terms was signed by "Robert F. Toth", the then "Senior Vice President" of ICF International.  The "manager" listed on ICF LLC's New Jersey foreign Business registration was and at all times, has been ICF International's COO, John Wasson.  At all times, ICF International manifested an intent to assume responsibility for ICF LLC's negotiation and performance of ICF LLC's involvement in the Superstorm Sandy RREM program.  At all times, ICF International has reported the revenue and expenses for ICF LLC on a consolidated 10K.  In sum, ICF LLC was a legal fiction that existed at all times only through and under the total control of ICF International, its board, officers, members, managers, and employees of ICF International.

12.     Thus, ICF International and ICF LLC will hereinafter be referenced jointly  as "ICF".

13.     Since 2006, ICF has been an international company that, according to its publicly accessible website, specializes in the provision of various "service offerings" to governments and governmental organizations ranging from "advisory services to execution, implementation, and improvement." The firm, a publicly traded company listed on the NASDAQ market under the symbol "ICFI," further states on its website, "With more than 40 years of consulting experience, ICF is a global, diversified firm that combines the entrepreneurship and dynamism of a new

company with a solid reputation and expertise in the consulting industry—offering solutions that help clients worldwide solve their biggest challenges to achieve their most formidable goals."

14.     More specifically, for purposes of the present matter, ICF is a United States government contractor that has provided – and continues to provide – disaster relief management services, including the management and disbursement of large-scale, disaster relief funds received into state government coffers in the form of block grants provided by the federal government. This civil fraud action concerns ICF's illicit, intentional and fraudulent management and disbursement of such types of monies received by the State of New Jersey from the United States government.

15.     The other Defendants are also United States government contractors, working in concert with ICF, that likewise mismanaged and intentionally, improperly disbursed large-scale, federal disaster relief funds deposited into state and/or city government treasuries. More specifically, these Defendants managed and disbursed in illicit and fraudulent fashion such monies provided by the United States to the State of New Jersey.

16.     Defendant, Gilbane Inc., is a privately held company with a principal business address of 7 Jackson Walkway, Providence, RI 02903. At all times during Gilbane's involvement in the New Jersey Superstorm Sandy RREM program, Gilbane Inc. is a family owned and managed business and is the controlling parent and alter ego of its wholly owned subsidiary Defendant Gilbane Building Company (collectively "Gilbane"). For instance, Defendant Gilbane Defendant Gilbane Building Company and Gilbane Inc each utilize in commerce the tradename "Gilbane" including but not limited to in connection with its best and final offer made to the State of New Jersey.  Defendants Gilbane Inc and Gilbane Building Company each utilize in commerce the same website https://www.gilbaneco.com. Defendants Gilbane Inc and Gilbane Building Company each have the same principal business address in

Rhode Island. Defendants Gilbane Inc and Gilbane Building Company are each governed and controlled by the same board of directors. Gilbane Building Company is entirely under control and direction of the Gilbane Inc. Board of Directors. Further and upon information and belief Gilbane Inc. and Gilbane Building Company are each insured under common policies of insurance including in connection with the performance of its obligations for the Superstorm Sandy RREM program.

17.    The Defendants other than ICF and Gilbane will be collectively referred to as CB&I/Shaw. The individual corporate profiles and relevant history of the CB&I/Shaw defendants are provided in the paragraphs that immediately follow. Nevertheless, for the purpose of simplifying this Amended Complaint and making the facts more easily understood, it is both helpful and worth noting that the State of New Jersey itself, in its own documentation of its efforts made and programs designed to help the State's citizens recover from the terrible damage wrought by Superstorm Sandy, consistently refers to these three entities (ICF, Gilbane and CB&I/Shaw) as the principal entities contracted to manage, oversee and/or assist with the expenditure of the federal and State monies comprised by the CDBG-DR funds awarded by HUD, monies that were falsely and fraudulently claimed upon by Defendants. Accordingly, this Amended Complaint centers its allegations essentially on three defendants: ICF, Gilbane and CB&I/Shaw.

18.    On or about May 9, 2013, "Shaw Environmental, Inc. a CBI company" bid on the New Jersey solicitation to provide RREM services to New Jersey for the Superstorm Sandy CDBG Rehab project.

19.    On May 22, 2013, New Jersey accepted Shaw Environmental, Inc.'s bid but entered into a contract with "Shaw Environmental and Infrastructure, Inc." to provide the RREM services upon which Shaw Environmental, Inc. had previously bid.

20.     Defendant, Chicago Bridge & Iron Company, N.V. ("CB&I"), stated in a contract dated October 9, 2013, "The Shaw Group Inc. was purchased by CB&I on February 12, 2013. At this time, we are continuing to operate under the Shaw legal entities. (i.e., The Shaw Group, Stone & Webster, Shaw Environmental, Inc., Shaw E&I etc.) Please continue to invoice us. with the Shaw entity in which your purchase order was issued under. The Shaw legal entities should NOT be removed or changed from your invoices and/or statements." Earlier, in a letter dated May 9, 2013, CB&I had likewise informed the State of New Jersey, "In February 2013, CB&I acquired The Shaw Group, Inc. [resulting in] a combined global work force of approximately 50,000 employees."

21.     Both "Shaw Environmental, Inc." and "Shaw Environmental and Infrastructure, Inc." were wholly owned subsidiaries of the Shaw Group, Inc on February 12, 2013.

22.     Following the sale of the Shaw Group, Inc to CB&I, Shaw Environmental, Inc. changed its name to "CB&I Environmental & Infrastructure Inc." but continued to trade as "Shaw Environmental, Inc." and/or "CBI/Shaw".

23.     Following the sale of the Shaw Group, Inc to CB&I, Shaw Environmental and Infrastructure, Inc. changed its name to "CB&I Government Solutions, LLC" but also continued to trade as "CBI/Shaw".

24.     In 2017, CB&I sold its Capital Services business unit - which included "CB&I Environmental & Infrastructure Inc." and "CB&I Government Solutions, LLC" to private equity firm, Veritas Capital Fund Management, LLC, a Delaware limited liability company and its affiliates including CSVC Acquisition Corp. for approximately 755 million dollars.

25.     Following its 2017 purchase of CB&I business units, Veritas rebranded the CB&I units under the "Aptim" umbrella.  In doing so, Veritas created Defendant, Aptim Corp as

successor to CSVC Acquisition Corp and as parent corporation to new entities: Defendant, "Aptim Environmental and Infrastructure, LLC", successor to Shaw Environmental, Inc. and Defendant, "Aptim Government Solutions, LLC.", successor to Shaw Environmental and Infrastructure, Inc."

26.    At all times since May of 2013, "Aptim Environmental and Infrastructure, LLC" and its predecessor CB&I entity retained the federal tax id number for "Shaw Environmental, Inc."

27.    At all times since May of 2013, "Aptim Government Solutions, LLC." and its predecessor CB&I entity, retained the federal tax id number for "Shaw Environmental and Infrastructure, Inc."

28.    Defendant, APTIM Corp., is a Delaware corporation and is the direct or indirect owner and parent company Defendant Aptim Environmental & Infrastructure, LLC successor in interest to and f/k/a Aptim Environmental & Infrastructure, Inc., and Defendant, Aptim Government Solutions, LLC (hereinafter collectively "APTIM"). APTIM has a principal address of 1200 Brickyard Lane, Suite 202, Baton Rouge, LA 70802; APTIM's subsidiaries also have a principal address of 1200 Brickyard Lane, Suite 202, Baton Rouge, LA 70802   Further, Aptim operates a common website for Aptim Corp and its subsidiaries  https://www.aptim.com. At all times relevant hereto, APTIM Corp. has possessed a high degree of control over the actions and inactions of its wholly owned subsidiaries, so as to constitute a single business enterprise for purposes of the wrongdoing alleged herein.

29.    Following Superstorm Sandy, HUD provided the State of New Jersey with large-scale, federal disaster relief funds in the form of CDBG-DR block grants sent by the United States Treasury to the New Jersey state treasury. Officials in New Jersey proceeded to outsource the management and disbursement of such federal monies to the Defendants who then fraudulently flouted and contravened their explicit statutory obligations, regulatory requirements and contractual duties to ensure that all such funds provided by the United States were utilized and

spent in wholly legal and non-fraudulent ways, particularly by certifying that all detected lead-paint hazards in Sandy-damaged, New Jersey homes were mitigated, abated or removed through the restoration of such homes using the CDBG-Dr funds – despite the fact that the Defendants knew such certification to be false.

30.    In sum, lead-based paint hazards were in fact detected on the premises of thousands of properties in New Jersey, New York and other states that had been damaged by Superstorm Sandy and for whose restoration federal funding had been granted ("Sandy rehabilitation funds"). In New Jersey, the utilization and disbursement of Sandy rehabilitation funds were to be directly overseen and managed by Defendants pursuant to certain bid contracts and other agreements awarded to them by the State of New Jersey in executing its "Action Plan" pursuant to which HUD had granted the federal CDBG-DR funds and, in such granting, had explicitly required compliance with federal lead paint laws and regulations.

31.    Nevertheless, inadequate – or, in myriad instances, no – lead abatement services were performed by certified lead abatement professionals, as stipulated by applicable legal obligations, regulatory requirements and Defendants' contractual duties to New Jersey and/or HUD through the Action Plan and under those same concomitant contracts and agreements that were bid by and awarded to each Defendant. Nor were mandatory lead dust-wipe clearances conducted, again by the requisite licensed and approved lead remediation contractors, prior to allowing general home-improvement contractors onto the premises to complete the restoration, rebuilding and rehabilitation of such Sandy-damaged properties.

32.    Furthermore, having recognized their fraudulent failures to properly remediate and abate these myriad known and still existing lead hazards, Defendants elevated their fraud to an even greater – indeed shocking – extent, by engaging in a purposeful, intentional and deceitful

cover-up of their fraud, and by fabricating a record trail in many instances meant to mislead any inquisitive government officials that lead abatements that had not been properly performed either supposedly were performed or, at least, the obligation and liability for such performance was accepted and "signed off" by the respective homeowners willingly and in advance.

33. Conversely, the management of Sandy relief funds in the State of New York and in New York City was controlled directly by the respective governments of each entity (rather than a private entity such as ICF). As part and parcel of that effort, the federally mandated lead remediation was identified as a required activity.

34. For instance, the New York City administered program was called "Build it Back".

http://www1.nyc.gov/site/cdbgdr/about/about.page.  Its website at the relevant time stated:

> **Why is the Damage Assessment Team testing for lead-based paint?**
> If your home was built prior to 1978, Federal regulations **require** that Build It Back identify lead-based paint hazards. Lead-based paint that is not flaking or chipping is generally not a hazard. However, lead-based paint may become a hazard if it starts to flake or chip and falls to the floor as dust or chips. **If Build It Back performs repairs on your home, lead-based paint hazards will be mitigated by licensed professionals.**
> http://www.nyc.gov/html/recovery/html/faq/faq.shtml#h6

35. CB&I/Shaw and AECOM/URS (contractual predecessors to CB&I/Shaw and Gilbane in New Jersey, as described *infra* at ¶74) were contractors for the NYC "Build it Back" program.  http://www1.nyc.gov/site/cdbgdr/documents/contracts.page

36. Similarly, the State of New York also had a self- managed program titled, "New York Rising", administered through the Governor's Office of Storm Recovery (GOSR).

https://stormrecovery.ny.gov/

37. On July 18, 2014, the New York Rising Recovery Program publicly issued a "lead warning" which stated:

> a. Housing built before 1978 may contain lead-based paint.
> b. Lead exposure is especially harmful to young children and pregnant women.

c. Lead from paint chips and dust can pose health hazards if not taken care of properly.

d. Homeowners need to be aware that lead-based paint may be found on any surfaces throughout a home both on the inside and outside.

e. Lead-based paint may be disturbed during rehabilitation, repair work and painting. These activities can create and release lead dust.

f. NY Rising Housing Recovery Programs require all painted surfaces to be disturbed or replaced during rehabilitation in homes built before 1978 to be tested for lead see 24 CFR 35.390 (a).

g. If lead is found it must be addressed following the U.S. Department of Housing and Urban Development Lead Safe Housing Rule (24 CFR Part 35). . .

h. NY Rising Housing Recovery Programs will pay for both the testing and the abatement.

i. Please note: All Lead Renovators must be certified by EPA or an EPA authorized state and all workers must have completed a HUD-approved course, or the crew must be supervised by a Renovator certified by EPA or an EPA authorized state who is also a Certified Lead Abatement Supervisor and untrained workers must receive on the job training from the Certified Renovator.

https://stormrecovery.ny.gov/sites/default/files/uploads/20140718_lead_mold_warning_st atement_-_v2.pdf

38.     In New Jersey, Defendants failed to follow the federally mandated lead inspection and remediation program as acknowledged and described, in part, in the NYC "Build it Back" and the New York State "New York Rising" Sandy relief programs. Defendants' collective and individual legal and contractual failures defrauded the Government and unnecessarily put at risk many, perhaps thousands of New Jersey citizens and residents – in particular young children most susceptible – to dangerous and ongoing lead-paint contamination. By repeatedly receiving in full the federal funds awarded directly to Defendants pursuant to their related oversight and management duties under their contracts with New Jersey, Defendants thereby made multiple false claims upon the federal treasury and received monies they should not have received or should have returned but did not.

## JURISDICTION AND VENUE

39.    This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C §§ 1331, 1337 and 1345, 31 U.S.C. § 3730 (a) and 31 U.S.C. § 3732(a) and (b), the last of which specifically confers jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730, as well as related actions for the recovery of funds under state law on behalf of the various states, including New Jersey.   More specifically, any action under § 3730 may be brought in any federal judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by § 3729 occurred. This court has supplemental jurisdiction over the common law cause of action under 28 U.S.C. § 1367(a)

40.    This court has personal jurisdiction over Defendants and venue lies in this District pursuant to 31 U.S.C. § 3732(a) and (b), traditional long arm principles, and 28 U.S.C. §§ 1391(b)(2) and (3) because defendants committed the acts and inactions alleged in this district, transacted business in this district from which the claims arise, contracted to perform and in fact, did perform the underlying  rehabilitation work in this district, and received payment for unlawful services provided in this district.

## STATUTORY BACKGROUND

### The False Claims Act

41.    The False Claims Act ("FCA") imposes civil liability to the United States on any person who, *inter alia*: (a) knowingly presents, or causes to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval; and (b) knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government, 31 U.S.C. §§ 3729(a)(l)(A) and (B); as well as (c) conspires to violate the FCA. *Id.* at§ 3729(a)(l)(C).

42.     The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United states Government provides or has provided any portion of the money or property requested or demanded." *Id.* at § 3729(b)(2). Defendants, in managing and/or assisting the expenditure of the CDBG-DR funds at issue here and in submitting for and receiving multiple (and in total multi-million dollar) payments for providing such services thereby made many a such claim upon federal funds awarded by HUD.

43.     The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* at § 3729(b)(1)(A). The FCA does not require proof of specific intent to defraud. *Id.* at § 3729(b)(l)(B). Defendants had actual knowledge of – or, in the least, acted in reckless disregard of – the falsity of the information provided, whether implicitly or explicitly, in both seeking and receiving payment for their services, which were required in part to ensure compliance with all federal and State lead-paint laws and regulations in rebuilding Sandy-affected residential properties in New Jersey with the CDBG-DR monies provided by HUD.

44.     The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at § 3729(b)(4). Ensuring compliance with all federal and State lead-paint laws and regulations was an explicit requirement of the HUD award. Indeed, New Jersey had to earmark such compliance in its "Action Plan" outlining its intended uses of HUD's CDBG-DR funding allocations. In addition,

the State incorporated the same requirement from the HUD Application and New Jersey's Action Plan into its various "Requests for Quote" from companies, including all the Defendants, to outline how they would manage, oversee and/or assist with New Jersey's recovery from Superstorm Sandy using the HUD award and how much of the CDBG-DR funds they would either directly remit to themselves or submit for payment to themselves in providing the management, oversight and/or assistance requested and (eventually) contracted.

45.    Any person who violates the FCA is liable for a mandatory civil penalty for each such claim, plus three times the damages sustained by the Government. *Id.* at§ 3729(a)(l).

## **The New Jersey False Claims Act**

46.    The New Jersey False Claims Act ("NJFCA"), which was enacted in 2008, substantially reflects the federal FCA and provides in pertinent part as follows:

> A person shall be jointly and severally liable to the State for a civil penalty of not less than and not more than the civil penalty allowed under the [New Jersey] False Claims Act . . . for each false or fraudulent claim, ***plus three times the amount of damages which the State sustains***, if the person commits any of the following acts:
>
> a.    Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval; [or]
>
> b.    Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State; [N.J. Stat. Ann. § 2A:32C-3; emphasis added]

47.    For purposes of the NJFCA, the terms "knowing" and "knowingly" mean that a person, with respect to information: "(1) has actual knowledge of the information; or (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of

the truth or falsity of the information. No proof of specific intent to defraud is required." [N.J. Stat. Ann. § 2A:32C-2]

48.     Again, similar to their violations of the federal FCA, Defendants both or either (a) knowingly presented to the State of New Jersey false or fraudulent claims for payment or approval by the State using the CDBG-DR funds provided by HUD; and/or (b) knowingly made, used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State using the same CDBG-DR funds. Moreover, Defendants had actual knowledge – or, in the least, acted in deliberate ignorance or reckless disregard – of the falsity of the information provided, whether implicitly or explicitly, in both seeking and receiving payment for their services, which were required in part to ensure compliance with all federal and State lead-paint laws and regulations in rebuilding Sandy-affected residential properties in New Jersey with the CDBG-DR monies provided by HUD.

49.     The "State" is defined in the NJFCA as "any of the principal departments in the Executive Branch of State government, and any division, board, bureau, office, commission or other instrumentality within or created by such department; and any independent State authority, commission, instrumentality or agency." [N.J. Stat. Ann. § 2A:32C-3]

50.     New Jersey's Department of Community Affairs is a Department of the Executive Branch of the State government for purposes of the NJFCA.

### FACTUAL BACKGROUND

### Superstorm Sandy, Her Aftermath and The Governmental Response

51.     On October 29, 2012, an historic hurricane that had already been nicknamed by weather forecasters "Superstorm Sandy" (or simply "Sandy") made landfall near Atlantic City,

New Jersey. The hurricane's storm surge, which measured 8.9 feet at its highpoint in Sandy Hook, inundated and severely affected regions of the State's shore from Cape May to Raritan Bay, including the barrier islands and many areas along the Hudson River. Other overland flooding, wind damage and an ensuing snowstorm further damaged these communities as well as multiple other locations throughout New Jersey. Given the extensive and unprecedented damage caused by Sandy to New Jersey's housing, business, infrastructure, health, social service and environmental sectors, then President Obama's disaster declaration on October 30, 2012 designated all 21 of the State's counties as "major disaster areas." In sum, Sandy had affected, in some way, virtually every household, business and community in New Jersey.

52.     In the immediate aftermath of the superstorm, New Jersey quickly embarked on the road to recovery. Along with government officials in local communities and the citizens of New Jersey themselves, the State undertook countless steps to revitalize and restore itself, its communities and its citizenry, in large part with the support of federal agency partners. More specifically, State officials committed themselves to implementing a thoughtful and comprehensive strategy that would expeditiously, efficiently, effectively and safely address the entirety of the State's long-term recovery, rebuilding and revitalization needs.

53.     To assist New Jersey's and other disaster-impacted states' recovery efforts, the United States Congress enacted the Disaster Relief Appropriations Act of 2013 (Public Law 113-2, approved January 29, 2013). This Act appropriated monies targeted for disaster recovery to various federal agencies. Among such monies, the federal government appropriated to HUD $16,000,000,000 in CDBG-DR funds to be split among States that experienced natural disasters which the President had declared to be "Major Disasters" and which had occurred in 2011, 2012 or 2013.

54.     These CDBG-DR funds were to be disbursed by HUD to various States and other governmental entities plagued by natural disasters, including Superstorm Sandy in particular, and were to be used to address unmet disaster recovery needs, *i.e.* funding needs not satisfied by other public, governmental or private funding sources or by private insurance. Pursuant to an evaluation conducted by HUD, the State of New Jersey was earmarked to receive a total of $5,400,000,000 in federal CDBG-DR funds to assist the State's recovery efforts in the aftermath of Sandy, which monies were to be administered by the State's Department of Community Affairs ("DCA").

55.     The Grant Application distributed by HUD to New Jersey had identified a number of requirements for grantees receiving CDBG-DR funds for utilization and disbursement by the State to enable recovery from Superstorm Sandy. For instance, the Application stated that:

> (a) "activities eligible under this Notice may be carried out, subject to State law, by the State through its employees, through procurement contracts, or through assistance provided under agreements with subrecipients or recipients. Notwithstanding this waiver, State grantees continue to be responsible for civil rights, labor standards, and environmental protection requirements contained in HCD Act and 24 CFR part 570, as well as ensuring such compliance by subgrantees;" and

> (b) "***The grantee certifies that its activities concerning lead-based paint will comply*** with the requirements of 24 CFR part 35, subparts A, B, J, K, and R" and, "***The grantee certifies that it will comply with all applicable laws***." (Emphases added)

56.     In submitting New Jersey's "Action Plan", the State's response to the Grant Application, DCA had provided to HUD certain information, stipulations and assurances, including: (a) "***The storm created multiple public health issues, including environmental hazards*** (e.g., mold, ***lead*** and asbestos) and unsafe debris;" (b) "***Superstorm Sandy created potential public health issues, including . . . lead and asbestos hazards*** within storm debris;" (c) "an estimated $32,700,000 is needed for hazard mitigation projects identified to date . . . [and] New Jersey has an unmet public health and safety infrastructure need of approximately $53,500,000;" and (d) "***All HUD regulations regarding lead-based paint***, asbestos removal,

environmental, housing quality standards, procurement and other applicable standards **apply to these programs**." (Emphases added).

57.    Moreover, New Jersey certified to HUD that DCA, as grantee of the Sandy-relief CDBG-DR funds, would ensure that "the Action Plan for Disaster Recovery is authorized under State and local law (as applicable) and that the grantee, and any contractor, subrecipient, or designated public agency carrying out an activity with CDBG-DR funds, possess(es) the legal authority to carry out the program for which it is seeking funding, **in accordance with applicable HUD regulations** and this Notice [of Application]"; that "activities to be 'administered' with funds under this Notice are consistent with its Action Plan"; that "**its activities concerning lead-based paint will comply with the requirements of 24 CFR part 35**, subparts A, B, J, K, and R"; and that "it **will comply with applicable laws**." (Emphases added)

58.    In sum, a total of $4,174,429,000 was provided to New Jersey, through three separate tranches. On February 6, 2013, HUD announced its initial allocation of CDBG-DR funds to Sandy-impacted states, awarding $1,829,520,000 to New Jersey. On April 29, 2013, HUD approved New Jersey's CDBG-DR Action Plan outlining the State's intended uses of the first of three CDBG-DR funding allocations. New Jersey was able to begin accessing the first tranche of CDBG-DR funds in May, with the stipulation that the initial $1.8-plus billion awarded was required to be spent by the State within two years, unless HUD provided an extension.

59.    To assist in the ongoing recovery effort, on October 28, 2013, HUD announced the second allocation of CDBG-DR funds to Sandy-impacted states, awarding New Jersey another $1,463,000,000.  Demand for state programs in New Jersey that had been funded with the first tranche of CDBG-DR monies had far outpaced available funding. Nearly all programs had long waitlists or unfunded pipelines. With the additional $1,463,000,000 of second tranche CDBG-DR

funds allocated by HUD to New Jersey, the State planned to continue to respond to critical storm-related unmet needs across various sectors, and to provide additional funding to several existing programs. Approximately one year later, on October 16, 2014, HUD issued Federal Register Notice FR-5696-N-11 (effective October 21, 2014), allocating $881,909,000 of third round CDBG-DR funds to New Jersey, bringing to $4,174,429,000 the total of federal Sandy-relief monies actually awarded and distributed to New Jersey.

60.    Upon receiving its initial allocation of CDBG-DR funds, the State quickly implemented a portfolio of programs targeting critical unmet needs. In setting up the programs, the State leveraged CDBG-DR funds with other funding sources to: (a) help homeowners and renters with unanticipated, non-construction storm-related expenses; (b) repair or replace damaged owner-occupied and rental housing; (c) provide much-needed capital to affected small businesses and investments in economic development and revitalization; (d) allow for post-storm community planning; and (e) support hardest hit and financially strained municipalities to ensure essential services continue to be provided to residents.

61.    In awarding the CDBG-DR funds, HUD required of New Jersey in particular that at least 80 percent of the first and second tranche monies be targeted to the nine counties most severely impacted by Sandy: Atlantic, Bergen, Cape May, Essex, Hudson, Middlesex, Monmouth, Ocean and Union Counties.

62.    For purposes of assisting eligible homeowners in these nine New Jersey counties and elsewhere to repair or rebuild their Sandy-impacted homes, the State established the Reconstruction, Rehabilitation, Elevation and Mitigation ("RREM") Program under the auspices of the DCA to manage, oversee and implement the disbursement and spending of the CDBG-DR funds earmarked for housing recovery and set aside a total of more than $1.344 billion for the

RREM Program alone. Once up and running, the RREM Program provided grant awards to the primary residences of homeowners for activities necessary to restore their storm-damaged homes, including reconstruction, rehabilitation, elevation and/or other mitigation activities (including inspecting the potential presence of lead paint hazards, abatement of any such lead paint hazards detected and certification that all such lead paint hazards had been abated).

63.    The RREM Program was authorized to provide eligible homeowners with grant awards of up to $150,000 in an effort to "fill the gap" between the cost of repairs and other funds that such owners had received to restore their primary residence. The calculation of any financial assistance provided by RREM took into consideration the cost of repairs and amounts each homeowner had received for home restoration from other sources such as insurance, the Federal Emergency Management Agency ("FEMA"), the Small Business Administration ("SBA" and non-profit organizations.

64.    To assist homeowners who decided to apply for federal funds through the grant process, the RREM Program provided to each such owner a Housing Advisor and an RREM Project Manager. The Housing Advisor was designated to help homeowners navigate the RREM Program and assist with eligibility determination, application processing and execution of grant awards. The RREM Project Manager was assigned to provide critical program and project details to the homeowners and to offer technical assistance for the completion of the homeowners' scope of work to ensure that they complied with all of the RREM construction standards, including requirements for lead hazard risk assessment and lead abatement. The RREM Project Manager was also charged with the duties of both inspecting all related construction while it was in progress and approving payment requests as the construction was completed.  All critical information related to homeowners' participation in New Jersey's RREM Program was contained in a non-public database called the WorlTrac system.  At all times relevant to this action, Relator had access to the WorlTrac database.

65.    On July, 1, 2014, the DCA issued a press release stating as follows: "Continuing its ongoing efforts to give homeowners flexibility to rebuild their Sandy-damaged homes, the Christie Administration simplified procedures effective today under which all eligible applicants in the federally-funded <u>Reconstruction, Rehabilitation, Elevation and Mitigation (RREM) Program</u> can select the contractor they want to use, provided they are registered and licensed in the State of New Jersey. 'A majority of the more than 3,000 homeowners who have signed RREM grant awards have decided to rebuild their homes with their own contractor,' said Commissioner Richard E. Constable, III of the New Jersey Department of Community Affairs, which administers the RREM Program. 'As a result, we have modified the RREM Program so that for grant awards signed starting today, July 1, 2014, all homeowners will select their own contractor.'"

66.    Furthermore, "While homeowners can choose from a myriad of qualified contractors throughout New Jersey, the State will make available to all eligible RREM applicants a list of contractors that are participating in the RREM Program's qualified builder pool and that have gained experience in the RREM process. . . . Each homeowner is assigned a RREM Program Manager who will provide the details of the scope of work, review and validate the construction contract and contractor, review construction invoices, perform a site visit upon completion, and monitor for project closure. ***The homeowner's RREM Program Manager*** will also provide a briefing on construction requirements and ***will give each homeowner a recommended Contractor Addendum to include in their contract to ensure all program and federal requirements are met as necessary in receiving these rebuilding grant funds***." (Emphases added)

67.    The establishment of the RREM Program under the auspices of another, new State umbrella program dubbed "the SSHIP", had been undertaken by New Jersey almost immediately after HUD had pledged to award $5.4 billion in CDBG-DR funds to restore and revitalize Sandy-affected properties. More specifically, the State published several "Requests for Quotation" or "RFQ's" from various companies potentially interested and able to assist the State's Sandy

recovery efforts and potentially considering to become a bidder eventually awarded a contract to provide a variety of critically needed expertise and services.

68.     On April 17, 2013, the State issued "REQUEST FOR QUOTATION (RFQ774394S) FOR Management and Implementation of the Superstorm Sandy Housing Incentive Program ('SSHIP') for the State of New Jersey DCA", inviting bidders to submit proposals for becoming the so-called SSHIP Manager of the CDBG-DR funds pledged to New Jersey by HUD.

69.     Just over one week later, on April 25, 2013, New Jersey released RFQ775040S (later amended to RFQ776040S) for Management of the Reconstruction, Rehabilitation, Elevation and Mitigation ("RREM") Program, asking bidders to submit proposals for becoming the so-called RREM Manager(s) of the same federally granted CDBG-DR funds provided to the State for Sandy clean-up.

70.     Both RFQ774394S and RFQ776040S explicitly defined any ensuing and executed contracts as follows: "**Contract** - This RFQ, any modifications to this RFQ, and the bidder's proposal submitted in response to this RFQ, as accepted by the State." (RFQ, §2.0) Likewise the principal contracts for each Defendant stipulated that the initial contract period would run from May 2013 through May 2015 and could be extended via three, separate one-year extensions up to and including May 2018 – which is exactly what happened with Defendants ICF, Gilbane and CB&I/Shaw. For example, as to the RREM Program Managers, "Any Contract resulting from this RFQ will be for a duration of up to two (2) years, with the option of up to three (3) one-year extensions, by the mutual written consent of the contractor and the State on the same terms, conditions, and pricing at the rates in effect in the last year of the contract, or rates more favorable to the State." (RFQ776040S at §5.0, at p.39)

71.     New Jersey further provided several critical clarifications for potential bidders in the RFQ's themselves and in later written responses to certain submitted questions, among them:

> (a) "The State of New Jersey Standard Terms and Conditions ('NJSTC'), as well as the Community Development Block Grant Disaster Recovery ('CDBG-DR') regulations and the New Jersey DCA CDBG-DR Action Plan ('Action Plan'), as approved by Department of Housing and Urban Development ('HUD'), shall apply to all contracts or purchase agreements made with the State of New Jersey";
>
> (b) the Staff Task Orders of the successful bidder included:
>> (i) "All tasks related to the implementation of the HUD Action Plan," which expressly incorporated the HUD Lead Safe Housing Rule,
>> (ii) "Provide for the implementation of the environmental and historic review responsibilities in the disaster setting,"
>> (iii) "Continue to address and assist with the oversight of housing recovery strategies," and
>> (iv) "Oversee grant administration";
>
> (c) the "Experience of Bidder" had to include "expertise in all CDBG-DR rules and regulations";
>
> (d) within "Bidder Responsibilities" it was explained, "The State requires a single Contractor as the result of any Contract negotiation, and that Contractor is responsible for all deliverables referenced in the RFQ and quote as well as the acts and liabilities created by personnel or subcontractors providing products or services as part of the Contractor's quote";
>
> (e) "The contractor shall assume responsibility for all work under the RFQ, including that work performed by any subcontractors"; and
>
> (f) "The successful bidder will perform an advisory function which could include project management".

72.     The Background section to the RREM Program Manager RFQ stated, "On October 27, 2012, Governor Chris Christie signed Executive Order 104 declaring a State of Emergency in New Jersey related to the impact of Superstorm Sandy, which caused massive property damage and loss of life. On October 30, 2012, President Obama declared a major disaster for New Jersey, DR-4086, thereby qualifying New Jersey for federal disaster assistance funds. The Governor's Office assigned the DCA as the lead agency for the State's housing response and recovery. As the Lead Agency, the DCA formulates and implements the State's housing recovery plan. *As the DCA moves into the recovery phase in the aftermath of the storm, it seeks Quotes from Contractors*

*to provide management services in connection with the RREM Program*. It is the State's intent to ensure that all work performed pursuant to this RFQ is eligible for HUD grant funding and performed in accordance with HUD regulations, policies and guidance. Qualified firms shall possess all required Federal and State licensing." (RFQ776040S, §1.2, at p.10)

73.    The same RFQ outlined the State's Purpose and Intent for the RREM Program as seeking "to establish a program that provides the following for an estimated 6,000 eligible New Jersey Homeowners who qualify for an award under the RREM program:

> • Reconstruction: Replacing a home if the estimated cost of repair is over 75% of prestorm equalized assessed value;
> • Rehabilitation: Restoring a home to its pre-storm condition if the estimated cost of repairs is less than 75% of the pre-storm equalized assessed value;
> • Reimbursement: Reimbursing Homeowners for the cost of repairs incurred prior to their acceptance into this Program;
> • Elevation: Elevating a home to the applicable advisory base flood elevation ("ABFE"); and/or
>  • Mitigation: Activity to protect the home from future storm damage (i.e. elevation, shutters, elevated HVAC, strengthen doors, soil stabilization, roof-ties, etc.). (RFQ776040S, §1.0, at pp.5-6)

74.    Furthermore, "The State intends to select, through this RFQ, one (1) Lead RREM and two (2) Secondary RREM Contractors to manage the implementation and operation of the RREM Program. The Lead RREM will complete and manage the preparation of program policies and procedures in consultation with the other RREM contractors and will manage the homebuilder prequalification process to create a pool of homebuilders who will be available to all RREM contractors." (*Id.* at p. 6)

75.    In delineating under the "Core Services" to be provided by the Lead RREM Program Manager, New Jersey officials explicitly stated, "The Lead RREM Contractor shall be responsible for, but not limited to, the following in consultation with the other RREM contractors (unless otherwise noted): 1) Completing a comprehensive set of written operational procedures

explaining how, and by whom, all of the Program elements necessary to meet the Program's goal to restore the storm-damaged properties of eligible Homeowners will be accomplished. ***The proposed operational procedures must specifically address how the Contractor shall ensure compliance with all Federal requirements attendant to CDBG including coordination with DEP to complete a environmental review compliant with . . . Lead-Based Paint regulations at 24 C.F.R. Part 35***". (*Id.* at 18-19; emphasis added)

76.    As to the distinction between and the duties of the SSHIP Manager versus the RREM Program Manager(s), the RFQ explained as follows:

> A separate program, called the Superstorm Sandy Housing Incentive Program ('SSHIP'), will first perform all application and intake processes for the Program, determine eligible Applicants, and refer those Applicants to the [RREM] Contractor. Once the Applicants have been referred, the [RREM] Contractor shall then prepare an Estimate of the Cost of Repairs ("ECR"), determine Duplication of Benefit ("DOB"), and make the award determination. The [RREM] Contractor shall then notify the SSHIP Contractor, who will issue a Notice of Award to the Applicant. After an award is determined, the [RREM] Contractor shall then meet with the Homeowner to review the Scope of Work and have the Homeowner sign off on a work write-up. Once the review is completed with the homeowner, the [RREM] Contractor shall manage a process to improve efficiency by bidding groups of properties units to 3 or more homebuilders. Those homebuilders will be selected to submit bids in accordance with a pre-determined process that is approved by DCA, and ensures reasonable equality and fairness in the assignment of properties. Although properties may be grouped together, each property will be considered a separate unit; therefore a separate quote will need to be submitted for each. Each homeowner will have an individual contract with a homebuilder so it is not expected that one bidder will be awarded all of the units that are bid at the same time. The contract will be offered to the pre-qualified Homebuilder who submitted the lowest bid for each property. If the lowest bidder does not have capacity to undertake the project, the contract will be awarded to the pre-qualified Homebuilder with the next lowest bid[.] The [RREM] Contractor will present the winning bidder to homeowner for acknowledgement. The Homeowner may either select that Homebuilder and execute a contract with the Homebuilder, or request an appeal. If the DCA resolves the appeal in favor of the Homeowner, the RREM Contractor will either present the next-

lowest priced Homebuilder to the Homeowner, or conduct a new bidding process. The SSHIP Contractor will be responsible, if applicable, for escrow of additional funds to be used towards the reconstruction, rehabilitation, elevation and mitigation of the property. The RREM [C]ontractor shall then issue a Notice to Proceed to the Homebuilder. The RREM Contractor shall serve as a construction manager and work with the Homeowner and Homebuilder to ensure good quality work and that the home is being built or repaired according to state and local codes and other program requirements, and that the Homeowner's project meets the Program's scheduling needs. The SSHIP Contractor is responsible for closing on the property. The [RREM] Contractor shall disburse RREM payments to the Homebuilder once Homebuilder's progress has been verified by the Construction Manager and Homeowner in accordance with the Homeowner/Homebuilder contract and grant terms. Upon final completion of the repairs/reconstruction, the RREM Contractor shall notify the SSHIP Contractor, who will complete the closeout of the Applicant's Grant/Loan. A flowchart of the processes is attached as Exhibit 1. (*Id.* at pp.6-7) [Exhibit 1 to RFQ776040S is attached to this Amended Complaint as Exhibit A]

77.    The State further set out in RFQ776040S as follows:

The Lead RREM Contractor shall coordinate with the State Contract Manager to determine the final program design, administrative procedures, and shall be responsible for the subsequent implementation of the Program referenced in Section 1.0. Specifically, the [RREM] Contractor shall be charged with the following: 1) Operationalizing the draft Program Policies into a detailed set of administrative procedures and then; 2) Implementing the Program components (with the exception of application intake, Notice of Award and Applicant Closeout which will be performed by the SSHIP Contractor) in accordance with any established administrative procedures. In the course of fulfilling this role, the [RREM] Contractor must ensure that the [RREM] Program is responsive to the needs of eligible property owners in the State and that assistance is provided in a manner that is fair, transparent, and expeditious. ***In recognition of the fact that CDBG-DR funds will be used to support the [RREM] Program, the [RREM] Contractor shall also be responsible for ensuring that the [RREM] Program components are administered in a way that is completely consistent and compliant with all applicable Federal and State statutes, regulations, and any other such guidance as may be issued by a Federal government or State governmental agency with jurisdiction.*** (*Id.* at p.17; emphasis added)

78.    New Jersey officials continued to emphasize the need for the RREM Program to be administered in full compliance with all applicable federal laws and regulations. For instance,

DCA Commissioner Richard Constable, in his January 8, 2014 appearance before the New Jersey Assembly Housing and Local Government Committee, first testified that (a) "DCA is the lead state agency responsible for the administration of the federal Community Development Block Grant-Disaster Recovery (CDBG-DR) funds granted to the State by the U.S. Department of Housing and Urban Development (HUD)"; and (b) "the RREM Program is a construction-based program designed to help Sandy-impacted homeowners repair or rebuild their damaged homes . . . DCA [had] received . . . more than 15,000 RREM applications" by that point.

79.     Commissioner Constable further explained in January 2014 that (a) "the RREM Program, which is the State's largest CDBG recovery program, is highly regulated by the federal government and as a result takes longer for grant awards to be finalized and disbursed to homeowners" and (b) before any construction can begin or payments made to homeowners, *__we must conduct fairly exhaustive environmental and historic reviews of each and every property because HUD demands confirmation that properties that have had homes on them must be newly confirmed to have no disturbance to the environment__* or historic and archaeological artifacts [which] federally mandated review can take anywhere from two to six weeks for each property." (Emphasis added) One purpose of the federally mandated environmental review was to inspect for the presence of any lead paint hazards that would require abatement and certification by expertly trained professionals such as Relator Wasserman and his staff at LEW.

80.     ICF and a couple other large companies specializing in disaster relief services, including Hammerman & Gainer, Inc. ("HGI") and URS (formerly called United Research Services and entirely acquired and merged into AECOM in October 2014), eventually won the initial bidding processes to help DCA implement New Jersey's utilization of HUD's $5.4 billion block grant to the State, principally through the companies' provision of strategic oversight and advisory and/or their direct administration and management of the SSHIP Program and the RREM

Program, respectively, for the latter of which alone $1.3 billion of the CDBG-DR funds had been set aside.

81.    Distinct from hiring any firm(s) as either the SSHIP Program Manager or as one of the RREM Program Managers, in May 2013 the State of New Jersey and ICF entered into and executed a "GSA Contract" effective May 25, 2013 through May 24, 2015 (the "Initial ICF Contract") appointing ICF as the "Housing Program Implementation Strategy Advisor" for the DCA, pursuant to which the company was obligated to perform disaster relief "Project Management Services" and for which services ICF was to be paid an estimated sum of $5,000,000.00 (five million dollars) per year, for a total of $10,000,000 (ten million dollars). In May 2015 and then again in May 2016, the Initial ICF Contract was extended through May 2017 by mutual agreement, pursuant to which ICF was to be paid additional, estimated annual sums of $5,000,000.00 (five million dollars).

82.    Aside from its apparent decades-long participation in managing disaster relief services and assisting federal block grant recipients of federal disaster relief funds, ICF, through the very bidding process for managing New Jersey's spending of the Superstorm Sandy CDBG-DR funds, was clearly made aware – and explicitly stated its understanding – of the requisite adherence to and compliance with all applicable federal regulations and requirements relating to lead-based paint hazards and lead abatement in undertaking and performing such management of federal disaster relief funds.

83.    In submitting its response to New Jersey's RFQ to be appointed as the State's Housing Program Implementation Strategy Advisor for utilizing the CDBG-DR funds granted by HUD, ICF represented its experience and unique expertise in, among other things, lead based paint disaster recovery. It stated in part, "ICF International has more than 350 staff with decades of

applied expertise in disaster recovery, housing, economic development, special needs and services programs, and infrastructure. ***We literally wrote HUD's books on disaster recovery, CDBG, affordable housing, economic development, and numerous federal requirements such as lead based paint, fair housing, and income documentation.*** We are also experts in the FEMA programs, having assisted grantees in understanding how these funds can be combined with CDBG. We have applied this knowledge to state and local government grantees nationwide, assisting them in managing and implementing federally assisted programs." (Emphases added)

84.    ICF had also assured, "***Our team*** currently supporting HUD and DCA in New Jersey are part of a larger line of business that ***helps CDBG grantees*** design and improve their programs . . . and ***comply with other federal requirements such as . . . lead paint regulations***. We've developed numerous program policy and procedures handbooks, monitoring plans and checklists, and performance reporting systems for housing rehabilitation programs, small business loan programs and other CDBG-eligible activities." (Emphases added). It is further noteworthy that, in making these representations in its application to New Jersey to assist in the State's management of the Superstorm Sandy CDBG-DR funds, ICF itself incorporated them into the contract pursuant to FAR § 52.204-19, which states, "The Contractor's representations and certifications, including those completed electronically via the System for Award Management (SAM), are incorporated by reference into the contract."

85.    Shortly after HUD dispersed the first $1.8 billion-plus tranche of CDBG-DR funds to New Jersey and ICF began to perform its duties under its initial contract with the State in the Spring of 2013, several large firms were additionally engaged by the State to oversee more directly and manage the RREM Program in different parts of New Jersey, including ensuring the performance of requisite lead-based paint testing, risk assessments and, where necessary, lead abatements on houses whose owners had applied to the RREM Program for federally funded

rehabilitation of their Sandy-damaged properties. Included among such firms were ICF's co-defendants:   Gilbane and CB&I/Shaw – for the last of which LEW itself acted as an additional subcontractor.

86.     As stated in a December 31, 2015 accounting report to the State of New Jersey Department of Treasury by way of the "Integrity Oversight Monitoring Reporting Model" conducted by Navigant Consulting Inc. ("Navigant"), the State's accounting "watchdog" for the expenditure of the $4.1 billion of CDBG-DR funds provided by HUD to help New Jersey recover from Superstorm Sandy, "In January 2014 HGI was terminated by mutual agreement as a contractor for the RREM program." More specifically, HGI had initially been appointed as the "Superstorm Sandy Housing Initiative Program (SSHIP) Manager"; but HGI's woeful performance during the first several months in managing New Jersey's Sandy-relief efforts had caused the State to terminate the original contract and appoint ICF as the new SSHIP Manager.

87.     In this vein, Navigant later stated in its September 30, 2017 report: "ICF provides strategic advice, program implementation, subject matter expertise and staff augmentation services to DCA. Superstorm Sandy Housing Incentive Program ("SSHIP") covered the completion and processing of housing program applications, and the determination of eligibility and disbursement of funds under the Resettlement Incentive Program, and the RREM and LRRP Programs. HGI was the original contractor selected to manage SSHIP, but prior to the beginning of Navigant's monitorship, DCA and HGI, by mutual agreement, terminated HGI's role as the SSHIP contractor. . . . DCA assumed responsibility over HGI's duties at the Superstorm Sandy Housing Recovery Centers . . . ."

88.     In reality and more specifically, pursuant to a non-publicized, January 31, 2014 "task order", ICF was charged with taking over the bulk of responsibilities of HGI as the SSHIP

Manager, at least insofar as those responsibilities related to overseeing the RREM Program. According to press resources at the time (specifically a news article published in *The Philadelphia Inquirer* on April 8, 2014), the "task order" agreement between DCA and ICF called for the private company to be paid up to $36.5 million for its additional duties assumed from the original HGI contract.

89.     As reported in *The Newark Star-Ledger* on April 14, 2014, "Only months after quietly firing the company he had hired to spearhead Hurricane Sandy recovery efforts in New Jersey [HGI], Gov. Chris Christie faces increasing scrutiny about the operation he hired as a replacement, Virginia-based ICF International. Recently given the task of aiding the state in administering  grant programs to help homeowners and landlords rebuild from the devastating storm, ICF is well known to Louisiana officials, who are embroiled in a battle with the company. Indeed, according to numerous reports from 2009, ICF was all but run out of Louisiana after three tumultuous years overseeing that state's 'Road Home' rebuilding effort after Hurricane Katrina."

90.     It was further reported, "Last week, news surfaced that New Jersey – already under contract with ICF for some Hurricane Sandy-related services – had expanded the firm's role to include aiding in the running of nine recovery centers statewide and assuming some of the day-to-day operations of the state's rebuilding grant programs" and that "[s]ome lawmakers were incensed that New Jersey's contract with ICF was expanded with no notice – and that no cap was placed on the total potential payout. To date, Gov. Christie's office has offered few details as to why Hammerman & Gainer Inc. (HGI) – which billed New Jersey $58 million for eight months of work – was fired. But numerous reports have indicated that there were performance issues and that the state anticipated massive cost overruns if the deal remained in place."

91.     The original contract between DCA and HGI appointing the latter as the SSHIP Program Manager had a start date of May 8, 2013 and an end date of May 7, 2016. HGI's contract stipulated that the company would be paid an estimated total amount of $67,739,989.39 during the three-year contract period for a multitude of services.

92.     By agreement of the parties and subsequently by operation of the January 31, 2014 task order between NJ and ICF and subsequent extensions, ICF assumed HGI's contractual obligations to perform as SSHIP Program Manager under the Sandy RREM program.

93.     The RFQ for the SSHIP Program Manager delineated the "Full Scale Operation of Incentive Program Scope" as follows: "The Contractor shall be responsible for the full-scale operation of the Incentive Program. This includes, but is not limited to, developing the processes for initial application processing, intake, determining eligibility determinations, appeals, operations, and disbursement, compliance and close-out for the Incentive Program. The Contractor shall also be responsible for the intake and determination of eligibility for the RREM and Small Rental Programs." RFQ774882S, § 3.1.4 at p. 19.

94.     More specific requirements imposed on the SSHIP Program Manager – first HGI, then ICF – included:

1) Ensure compliance with all policies and procedures for the Incentive Program;
2) Develop an Operational Plan for the Incentive Program; . . .
4) Perform all intake and application procedures for the Incentive Program, the RREM Program, and the Small Rental Program;
5) Determine the eligibility of Applicants in accordance with the policies and procedures for the Incentive Program, the RREM Program, and the Small Rental Program;
6) Establish and operate an appeals process for Applicants deemed ineligible for the Incentive Program, the RREM Program, and the Small Rental Program; and
7) Closing-out Incentive Program, RREM Program, and Small Rental Program participants once funds have been disbursed and compliance with the Program requirements has been verified. (*Id.*)

95.    Just two months after appointing ICF as the replacement SSHIP Program Manager, in March 2014, DCA and ICF formalized another set of duties that included ensuring compliance by homebuilders providing relief from Superstorm Sandy with federal and State lead paint laws, designating ICF as the "Program Manager of EAF Contractors" in a three-year contract running from March 26, 2014 through March 25, 2017.

96.    In seeking to hire a company as the EAF Manager, New Jersey issued RFQ846094S, in which it outlined the EAF Manager's duties to include, under § 3.1.4, oversight of Core Management Operations – Environmental Reviews for multiple HUD-funded, Sandy-Relief programs. More specifically, the EAF Manager's responsibilities included:

a)    Prepare Task Orders for the State Contract Manager's approval and issuance to EAF Contractors to perform the various steps within the environmental review process to establish the environmental review record: desktop assessments; field assessments; and the additional levels of assessment to support an environmental review and determine environmental clearance;

b)    Review the level of environmental review in accordance with 24 CFR Part 58.30 (HUD) and 44 CFR Part 10 (FEMA) determined by the State Contract Manager, then distribute State-issued Task Orders to EAF Contractors or DEP staff for completion within a set time frame approved by the State Contract Manager. ***Each Task Order will include the funding program (e.g., RREM, SSHP) specific property information and project information to accomplish the work including property site descriptions, physical addresses, and a description of the grant requests (e.g., scope of rehabilitation, repairs or reconstruction, or anticipated scope of activity), any previous data collected by the Sub-Recipient that can be used to assist in the environmental assessment, and the property contact information such as the Applicant's name and telephone number***.

c)    Manage environmental review intake and quality assurance from DCA; its Sub-recipients, or its Contractors for quality of data and completeness of data to facilitate the performance of an environmental review. Identify any project applicant data or document needs or deficiencies of application packages; manage needed changes to make reviews acceptable for tasking assignments to EAF Contractors.

97.    In its response to RFQ846094S, ICF made several assurances to New Jersey as to its competence in overseeing environmental reviews for projects using CDBG-DR funds, stating

"With Federal assistance comes complex rules for environmental review . . . and other requirements that present challenges. Providing Community Development Block Grant – Disaster Recovery (CDBG-DR) assistance quickly while complying with Federal environmental requirements will be in dynamic tension. ICF is the best firm to help the Department of Environmental Protection (DEP) balance that tension between expediency, accuracy, and compliance."

98.    ICF further explained that the company's "recent work with DEP and the Department of Community Affairs (DCA) on the implementation of the programs outlined in the State's Action Plan means we have already hit the ground running for a seamless startup process" and "Our current support to DEP and DCA in New Jersey, coupled with our unparalleled knowledge of HUD and other federal regulations; our depth of staff, skills, and expertise; and our established management approach will enable DEP to ensure a fully compliant environmental review process for Superstorm Sandy recovery."

99.    Similar to DCA's termination of its SSHIP Manager contract with HGI, "In February 2014 the URS contract for the RREM program was allowed to expire by mutual agreement. Gilbane and CB&I/Shaw assumed the remaining joint responsibilities for the URS duties" according to the December 31, 2015 Navigant report. URS, like HGI, had been one of the original companies to execute a contract with DCA to help manage, oversee and/or assist with the expenditure of the federal funds earmarked for the RREM Program. In fact, URS had been appointed in May 2013 as the Lead RREM Program Manager, whereas Gilbane and CB&I/Shaw had each been appointed as a secondary RREM Program Manager in the same month.

100.    Interestingly, despite DCA's replacement of HGI and URS with ICF and Gilbane and CB&I/Shaw, respectively, to oversee, manage and assist with the SSHIP and RREM Programs

in their early stages, it nevertheless still remained true that "[t]wo years after superstorm Sandy severely damaged or destroyed 40,500 primary residences in New Jersey, the state's primary rebuilding program has managed to complete only 113 homes, according to figures provided by the state." (Russ Zimmer, "Few Homes Completed Through RREM Program", app.com, Nov. 19, 2014, available at https://www.app.com/story/news/local/monmouth-county/sandy-recovery/2014/11/19/monmouth -county-rrem-homes-completed/19273821)

101.    Moreover, "Only six homes statewide have been completely rebuilt and elevated using the Reconstruction, Rehabilitation, Elevation and Mitigation (RREM) program's most hands-off option for homeowners: Pathway C, in which the New Jersey Department of Community Affairs assigned pre-approved general contractors, rather than the grant recipients choosing their own builders or seeking reimbursement for work done before they applied." (*Id.*)

102.    In responding to the State's RFQ for the RREM Program Manager role, URS had stated, "In our experience, potential areas for in depth reviews that require agency coordination include architectural history, archaeology, wetlands, threatened and endangered species, and asbestos/lead-based paint. ***Our approach for the analysis and mitigation for asbestos and lead based paint includes inspection, identification, and reports generated by certified professionals***. Although asbestos and lead based paint are environmental issues, ***the URS Team conducts follow on inspections and certifications during the construction management phase, as the remedial action can be effectively monitored by professionals during construction. The environmental certification process includes the completed checklist, any site reports, and a signature by the URS senior environmental manager validating the clearance in accordance with 24 CFR Part 58***. Our normal certification process is performed paperless, with digital signatures. The final product is an Environmental Review Record (ERR) transmitted to the responsible entity (RE) for final review and approval. (URS RFQ Response at p.1.18; emphases added)

103.    URS had further assured New Jersey officials that "the URS Team has an inspection protocol, quality assurance processes, and **standardized inspections procedures developed specifically for HUD CDBG-DR programs**" (*Id.* at pp.1.21; emphasis added); that such inspections "occur during construction **to monitor the abatement and disposal of environmental hazards including lead based paint and asbestos** (*Id.* at pp.1.22; emphasis added); that "[i]nspectors with qualifications in this field are employed **with the necessary testing equipment to provide the required certifications**" (*Id.*; emphasis added); that "typical staff monitoring [by URS personnel] will include file reviews, document maintenance, client operations, and **program compliance with State and Federal laws** (*Id.* at p. 1.24; emphasis added); and, finally, after noting that "[a] large number of eligible homes are found to have been constructed before 1978", stating accordingly, "**The URS Team, in consultation with DCA, will develop a plan governing how lead based paint will be identified and addressed prior to program deployment**. (*Id.* at p. 4.1; emphasis added)

104.    Aside from their January 2014 assumption of the contractual duties of URS as the Lead RREM Program Manager to supervise the rebuilding of New Jersey homes devastated by Sandy, Gilbane and CB&I/Shaw had already separately contracted with DCA in May 2013 to help manage the RREM Program as Secondary Program Managers. More specifically, those multiple RREM Program management contracts set out Defendants' duties as follows:

• The Lead and Secondary RREM Contractors will complete the Scope of Work including assessment of the Estimated Cost to Repair, **assessment of lead based paint hazards**, and assessment for asbestos; and confirm the environmental review process status and timeline for completion. (RFQ776040S at §1.1, at p.9, #1; emphasis added);

• The Lead REEM Contractor shall coordinate with the State Contract Manager to determine the final program design, administrative procedures, and shall be responsible for the subsequent implementation of the Program referenced in Section 1.0. Specifically, the Contractor shall be charged with the following: 1) Operationalizing the draft Program Policies into a detailed set of administrative procedures and then; 2) Implementing the Program components (with the exception of application intake, Notice of Award and

Applicant Closeout which will be performed by the SSHIP Contractor) in accordance with any established administrative procedures. (*Id.* at §3.1, at p.17);

- *Conducting lead paint and asbestos assessments and testing wherever required meeting local, state or federal requirements* and ensuring that costs and scope of any required remediation is incorporated into the Scope of Work. Ensure that all assessments and tests are reviewed by DEP. (*Id.* at §3.1.3, at p.22, #5; emphasis added);

- Ensuring that operational processes have adequate controls in place to *comply with all applicable CDGB, FEMA requirements as applicable, federal or state requirements* (*Id.* at §3.1.5, at p.24, #A2; emphasis added);

- Ensuring that procedures are *in compliance with CDBG, FEMA guidelines if applicable, state and federal guidelines* (*Id.* at §3.1.7, at p.25, #2; emphasis added);

- The [RREM] Contractor shall account for and reconcile all federal funds requested and drawn from HUD, or FEMA as applicable for the RREM Program and awarded to grant recipients (*Id.* at §3.1.10, p.28);

- The [RREM] Contractor shall be responsible for, but not limited to . . . 1. Reconciliation of federal funds disbursed and funds recovered among multiple database systems and interfaces (*Id.* at §3.1.10, p.29); and

- The [RREM] Contractor shall provide and submit to the State all reports and documents as may be necessary to support the provisions of the State's HUD Action Plan in accordance with all relevant requirements, including but not limited to those imposed by HUD, FEMA and the State (*Id.* at §3.3, p.29);

105.    Whereas the initial RFQ for RREM Program Managers imposed duties upon successful bidders of "[e]stablishing a system by which funds can be drawn down from the State's CDBG-DR allocation and paid out in a timely fashion to Homebuilders for work that has been verified to be complete according to the approved specifications" (*Id.* at §3.1.4, #5 at p.23) and "[f]or individual projects, determining that (1) the Scope of Work has been completed, (2) the Program's construction standards and green building standards have been reached, (3) all of the attendant CDBG provisions have been complied with, and (4) final construction inspections have been conducted so that the final construction payment can be issued" (*Id.* at §3.1.4, #8 at p.23), a Modification to the same RFQ added the following duties under §3.1.4:

- 9) The RREM Contractor will be responsible for processing payments to the Homebuilder.
- 10) The RREM Contractor will be required to forward batched approved homebuilder invoices to DCA for payment processing.

- 11) DCA will make a payment to the RREM Contractor. RREM contractor will draw any relevant escrowed funds and then make payments to the Homebuilder securing appropriate confirmation of receipt of payment by homebuilder.
- 12) For bidding purposes, the RREM Contractor may assume that they will need to process between 2-4 payments for each property. The first payment may include a reimbursement to the homeowner for work to date, if eligible. (Modification #1 to RFQ776040S at #1, on April 30, 2013)

106.    A later Addendum to the same RFQ made further clarifications under §3.1.4 as to RREM Program Managers' contractual duties in implementing the utilization of HUD's CDBG-DR funds through the RREM Program, stating that:

- The Homebuilders will be paid through the RREM contractor. The RREM contractor will submit groups of homebuilder invoices to DCA for payment and DCA will make a payment to the RREM contractor which will then disburse to homebuilders. (Addendum #2 to RFQ776040S at #17, on May 3, 2013);
- The RREM contractor will submit groups of homebuilder invoices to DCA for payment and DCA will make a payment to the RREM contractor which will then disburse to homebuilders. (*Id.* at #18); and
- The RREM Contractor will be managing disbursement of Federal CDBG-DR funds to the homebuilders. As part of their responsibilities, the contractor will be expected to reconcile those funds as directed by DCA. (*Id.* at 19)

107.    In an April 24, 2013 "Modification" to RFQ776040S, DCA answered a prospective bidder's question as to the "significance and role(s)" of RREM Contractors, that the RREM Contractors "will manage, among other tasks, the process to determine the Duplication of Benefits, create the Scope of Work on a property, conduct bidding to secure a Home Builder/General Contractor and oversee the Construction process and compliance for CDBG-DR on behalf of the State." Insofar as each and every published answer to bidders' questions regarding the RFQ constitute an actual term of the later, signed contracts between Defendants and DCA, it was clear that Defendants were essentially running the RREM Program for New Jersey rather than being directed by the State how to run the RREM Program on any ongoing basis.

108.    In convincing the DCA to name CB&I/Shaw as a Secondary RREM Program Manager in May 2013, the company had opened its RFQ Response by citing in the very first paragraph its vast experience in managing such programs for HUD "on contracts of similar size and scope both in Texas and Louisiana. In addition, we are currently serving as a CDBG-DR technical advisor to New York City in the aftermath of Superstorm Sandy." (CB&I/Shaw Response to RFQ776040S at p.1).

109.    Furthermore, "The Shaw team's depth of CDGB-DR technical experience and resources will help us to deliver a successful NJDCA RREM program. Key staff, who are committed to this program, are senior management and technical experts with many years of direct disaster recovery project and program management experience. They  are very familiar with developing, implementing, and executing CDBG-DR funded programs. For NJDCA's  RREM program this means access to critical resources with no learning curves and efficient execution of required services." (*Id.*)

110.    In describing its Environmental Qualifications and Experience, CB&I Shaw stated, "After containment, cleanup, and/or transfer activities, CB&I has the capabilities to remediate sites in accordance with applicable regulations." (*Id.* at Attachment 2, p. 8) Similarly, the company boasted of its assistance to New York City residents in November 2012 while participating in the "Rapid Repairs Program" established by Mayor Michael Bloomberg almost immediately after Superstorm Sandy had wreaked her havoc, citing one of its services as "Environmental Health & Safety (EH&S) Program Support," which included "Reviewing contractor EH&S plans and hazard analyses; "Updating and distributing EH&S protocols; Reviewing incident reports; [and] EH&S audits". (*Id.* at 164)

111.    Finally, CB&I/Shaw assured New Jersey officials that its "Application Review and Processing" timeline would include the processing of "Applications referred from SSHIP with environmental clearance form DEP" from August 15, 2013 until February 28, 2014 and the completion of "Estimated Cost of Repairs (ECRs) [and] ***Lead Paint/Asbestos assessments for Program Homes***" beginning on September 2, 2013 and ending December 23, 2014. (Id. at 47; emphasis added)

112.    Indeed, by October 2013, CB&I/Shaw was already invoicing the RREM Program for a purchase order of certified, expert work to "Provide lead hazard risk assessments as indicated in Section 2 of the scope of work on single family homes" on 150 "Lead Sites".

113.    In similarly convincing DCA to hire Gilbane as another Secondary RREM Program Manager in May 2013, the company had boasted: "The enclosed Gilbane proposal presents numerous advantages to the State of New Jersey for the timely and successful completion of RREM Program. Augmenting our team from day one will be MBP, a relationship that will bring a proven team of disaster recovery experts fresh off of the New York City Superstorm Sandy Rapid Repairs Program (NYC SSRRP). In working together as one cohesive unit, we successfully returned over 1,500 homes to habitable state in under four months from contract award to construction completion. The lessons learned and best practices absorbed by the Gilbane team will be unparalleled in terms of understanding the overall size and scope of this effort. In addition, the recent completion of this program will allow the seamless transition of key project personnel (including team leaders) from the NYC SSRRP to New Jersey, resulting in a minimal learning curve and ability to hit the ground running." (Gilbane Response to RFQ776040S at p.1)

114.    Furthermore, "The Gilbane approach to understanding the work that is required of the RREM Contractor and successfully implementing all tasks that are required in the RFP is

predicated on a platform of total transparency and the meeting of all of the requirements of the various jurisdictional agencies such as FEMA, HUD, and the State of New Jersey." (*Id.* at Section 1, p.2),

115.    Gilbane further promised to "develop all required policies and procedures in the first 30 days after award. The Gilbane team will ensure compliance with CDBG, FEMA and other regulations as required as these policies and procedures are developed." (*Id.* at Section 3, p.2) Importantly, Gilbane also stated, "Elevation requirements will be determined before the site visit. ***The single site visit will determine scope of work, assessment of asbestos and lead hazards and estimate of cost to repair***." (*Id.* at Section 3, p.3; emphasis added) In similar vein, Gilbane's proposal stated that "we will develop our Preconstruction Implementation plan within the first thirty days after the RREM contract award. This plan will clearly articulate the policies, procedure and program forms. It will serve as the roadmap for all project participants. This plan will focus on [among other items] ***Environmental review protocols and procedures***." (*Id.* at Section 3, p.3; emphasis added) (*Id.* at Section 3, p.6; emphasis added) "The Rehabilitation and Mitigation project estimates will be based predominantly onsite visits and interviews with the Homeowners. ***Site visits with the Homeowners will also provide the opportunity to*** verify the damages incurred, confirm the construction category, photograph the site/building and ***coordinate the environmental survey***. (*Id.* at Section 3, p.7; emphasis added)

116.    Lastly, in charting its proposed "Preconstruction Schedule", Gilbane projected that its personnel would be able to have "SSHIP Determine Eligible Applicants/Refer RREM" participants by the first week of July 2013 and then "Determine SOW / HAZMAT / Environmental Review" and "Issue Environmental Assessment Report" by the end of July 2013. (*Id.* at Section 3, p.12)

117.    In May 2013, New Jersey hired Cohn Reznick, LLP  to provide "integrity monitoring and anti-fraud" services for the payments made to Defendants under the Sandy RREM program from the HUD CDBG-DR grant.

118.    In or about October of 2014, New Jersey replaced Cohn Reznick with Navigant Consulting, Inc. ("Navigant") as the provider of "integrity monitoring and anti-fraud services" for payments made to Defendants under the Sandy RREM program from the HUD CDBG-DR grant.

119.    In its September 30, 2017 report, Navigant describes the payment of the "HUD CDBG-DR Award funds" to Defendants as follows:, "DCA retained several contractors, who fall under the purview of the New Jersey Integrity Oversight Monitor Act ("A-60"), to assist it in managing various programs designed to distribute CDBG-DR funds to eligible New Jersey residents and businesses. These Contractors include the Gilbane Building Company ("Gilbane"), CB&I Shaw ("CB&I"), and the URS Group, which were retained to manage the Rehabilitation, Reconstruction, Elevation and Mitigation Program ("RREM")". . .  "ICF" provides strategic advice, program implementation,  subject matter expertise and staff augmentation services to DCA."

120.    In Navigant's September 30, 2017 report,  the total sums paid out of the federal and State CDBG-DR funds to the Defendants for their management and/or assistance with the RREM Program as of that date were as follows: $75,624,764 to Gilbane; $92,011,030 to CB&I/Shaw and $99,170,934 to ICF; despite the failures of each company to meet, satisfy and or comply with their non-dischargeable statutory and regulatory obligations – as  well as their explicit, non-transferrable contractual duties – to ensure that the rebuilding of Sandy-damaged homes in New Jersey through the RREM Program be completed in such a way as to detect, abate and certify the mitigation of all lead paint hazards present in such homes.

121.    Not one of these companies can therefore reasonably disclaim their actual knowledge of their statutory obligations, regulatory requirements and explicit contractual duties, both directly and through their subcontractors, to comply with all applicable laws and regulations, including with respect to the detection, mitigation, abatement and/or removal of lead-based paint hazards insofar as Navigant was constantly monitoring their billing practices and expenditure claims with regard to all such activities. For instance, Navigant's report "for the Fourth Quarter 2015 focused principally on . . . reviewing the invoices of the two RREM Contractors, Gilbane and CB&I-Shaw ("the Contractors"), and their numerous subcontractors" and "conducting site visits of homes in the RREM program." Furthermore, "*During this quarter, we conducted* 11 *meetings with* DCA, Treasury, NJ Attorney General's Office, *ICF*, Housing Center staff and RREM applicants. We also conducted a site visit in Lavalette, NJ encompassing fifty-eight (58) properties." [Emphases added]

122.    In this further regard, Navigant "continued [its] review of the RREM and LRRP Contractor and their respective subcontractor invoices, and continued: (1) Identifying and tracking potential discrepancies including invoiced unit pricing for *hazmat sample testing* [and] (2) Analyzed and reviewed for *unsupported invoiced hazmat testing* . . . ." [Emphases added] The State's accounting watchdog for the RREM Program stated, "Navigant's review of the detailed invoice support provided [one] subcontractor determined that this subcontractor included a line item charging $150 per home *for the preparation of an abatement cost estimate for each home inspected that contained asbestos or lead risks*" and further explained, "During field inspections, *samples are collected from homes and submitted to a hazmat laboratory to test for asbestos and/or lead risks*. Consequently, for the homes in which samples that tested positive for hazmat risks this subcontractor's report included additional estimated cost abatement information. Therefore, if a home tested positive for both asbestos and lead risks, the home was typically

invoiced for a total of $300" a charge "is unique to this subcontractor as it (1) is not included in any of the Gilbane or CBI/Shaw subcontract agreements, and (2) it is not a line item billed by the other Gilbane or CBI/Shaw hazmat subcontractors. Although these other subcontractors typically provided cost estimates in their hazmat reports for homes they inspected that tested positive for asbestos or lead risks, they did not charge the homeowner to provide this estimate." Finally, "Navigant also noted potential discrepancies in the invoiced unit prices for various types of testing on asbestos and lead samples obtained during the field inspection."

123.    Based on Navigant's continual if not constant monitoring of all three Defendants expenditures and subcontractor payouts alone, particularly with respect to inspecting for the presence of lead risks and the abatement costs for lead risks found, ICF, Gilbane and CB&I/Shaw were thus well aware their management of and/or assistance with the expenditure of RREM Program funds included legal and regulatory obligations as well as contractual duties to detect, abate and certify mitigation of all present lead pain hazards.

124.    Indeed, appended to and included in ICF's Initial Contract, in all of ICF's subsequent contracts, and in all the similar contracts entered into by both Gilbane and CB&I/Shaw were the "State of New Jersey Standard Terms and Conditions," which stipulated, "Unless the bidder/offeror is specifically instructed otherwise in the Request for Proposals (RFP), the following terms and conditions shall apply to all contracts or purchase agreements made with the State of New Jersey" (¶ 1); that "any contracts and/or orders placed as a result of [this proposal] shall be governed and construed and the rights and obligations of the parties hereto shall be determined in accordance with the laws of the STATE OF NEW JERSEY" (¶ 2.11); and that ***any consent given by the State for subcontracting "shall not relieve the contractor of any of his responsibilities under the contract***, nor shall it create privity of contract between the State and any subcontractor. If the contractor uses a subcontractor to fulfill any of its obligations, ***the***

*contactor shall be responsible for* the subcontractor's: (a) performance; (b) compliance with all of the terms and conditions of the contract; and (c) *compliance with the requirements of all applicable laws.*" (¶ 5.8(a)) "All services rendered to the State shall be performed in strict and full compliance with the specifications stated in the contract." (¶ 5.11(g)) [Emphases added].

125.    Accordingly, ICF itself characterized the work that its personnel performed under the company's various contracts with DCA in the following manner:

> a)      "New Jersey Superstorm Sandy Recovery. CLIENT**:** State of New Jersey Department of Community Affairs (DCA). ICF maximized Community Disaster Block Grant Disaster Recovery (CDBG-DR) funds for residents and communities impacted by Superstorm Sandy in New Jersey. When Superstorm Sandy hit, the state of New Jersey had the monumental task of responding to the immediate, critical needs of citizens as well as establishing a comprehensive, long-term recovery process."

> b)      "Although the U.S. federal government allocated funding for Sandy recovery, assigning these resources quickly and effectively required expert guidance in the management of CDBG-DR funds. Managing funding to the satisfaction of federal requirements was fundamental to New Jersey's ability to meet the needs of Sandy-impacted residents and communities."

> c)      "While a primary concern was housing, more than 20 programs were ultimately established across all sectors to promote recovery, resumption of business, long-term sustainability, and improved resilience."

(https://www.icf.com/projects/ community-development/new-jersey-superstorm-sandy-recovery)

126.    In further describing its company's efforts to assist New Jersey's recovery from Superstorm Sandy, ICF stated:

> a)      "Among the ways ICF helped New Jersey's [DCA} implement the state's $4.1 billion Superstorm Sandy Recovery Program include: . . . Provided subject matter expertise on CDBG-DR . . . [and] Set up more than 130 staff to augment DCA staff at headquarters and nine Housing Recovery Centers to help expand capacity quickly." (ICF DISASTER RECOVERY CASE STUDY at 1)

> b)      In addition, "When Superstorm Sandy hit in October 2012, New Jersey's state and local governments were faced with the monumental task of responding to the immediate, critical needs of citizens while establishing a comprehensive, long-term recovery process. In March 2013, the federal government allocated funding for Sandy recovery, but assigning

these resources as quickly and effectively as possible required expert guidance in the management of Community Disaster Block Grant Disaster Recovery (CDBG-DR) funds."

c)    "New Jersey needed to know how to: . . . best use the resources available to balance competing priorities with speed[;] stand up the functions and programs required for recovery[; and] ***remain compliant with Federal regulations and reporting requirements***. The cost of non-compliance would compound an already dire situation and add to the risk that the State would not be able to fund important recovery efforts for its communities." (*Id.*; emphasis added)

127.    Lastly, the primary defendant here boasted on its website as follows:

a)    "ICF's 25-years of work with the U.S. Department of Housing and Urban Development (HUD) gave them the experience and expertise to help New Jersey staff navigate the CDBG-DR and Federal Emergency Management Agency (FEMA) requirements. ***After an initial advisory role, ICF's responsibilities were expanded to provide a full suite of end-to-end services***. . . . "

b)    "Recovering and rebuilding strong communities following the unprecedented damage of Superstorm Sandy required New Jersey state officials to work through the highly complex, natural disaster aftermath efficiently and effectively.

c)    "***Expert policy knowledge and in-depth understanding of the regulatory context in which disaster recovery programs are implemented ensured CDBG-DR funding was deployed where it was most needed and helped maximize the use of CDBG-DR funds for matching***." (*Id.* at 2; emphasis added)

128.    ICF similarly characterized its Sandy-aftermath "success" in a company Press

Release issued for the first quarter of 2014:

Key Government Contracts Awarded for the 2014 First Quarter

ICF was awarded more than 100 U.S. Federal Government contracts and task orders and hundreds of additional contracts from other U.S. state and local and international governments. The largest awards included:

• Environment: ***A contract valued at up to $17 million to provide environmental compliance assistance to the State of New Jersey for Superstorm Sandy recovery programs***. * * *
 • Housing: A contract valued at approximately $7 million net to ICF to provide staff augmentation assistance to the State of New Jersey as part of Superstorm Sandy housing recovery programs. (emphasis added)

129.    In like fashion, Gilbane described its personnel's accomplishments for DCA in an October 2014 press release titled by the company itself as "STATE OF NEW JERSEY MANAGEMENT OF RECONSTRUCTION REHABILITATION, ELEVATION PROGRAM (RREM)" In that press release, Gilbane stated as follows:

**Gilbane leads recovery and rebuilding efforts after Superstorm Sandy**

The State of New Jersey allocated $1.1 billion in federal funds to help eligible homeowners repair or rebuild their Superstorm Sandy-impacted homes. ***Based on the successful completion of a similar disaster recovery program in New York, Gilbane mobilized an experienced team for this recovery effort***. These individuals brought with them ***an intimate knowledge of the processes and procedures needed to administer the program effectively***. As of October 2014, Gilbane had completed 2,468 environmental assessments, 40 final site visits/closeout inspections, 30,000+ call center clarification request responses by residential experts, 1,194 reimbursement payments processed to NJ for disbursement and $40 million in processed payments.

**Project Overview**

- ***Development of program policies and procedures***
- ***Estimating the cost of repairs and determining the proper filing for rehab or reconstruction***
- Producing new home and renovation designs including HUD housing quality standards
- ***Performing final construction inspections to ensure conformance with program requirements***
- ***Providing all documentation required for HUD CDBG-DR compliance***, managing and reporting HUD Section 3 compliance

***Through the implementation of this program, Gilbane committed to assisting the State of New Jersey with executing a comprehensive strategy to address the State's long-term recovery and revitalization needs for communities affected by Superstorm Sandy***. [Emphases added except with respect to headings and subheadings]

130.    That ICF, Gilbane and CB&I/Shaw had virtual control of the RREM Program and thus were directly responsible for the handling of the CDBG-DR funds issued to New Jersey by HUD is perhaps best synopsized by the expert testimony presented by Janice Fine, Associate Professor, Rutgers School of Management and Labor Relations, on March 12, 2014 to the

Subcommittee on Housing, Transportation, and Community Development of the United States

Senate Committee on Banking, Housing, and Urban Affairs:

> A key component of the RREM program, is the establishment of two categories of contractors – those who administer the program and those who monitor the program. Even though the RFQ for the management of the RREM Program states that the State Contract Manager is responsible for the overall management and administration of the contract, RREM contractors are required to "perform management, file review, reporting and document management for compliance with all program policies and procedures. File documentation, document management, quality control, reporting, program and federal compliance, and issue tracking are also embedded requirements for this functional area" (RFQ for the Management of the RREM Program, 2013, p. 25). ***This ultimately means that RREM contractors remained at the forefront of contract monitoring and compliance***. The DCA did identify an internal monitoring agent. However it is unclear if the internal monitoring agent was provided with the requisite training, financial resources, and additional staff required to engage in effective contract oversight. ***Finally, the partitioning of the RREM program into two categories of contractors – those who administer the program and those who monitor the program further distanced the DCA from the service being provided. The DCA's ability to monitor and oversee the performance of a contractor is directly related to their ability to identify the actor who is responsible. Similar to a situation where a contractor subcontracts a service, DCA's already limited capacity to monitor contractors was further strained. In this context, DCA essentially outsourced a core governmental function – contract monitoring and oversight.*** [Emphases added; footnotes omitted]

131.    In this regard, DCA's essentially handing off virtually the entire administration of

the RREM Program to ICF, Gilbane and CG&I/Shaw as well as the myriad contractual duties of

management and implementation explicitly imposed upon and agreed to by the Defendants

through the RFQ bidding process rendered them "subrecipients" under the Code of Federal

Regulations ("CFR") applicable to CDBG-DR awards by HUD, which provides in pertinent part,

under CFR § 200.331 Subrecipient and contractor determinations, as follows.

> ***The non-Federal entity may*** concurrently ***receive Federal awards as*** a recipient, ***a subrecipient***, and a contractor, ***depending on the substance of its agreements with Federal awarding agencies and pass-through entities***. Therefore, a pass-through entity must make ***case-by-case determinations whether each agreement*** it makes for the disbursement of Federal program funds ***casts the party receiving the funds in the role of a subrecipient or a contractor***. The Federal awarding agency may supply and require recipients to comply with additional guidance to support these determinations provided such guidance does not conflict with this section.

(a) ***Subrecipients.*** A subaward is for the purpose of carrying out a portion of a Federal award and creates a Federal assistance relationship with the subrecipient. See definition for *Subaward* in § 200.1 of this part. ***Characteristics which support the classification of the non-Federal entity as a subrecipient include when the non-Federal entity:***

(1) ***Determines who is eligible to receive what Federal assistance***;

(2) ***Has its performance measured in relation to whether objectives of a Federal program were met***;

(3) ***Has responsibility for programmatic decision-making***;

(4) ***Is responsible for adherence to applicable Federal program requirements specified in the Federal award***; and

(5) ***In accordance with its agreement, uses the Federal funds to carry out a program for a public purpose specified in authorizing statute, as opposed to providing goods or services for the benefit of the pass-through entity***.

(b) ***Contractors.*** A contract is for the purpose of obtaining goods and services for the non-Federal entity's own use and creates a procurement relationship with the contractor. See the definition of *contract* in § 200.1 of this part. Characteristics indicative of a procurement relationship between the non-Federal entity and a contractor are when the contractor:

(1) Provides the goods and services within normal business operations;

(2) Provides similar goods or services to many different purchasers;

(3) Normally operates in a competitive environment;

(4) Provides goods or services that are ancillary to the operation of the Federal program; and

(5) Is not subject to compliance requirements of the Federal program as a result of the agreement, though similar requirements may apply for other reasons.

(c) ***Use of judgment in making determination.*** In determining whether an agreement between a pass-through entity and another non-Federal entity casts the latter as a subrecipient or a contractor, ***the substance of the relationship is more important than the form of the agreement***. All of the characteristics listed above may not be present in all cases, and the pass-through entity must use judgment in classifying each agreement as a subaward or a procurement contract. [Emphases added except with respect to sub-headings]

132. Accordingly, the roles of Defendants here as either the SSHIP Manager or the RREM Program Managers pursuant to their contracts with DCA (the pass-through entity here) substantially, even perhaps perfectly align with the criteria identifying and determining a subrecipient of federal funds.

**The Legal Framework for Allocation and Spending of
Sandy-Related Disaster-Relief Funds: the Requirement
of Lead-Hazard Risk Assessments and Lead Abatement**

133.    In 1992, the Residential Lead-Based Paint Hazard Reduction Act, also known as Title X (hereinafter, "Title X"), was passed by the United States Congress and signed into law by President George H.W. Bush.  While the general intent of Title X was to protect families from potentially toxic exposure to lead from paint, dust, and soil, the law more specifically sought to establish the framework to eliminate or substantially reduce lead poisoning in the United States within 20 years, that is, by the year 2012.

134.    In attempting to effect these goals, Section 1012(a)(3) of Title X stipulates that, for any federally funded housing rehabilitation project conducted on residential property built prior to 1978, certain requirements must be met, "at a minimum," including:

> "(C) **inspection for the presence of lead-based paint** prior to federally-funded renovation or rehabilitation that is likely to disturb painted surfaces;
>
> (D) **reduction of lead-based paint hazards** in the course of rehabilitation projects receiving less than $ 25,000 per unit in Federal funds; [and]
>
> (E) **abatement of lead-based paint hazards in the course of substantial rehabilitation projects receiving more than $25,000 per unit in Federal funds** . . . ." (Emphases added.)

135.    Relator and other LEW company personnel were informed by New Jersey officials on multiple occasions that all of the housing rehabilitation projects processed through the RREM Program were deemed to be subject to the **lead abatement** requirement set out under subsection (C) above insofar as the average of all such projects undertaken with respect to Sandy-damaged properties in New Jersey exceeds the "$25,000 per unit" qualifying minimum.

136.    Title X defines "lead-based paint hazards" and "abatement" as follows: "The term 'lead-based paint hazard' means any condition that causes exposure to lead from lead-contaminated dust, lead-contaminated soil, lead-contaminated paint that is deteriorated or present in accessible surfaces, friction surfaces, or impact surfaces that would result in adverse human health effects as established by the appropriate Federal agency" §1004(15); and "The term

'abatement' means any set of measures designed to permanently eliminate lead-based paint hazards in accordance with standards established by appropriate Federal agencies. Such term includes . . . the removal of lead-based paint and lead-contaminated dust, the permanent containment or encapsulation of lead-based paint, the replacement of lead-painted surfaces or fixtures, and the removal or covering of lead contaminated soil; and . . . all preparation, cleanup, disposal, and post-abatement clearance testing activities associated with such measures." §1004(1).

137.    In the implementation of Title X, the "HUD Lead Safe Housing Rule" was added to the Code of Federal Regulations in 1996 under 24 CFR 35, subpart J of which was further added in 1999, for the express purpose "to establish procedures to eliminate as far as practicable lead-based paint hazards in a residential property that receives Federal rehabilitation assistance under a program administered by HUD." (24 CFR § 35.900(a)(1)). The residential properties in New Jersey that were damaged by Superstorm Sandy and that were in part contemplated by HUD in granting New Jersey the CDBG-DR funding at issue here "receive[d] rehabilitation assistance under a program administered by HUD" and were explicitly targeted "to eliminate as far as practicable lead-based paint hazards"; yet, for so many Sandy-affected houses in New Jersey, insufficient or no mitigation – let alone elimination of – identified lead based paint hazards was conducted or achieved because of the failures of Defendants in properly managing and/or assisting the RREM Program so as to ensure the HUD Lead Safe Housing Rule requirements were met. Still, the Defendants made claims upon and were paid through the HUD funds provided to New Jersey despite their knowing failures to comply with federal and State lead-paint laws and regulations.

138.    With respect to "the CDBG Entitlement program, the requirements of this subpart [subpart J] shall apply to all residential rehabilitation activities . . . for which funds are first

obligated on or after September 15, 2000" (24 CFR § 35.900 (a)(3)). The residential rehabilitation activities at issue in this matter all occurred between 2013 and 2018.

139.    Furthermore, "The grantee or participating jurisdiction may assign to a subrecipient or other entity the responsibilities set forth in this subpart." (24 CFR § 35.900 (b)) Such an assignment of responsibility – for ensuring that the requirements of the HUD Lead Safe Housing Rule were met in the spending of the CDBG-DR funds awarded to New Jersey as grantee – occurred in the State's execution of its aforementioned contracts with Defendants. Through such assignation of responsibilities to the Defendants, the Government of New Jersey was a direct beneficiary and the federal Government became a third-party beneficiary of the contractual duties agreed to by Defendants, including the detection, abatement and certification required with respect to the possible and/or actual presence of lead paint in the residential properties restored (though not fully restored) under the RREM Program managed and/or assisted by Defendants.

140.    The presence of lead paint is assumed in the law. These same federal regulations and HUD Rule further require that the "grantee or participating jurisdiction shall ***either perform paint testing*** on the painted surfaces to be disturbed or replaced during rehabilitation activities or ***presume that all these painted surfaces are coated with lead-based paint***." (24 CFR § 35.930 (a)) (Emphases added).  In connection with meeting such requirements, Title X itself mandates as follows: "Lead-based paint inspections ***shall be*** performed in accordance with methods and standards established . . . by a State . . . program authorized by the EPA . . . [and] Paint testing to determine the presence or absence of lead-based paint on deteriorated paint surfaces or surfaces to be disturbed or replaced shall be performed by a certified lead-based paint inspector or risk assessor." § 35.1320(a) (Emphasis added). New Jersey implemented such requisite methods, standards and certifications through the "Lead-Based Paint Hazard Abatement and Lead-Based Paint Abatement Contractor Certification Act" with respect to companies, codified under the New

Jersey Administrative Code ("N.J.A.C.") § 5:17 and administered by the State's DCA; and through the "Standards for Lead Certification" with respect to individuals, codified under N.J.A.C. § 8:62 and administered by the State's Department of Health.

141.    Gilbane initially did not have any subcontractors or internal staff that owned the X-Ray Fluorescence ("XRF") equipment required to directly test paint in pre-1978 houses so as to conduct a certifiable lead-hazard risk assessment. Accordingly, at least in the beginning of the testing stage, the Gilbane's personnel elected to exercise the "presumption standard" of 24 CFR § 35.930(a) instead of actually testing and determining if lead-based paint or lead-paint hazards in fact existed in the houses they tested. Accordingly, all of the thousands of pre-1978 houses damaged by Sandy and assessed by Gilbane were presumed to have contained surfaces that were coated with lead-based paint and that were, therefore, required to be abated by a licensed and certified New Jersey Lead Abatement Contractor.

142.    The same certified lead abatements were, of course, likewise required to be conducted on all the properties on which lead-paint testing was actually performed and where lead-based paint hazards or even lead-dust hazards were identified and detected.  For instance, out of 4,000 lead-hazard risk assessments performed by LEW as a subcontractor for CB&I/Shaw since 2013, approximately 1000 houses were identified as containing such risks that required abatement.

143.    On information and belief, however, lead abatements legally required in connection with New Jersey's and ICF's spending of the CDBG-DR funds, on account of the presumed or identified presence of lead-based paint hazards and lead-dust hazards in thousands of New Jersey residential properties, were wholly or at least largely ignored and never performed, thereby putting the State's residents at risk of significant harm and injury.  Indeed, Relator has actual knowledge

that there were numerous properties that had lead-dust hazards present and, yet again, the proper, legally required lead abatements were ignored and never performed.

144.    Moreover, Relator knows that very few lead-abatement permits, in absolute numbers, and for only a minimal percentage of the innumerable pre-1978 properties where lead hazards were either found or presumed, were applied for and obtained from State construction officials during the RREM's implementation, largely through Defendants' employees, of the Sandy-rebuilding and rehabilitation project and efforts.  In fact, a limited review was performed by Relator into specific properties where lead-based paint hazards had been detected and where lead abatement services were therefore required to have been performed by certified professionals; yet, it was learned by Relator that the requisite lead-abatement permits were never issued nor even applied for.

145.    Further evidence of the Defendants' decision to cut corners to the detriment of New Jersey families, including vulnerable children, lies in the State's description and tracking of its allocation, disbursement and spending of the $4.1 billion-plus CDBG-DR funds awarded by HUD since 2013.  For instance, in amending the "Action Plan" required to be undertaken by the State in order to first qualify for – and then continue to utilize – those federal disaster relief funds, New Jersey announced in March 2014 its "Creation of the Lead Hazard Reduction Program."

146.    More specifically, in its "Action Plan Amendment Number 6," the State explained, "The Department of Health received Social Services Block Grant (SSBG) funding for a Lead Risk Assessment Program for Young Children. This program provides funding for community outreach and testing of young children, pregnant women, and adults performing physical recovery work for blood lead levels and case management services. However, the SSBG funding does not cover lead assessment and remediation. To address this need, DCA proposes to implement a Lead Hazard

Reduction Program with a primary focus on providing funding for lead assessment, lead hazard reduction, and clearance. Homes targeted for hazard reduction will be homes impacted by Superstorm Sandy. Paint will typically begin to flake once surfaces that were submerged in water begin to dry. As a result, flooded homes built prior to 1978 are more likely to experience increased lead and other health hazards. This program will fall under Section 4.5 Supportive Services Programs. The program is funded with $5,000,000 reallocated to the program from the Landlord Incentive Program."

147.    New Jersey's sixth amendment of its action plan further stated, "The program will be inserted into the Action Plan as below: 4.5.1 Lead Hazard Reduction Program Lead Agency: Department of Community Affairs Allocation for Activity: $5,000,000 Eligible Entities: Community based organizations and units of local and county government with experience in administering lead hazard reduction and/or weatherization programs. Process: DCA will issue a request for proposals to identify qualified nonprofit community-based organizations and local public agencies to conduct lead hazard reduction programs. Eligible Activities: Assessment of lead-based paint hazards in single and multi-family residential units; Abatement, remediation or reduction of lead paint hazards in residential units[.] DCA may also elect to allow other moderate levels of repair to occur in combination with the lead paint abatement, including addressing other environmental hazards such as mold, as well as other ancillary costs to performing the abatement. Eligibility: Section 105(a)(4) and (a)(25) National Objective: Low and moderate income; ***urgent need***." (Emphases added.)

148.    Per HUD requirements, the State's amendment of its Superstorm-Sandy action plan was made available for public comment over a thirty-day period. In its release of the amendment, the State noted that one "[c]ommenter stated that the proposed Substantial Amendment does not provide sufficient information regarding how the voucher program or Lead Hazard Reduction

Program will operate." The DCA issued the following "Staff Response: The Action Plan, and by extension this proposed Substantial Amendment to the Action Plan, is intended to describe the basic framework for proposed programs. More specific programmatic details are set forth in the policies and procedures created after HUD has approved the basic framework. The policies and procedures for each program will be available on the DCA website, as they are for other Sandy recovery programs, once the Action Plan Amendment is approved by HUD and the policies and procedures are developed."  To date, no such information appears to have been released to the public via the DCA's website as to exactly how – or on what – the spending of the $5 million allocated for lead-hazard reductions and/or abatements has been undertaken or implemented.

149.    More generally, however, in one of New Jersey's periodic updates, on October 31, 2016, of its "Sandy Recovery Program Dashboard," the State's thusly dedicated website, it was reported that, out of the $4.174 billion in CDBG-DR funds awarded to New Jersey, only $5.8 million was ever allocated for "Lead Hazard Risk Reduction."  Upon information and belief, a significant portion of those funds were used for inspections such as those performed by LEW Corporation, rather than actual lead remediation and/or post lead remediation inspections.  That such a tiny percentage (less than 0.14%) of the total federally allocated funds was used for what the State recognized to be an "urgent need" – the assessment, reduction and abatement of lead-hazard risks of thousands of pre-1978 residential properties badly damaged by Superstorm Sandy – alone demonstrates the haphazard, inadequate and indeed illegal misconduct that ICF, Gilbane and CB7I/Shaw, as the State's disaster relief managers and administrators, committed in spending the federal monies awarded by HUD.

150.    Even worse and more damning is that, as of March 31, 2018, the $5.8 million that had been allocated to "lead hazard risk reduction" was reduced to just $5 million. Moreover, of that reduced amount, only $1,190,823 had actually been disbursed as of March 31, 2018 for

purposes of assessing, abating and inspecting (post abatement) the known lead-hazard risks for thousands of damaged homes under the New Jersey CDBG-DR program. http://www.renewjerseystronger.org/transparency/sandy-recovery-program-dashboard/.

151.    Accordingly, less than 24% of the money allocated for lead-hazard risk reduction was spent more than five years after the federally appropriated, Superstorm Sandy disaster-relief funds were first disbursed to the State of New Jersey. Moreover, it is unquestionable that only a portion of these already inadequate expenditures for lead-hazard risk assessment and lead abatement went to <u>actual</u> reduction or elimination of the certain, indeed identified lead hazards thrust by Superstorm Sandy upon New Jersey's residents, whom the U.S. Government most directly sought to protect when it granted the State over $4.1 billion in CDBG-DR funds.

### The Defendants' False Claims and Underlying Activities

152.    As a general matter, tens of thousands of residential properties in New Jersey were built prior to 1978. Under federal regulations, all such homes damaged by Sandy were presumed to contain on their premises lead-based paint hazards that are required by law to be abated by licensed and certified companies and professionals such as Relator and LEW personnel. More specifically, Relator became directly aware that thousands of New Jersey homes for which lead hazard risk assessments were conducted by ICF, Gilbane and CB&I/Shaw or their subcontractors were presumed to require lead abatement insofar as no actual certified lead-paint testing had been conducted because the companies lacked the necessary equipment. Hundreds of such homes were then found to have lead hazards actually present, likewise requiring abatement.

153.    On information and belief, however, very few abatements of lead-based paint were actually performed for the thousands of New Jersey properties damaged by Superstorm Sandy. Indeed, Relator has personal knowledge that, for numerous specific, identifiable properties with

lead paint disturbances, lead abatements were either not done properly or were not done at all. For instance, Relator has knowledge that for a few properties where required lead abatement procedures were undertaken, lead dust hazards still remained afterwards yet were not themselves corrected.  Moreover, final clearance sampling that occurred during the Spring and Summer of 2016 revealed that there were many homes in New Jersey whose residents were living with elevated levels of lead dust on their property.

154.    For instance, see the sampling of homes set forth in ¶¶ ***-*** below, where lead paint was found to be present but where no evidence of proper and lawful lead remediation or post lead remediation inspection could be found.

155.    Insofar as so few lead abatement permits were ever applied for or issued in those counties most seriously affected by Sandy, it is clear that the requisite, properly licensed lead abatement contractors – either companies certified by DCA or individuals certified by DOH – were not engaged as required and did not in fact perform lead abatement work as required by the federal and state regulations and Defendants' contracts; and, consequently, many residential properties in New Jersey were exposed and potentially contaminated by toxic lead paint and/or dust above the maximum clearance and risk assessment levels deemed tolerable by federal and state authorities.

156.    On further information and belief, for some rehabilitation projects processed through the RREM Program, a non-lead abatement certified home improvement contractor performed the restorative work on almost all components of the property, including both those requiring and those not requiring lead abatement, leaving only one component requiring lead abatement to be restored by a licensed and certified lead abatement contractor.  Hence, only one lead abatement component would have been properly abated by a New Jersey licensed lead abatement contractor and the related lead abatement clearance conducted after such abatement could then be reflected in the project paperwork even though such lead abatement had been undertaken for *only one* of the property's components. Again, these instances of improperly

performed lead abatements on certain properties were a direct, material violation of the governing regulations and Defendants' contracts with DCA and moreover may likewise have resulted in the continued presence of lead hazards and/or actual lead dust, thereby endangering the good health of the residents of any such properties, especially those inhabited or frequently visited by children under the age of six, who are especially vulnerable to some particularly debilitating effects of lead poisoning.

157.    In keeping with such a lead abatement "masking scheme," devised as a cover-up by ICF and its co-defendants, and where all property components but one requiring lead abatement by a certified specialist were performed by non-certified home improvement contractors, LEW personnel began to receive requests for rather small and/or singular lead abatements, involving for instance the abatement of just one window or just one door.  True to form, on one occasion, LEW personnel completed a minimal, single-component lead abatement project for one homeowner who admitted that a non-certified contractor had done all the required lead abatement except for the one item, to ensure that: (a) a lead abatement permit would be issued; (b) the requisite RREM Program paperwork could be closed out; and (c) final payment of the awarded CDBG-DR funds would be approved.

158.    Lastly, as a result of Defendants' actions, many homes were left with confirmed lead hazards and these resulted in not only harm to the Government, which paid for services that were not lawfully rendered or not rendered at all, but also safety and health risks and harm to the homeowners, including children.

159.    Given the Defendants' widespread violation of material federally mandated lead abatement requirements, it was highly likely that many occupants of non-lead abated housing would have had heightened blood lead levels. In fact, many occupants, especially children, may still be suffering adverse, and in some cases, irreversible health effects from lead poisoning.  In 1991, the United States Center for Disease Control ("CDC") formally revised its statement on

"Preventing Lead Poisoning in Young Children", reducing its "level of concern" for childhood lead poisoning from the previous threshold of 25 micrograms/deciliter (μg/dL) to 10 μg/dL based on overwhelming scientific evidence that adverse health effects can occur at levels as low as 10 μg/d.

160.    Further CDC research suggested that adverse health effects occur at levels well below 10μg/dL (CDC ACCLPP, 2012). *See also* CDC, 2012a (announcing that CDC had adopted the core recommendation of eliminating the term "level of concern" from its future policies, guidance documents, and other CDC publications, and it would use a childhood blood lead level (BLL) reference value based on the 97.5th percentile of the population BLL in children ages 1-5, a measurement of just 5 μg/dL as of May 16, 2012).

161.    Indeed, the extreme danger of lead poisoning for <u>all</u> individuals – including adults but especially children under the age of six – is now well-documented and undeniable. As United States Congressman Frank Pallone, Jr. wrote to the Acting Commissioner of the New Jersey Department of Health less than one year before Sandy struck, "Lead exposure can cause serious damage to the heart, kidneys, reproductive system, and brain. [*citing* Centers for Disease Control and Prevention, *Very High Blood Levels Among Adults – United States, 2002-2011*, Morbidity and Mortality Weekly Report (Nov. 29, 2013)] According to the World Health Organization (WHO), at its most severe exposure levels, lead attacks the brain and central nervous system to cause coma, convulsions, and even death. [*citing* World Health Organization, Lead Poisoning and Health (www.who.int/mediacentre/factsheets/fs379/en/) (accessed Feb. 3, 2016)] Lead exposure is particularly harmful to the developing brains and nervous systems of young children – even low levels of exposure are associated with irreversible neurologic damage and behavioral disorders. [*citing* Centers for Disease Control and Prevention, *Educational Interventions for Children Affected by Lead* (Apr. 2015) (online at

www.cdc.gov/nceh/lead/publications/Educational_Interventions_Children_Affected_by_Lead.
pdf)]

162.    In 2012, the Centers for Disease Control and Prevention (CDC) lowered the
"reference level" for lead poisoning from 10 micrograms per deciliter to 5 micrograms per
deciliter, in recognition of a growing scientific consensus that <u>no amount of lead in the blood is
safe for children</u>. The CDC therefore recommended follow-up visits and further interventions to
reduce lead exposure for children with blood lead levels at 5 micrograms per deciliter or more.
[*citing* Centers for Disease Control and Prevention, *Fact Sheet: Blood Lead Levels in Children*
(online at www.cdc.gov/nceh/lead/acclpp/lead_levels_in_children_fact_sheet. pdf) (accessed Feb.
3,2016)] (Letter from The Honorable Frank Pallone, Jr. to Ms. Cathleen Bennett, February 22,
2016.)

163.    There thus exists a significant probability that, because improper, woefully
insufficient or no mandatory lead abatement was conducted, numerous adults and children residing
in some of the thousands of residences damaged by Superstorm Sandy suffered a greater risk for
lead poisoning or may in fact have incurred adverse health effects from ingesting lead dust that
was not properly contained, cleaned and/or cleared as required by relevant provisions of law,
particularly those made applicable and binding pursuant to HUD's release of the CDBG-DR
funding at issue in the present matter.

164.    As the aftermath of Sandy unfolded and the implementation and disbursement of
federal disaster relief funds by New Jersey through Defendants, as the State's chief disaster relief
management partners, were undertaken, Relator eventually became aware that ICF's and its co-
defendants' personnel began themselves to recognize a number of the foreseeable problems
resulting from their intentional decision to omit lead abatement: the RREM Program had not
properly complied with HUD lead paint abatement requirements for the spending of CDBG-DR
funds; Defendants had breached critical components of the CDBG-DR agreement/grant with HUD

that were binding conditions of such funding; and Defendants' themselves had breached their contractual duties with the State of New Jersey by failing to ensure, as was the responsibility of each company under the law and under the management and administrative contracts themselves, that all the rehabilitation projects undertaken through the RREM Program complied with federal lead paint requirements, including lead hazard risk assessments and lead abatements.

165. Defendants' personnel assigned to manage and administer the RREM Program were thus faced with a terrible predicament, a modern-day Hobson's Choice: (a) either wholly ignore and continue their noncompliance with HUD's federal funding requirements; or (b) attempt to cover up and conceal their noncompliance by duping individual homeowners who availed themselves of the federal funding made available through the RREM Program to sign written declarations that they had decided to engage in "owner occupied lead abatement."

166. As these issues began to come to light during the months following HUD's disbursements of the successive tranches of CDBG-DR funds, LEW personnel themselves were beginning to question why there were so few requests for any lead abatement projects of any kind at all, let alone for major restoration and rehabilitation projects of Sandy-damaged homes, especially given their knowledge that, for the CDBG-DR funds awarded by HUD to New Jersey to be properly and lawfully utilized, strict compliance was required with respect to all federal laws and regulations relating to lead hazards – for paint, dust and soil.

167. Mr. Wasserman became aware of Defendants' scheme to knowingly defraud the United States government by setting out in the Summer of 2015 to discover more directly why very few if any contracts for the legally required lead hazard risk assessments and/or lead abatement services were being negotiated and/or executed in New Jersey during the more-than-two full years at that point that had followed the onslaught of Sandy and the initial distribution of $1.8 billion in CDBG-DR funds.

168.    For instance, Mr. Wasserman spoke repeatedly to one Kevin Roddy ("Mr. Roddy"), who was a manager with ICF and was familiar with HUD's Office of Lead Hazard Control and Healthy Homes ("OLHCHH").

169.    On or about September 16, 2015, Mr. Wasserman attended a "Town Hall RREM Hurricane Sandy Open Discussion Forum," at the Brigantine Community Center in Brigantine, New Jersey. Mr. Roddy was also present.

170.    On that occasion, after the formal presentation was completed, Mr. Wasserman spoke privately with Mr. Roddy, who he had learned was a top-level executive with ICF assigned the duty of approving restoration contracts under New Jersey's DCA-RREM program, which had been designated by Governor Christie as the State's agency responsible for ensuring that the CDBG-DR funds were properly and lawfully spent, at least with respect to residential housing.

171.    When Mr. Wasserman asked Mr. Roddy whether any lead abatement services had been performed in connection with the restoration contracts already approved by ICF and completed by the assigned contractors, Mr. Roddy told him that, in many instances, such services were in fact <u>not</u> performed.

172.    When Mr. Wasserman further inquired how ICF planned to ensure that such services were going to be performed as required by law, particularly in light of the fact that such services could be performed only ***before*** completion of the actual restorations already completed by the assigned contractors, Mr. Roddy stated that ICF had devised a suitable "workaround."

173.    In trying to clarify what he meant, Mr. Roddy further explained to Mr. Wasserman that, if homeowners approved for federal funding through RREM Program could not provide proof of their hiring of a firm or individual certified for lead abatement and/or a lead abatement permit issued for the project, the homeowners, as a mandatory condition of their receipt of the release of

their federal funds, were going to be forced to sign a document stating that they had performed the lead abatement themselves. Mr. Roddy indicated that all such homeowners would be incentivized to sign the document because such homeowners would not receive the balance of rehabilitation funds approved for them unless and until they signed the document.

174.    Finally, Mr. Roddy admitted to Mr. Wasserman that such signatures would be compelled from homeowners on the appropriate forms even though it was undeniable – even admitted by Mr. Roddy himself – that such lead abatement had in "most instances" not actually been completed.

175.    In this last instance, Mr. Roddy and his company, ICF, as well as Gilbane and CB&I/Shaw in similar situations, effectively committed multiple FCA violations, in not only failing to ensure that all lead abatements were performed as required but also (a) in submitting claims for and receiving payments for the RREM Program management and administrative services Defendants were performing for DCA; (b) in not affirmatively reporting their legal violations and contractual breaches to government officials in New Jersey and/or HUD, which had originally doled out the CDBG-DR funds; and (c) in not returning all funds to the Government that were expressly paid on the condition of compliance. The Federal Acquisition Regulations explicitly require contractors of grantees of federal disaster-relief funds to report all known FCA violations: "The Contractor shall timely disclose, in writing, to the agency Office of the Inspector General (OIG), with a copy to the Contracting Officer, whenever, in connection with the award, performance, or closeout of this contract or any subcontract thereunder, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed . . . [a] violation of the civil False Claims Act (31 U.S.C. 3729-3733)." FAR § 52.203-13(b)(3)(i)(B)

176.    On personal knowledge, information and belief, homeowners finding themselves in this predicament foisted upon them by ICF and its co-Defendants were told that all remaining monies owed to them by or through the RREM Program would not be paid unless they either

documented the performance of the legally required lead abatement or would sign the proposed form alleging their having opted to conduct "do-it-yourself" lead abatement. Furthermore, Defendants' personnel were charged not only with the responsibility of developing the form itself but also with the task of ensuring that all homeowners who took advantage of the RREM Program complied by providing either proof of certified lead abatement or their signatures on the proposed form, which, once developed, was dubbed the "Lead Abatement Applicant Liability Acceptance" form (which was sometimes described as the "LHAS" form).

177.    In addition to the drafting and distribution of the LHAS form, a "flow chart" was circulated, upon information and belief at the direction of CB&I/Shaw personnel, explaining how to handle the processing of properties in the RREM Program that did not have proper lead abatement performed, which flow chart instructed that, if certified lead abatement did not occur as required, then the LHAS form needed to be executed by the respective homeowner(s). Accordingly, the legal responsibility and assumption of liability for Defendants' repeated failures to fulfill the federal requirements and contractual duties for accessing and using CDBG-DR funds were unfairly attempted to be inflicted upon the uninformed, financially strapped and/or ethically compromised homeowners who were simply seeking to receive their final payment form the RREM Program.

178.    This "workaround" – which was devised by ICF and circulated by CB&I/Shaw, and about which Mr. Roddy, the company's chief administrator assigned to the RREM Program, spoke to Mr. Wasserman – thus constituted the creation of a fallacy fraught form, the compulsory employment and execution of which required property owners in New Jersey whose properties had been restored using CDBG-DR funds without the required lead abatements having been performed to sign – essentially under penalty of perjury – a falsity in most cases, as demonstrated by the wording itself of the LHAS form

179.    Specifically, the LHAS form first warned as follows: "The RREM Program requires that a Lead Risk Assessment be undertaken of each residential housing unit constructed prior to 1978 to identify lead-based paint hazards.  If lead-based paint hazards are identified as the result of this assessment, only contractors that are either underlined certified in abatement [in cases where a lead hazard is identified] or trained in lead-safe work practices [in cases where non-hazardous lead-based paint is identified] may engage in lead hazard reduction activities.  If a property owner undertakes lead hazard reduction activities on their own property, s/he is not required to be either certified or have undergone lead safe work practice training. If a property owner engages a contractor that is neither certified in abatement nor trained in lead-safe work practices for lead hazard reduction activities, s/he is required to accept all responsibility and liability associated with the construction work to remove lead hazards from the property."

180.    The LHAS form, which was not presented to most if not all  homeowners until after construction work had been completed, additionally required the signing homeowners to initial and attest to each of the following statements: "I certify that active measures were taken to abate any lead hazards in my home while performing construction activities[;] I understand that I will **not** be reimbursed by the RREM Program for any costs incurred for removing lead hazards from my home as per RREM Program Policy[;] I accept all responsibility and liability associated with any work listed in my Scope of Work to abate lead hazards from my home[; and] I acknowledge and accept that, having completed lead hazard abatement activities in my home without the use of a certified lead abatement contractor or one trained in lead-safe work practices, I will not hold liable the State of New Jersey or any party associated with the RREM Program for any damages that derive from or relate to such as renovations, lead hazard abatement activities."

181.    Finally, the LHAS form included the following oath: "We/I certify that the foregoing statements are true. We/I am aware that by knowingly and willingly making false or fraudulent statements we/I am subject to appropriate civil or criminal penalties allowed by law,

including but not limited to, the DCA and/or State of New Jersey, bringing action to recover all or a portion of the amount of HUD funds received under this agreement. This information will be used to protect the Government's financial interest and to verify the accuracy of information furnished and it may be released to appropriate Federal, State, and local agencies when relevant to any civil, criminal, or regulatory investigators, attorneys and/or prosecutors."

### Sample Documentation of Defendants' Noncompliance with Lead-Based Paint Legal and Regulatory Requirements

182.   Included among the recorded documents for many individually owned properties in New Jersey rehabilitated and restored in part with the CDBG-DR funds at issue here was a "Lead-Safe Housing Rule – Applicability Form" (hereinafter, "LSH Form"). This form was used to identify any properties subject to mandatory inspection for potential lead-based paint hazards – to be followed by mandatory lead abatement where any such hazards were found – on the basis of three conditions: (a) that the "Property [was] receiving Federal Funds;" (b) that the "Unit was built prior to 1978;" and (c) that the property was <u>not</u> subject to any one of eleven exemptions from lead-based paint regulations set out under 24 CFR § 35.115, for instance because the "property will not be used for human residential habitation," or an earlier "inspection performed to HUD standards found the property contained no lead-based paint and no lead hazards," or the "rehabilitation will not disturb any painted surface," or the "property has no bedrooms," or the "property is currently vacant and will remain vacant until demolition."

183.   For some properties identified through the LSH Form to be subject to lead-based paint regulations, the WorlTrac database also included a "Lead Risk Assessment Report," which specified the particular lead hazards present on a property (for instance, lead paint, lead dust and/or lead soil) and denoted whether a "Lead Clearance Report" would eventually be required for that property. Rather importantly, each Lead Risk Assessment Report presented in Appendix D a "Questionnaire for a Lead Hazard Risk Assessment of an Individual Occupied Dwelling Unit . . .

[t]o be completed by [the assigned] risk assessor via interview with owner-occupant or, if a rental unit, an adult resident . . ..." Key inquiries on this questionnaire required the lead-hazard risk assessor to denote whether "any children under age 6 live in the home or visit frequently," if "yes, how many," and what is the "Age . . . Blood lead level . . . [and] Month/year of blood level test" for each such child identified.

184.    Another form included for some properties in the WorlTrac database was a "Lead-Based Paint Evaluation Report," which specifically delineated the findings of a certified lead-hazard risk assessor as to the subject property's "Summary of Test Results" as well as the presence and particular location of any "Lead Hazards, . . . Building Components With Lead-Based Paint, . . . Dust Lead Hazards, . . . [and/or] Soli Lead Hazards." In addition, this Evaluation Report set out all the relevant "Regulatory Requirements, . . . Procedures & Methodology, . . . [and] Lead Hazard Control," including all "Abatement Options."

185.    The WorlTrac database also contained for some properties a completed LHAS Form, as described above in paragraphs *** through ***, which again reflects the signed acceptance by the respective property owner of any liability stemming either from the owner's "self-abatement" of known lead hazards or from the owner's failure to ensure the otherwise proper abatement of any such lead hazards, necessarily performed by a contractor "<u>certified in NJ lead abatement</u>."

186.    Lastly, for some properties, there were found within the WorlTrac database a post-remediation or post-abatement "Lead-Based Paint Clearance" along with a related invoice charging for such a "Lead RREM Final Clearance," as well as representative invoices for "Lead Testing-NJ Sandy Testing" and/or for "Lead Paint Abatement." The inclusion, however, of <u>all</u> such documents for any single property – out of the thousands of properties contained within this

database – was quite rare, less than a handful, once again reflecting the utter failure in most instances by the Defendants to ensure that all legal and, regulatory requirements and contractual duties concerning lead-based paint hazards were properly met and fulfilled in the federally funded restoration and remediation of thousands of Sandy-damaged properties in New Jersey. Moreover, these documents were not absent due to faulty recordkeeping; they were missing because the required lead testing and abatement was intentionally not performed by the Defendants in order to save money.

187.    For instance, the WorlTrac database did contain two properties (the house located at 1531 Central Morris Cain Place in Atlantic City and owned by Carol Kelly, as well as the home owned by her neighbor, Yulanda Weather, located at 1522 Central Morris Cain Place) whose paperwork did show that Lead-Based Paint Clearances were successfully obtained by the homeowners. Even so, it was unclear as to whether the lead abatements performed for these two properties were conducted by the homeowners themselves, by a subcontractor of one of the Defendants or by some other licensed, lead-remediation specialist. Moreover, it could not be discerned whether either of those two properties were inspected post lead remediation to ensure that the lead had, in fact, been properly and safely remediated.

188.    In stark contrast, a sampling of the WorlTrac database reveals many properties whose paperwork reflected that each house in question, based upon a completed LSH Form, was subject to inspection for lead-based paint hazards because the property (a) was receiving federal funds, (b) was built prior to 1978 and (c) was not qualified for any of the 11 available regulatory exemptions.

189.    For instance, a sample of 14 properties (described below) in the database reflected that lead-based paint hazards were detected for each of these 14 properties. Yet, for all such

sampled properties, the database did not contain any further indication of any performance of the requisite lead abatement by a certified lead-remediation specialist or a post lead remediation inspection. Even worse, for half (7) of the 14 sampled properties, the Lead Risk Assessment Report found in the database denoted in Appendix D the presence of one or more children under the age of six.

190.    More specifically, the paperwork contained – or not contained – in the database for these 14 properties, all located in Atlantic City (as described earlier, one of the locations in New Jersey most savagely devastated by Superstorm Sandy), demonstrated as follows (a) the LSH Form for each property indicated that all were required to undergo an inspection for lead hazards; and (b) the ensuing Lead Risk Assessment Report for each property specified the presence of one or more such lead hazards. Yet, for one property, the house located at 1462 West Riverside Drive and owned by Michael Atkinson, the lack of any further related database entries reflected that the required lead abatement was never performed.

191.    For six other properties (namely, 307 Grammercy Place owned by Gary Warrington; 117 North Kingston Avenue owned by Marianne Kehner; 2916 Sunset Avenue owned by Dawn Belamarich; 18 South Florida Avenue owned by Wei Chen; 221 North California Avenue owned by Pinglei Ou; and 204 North Florida Avenue by Edith Burgos), the WorlTrac database contained a signed LHAS Form, again indicating that these homeowners accepted liability either for having performed the requisite lead abatements on their own – hardly a likely proposition – or for failing to ensure that such mandatory lead remediation was properly performed by a contractor licensed and certified to conduct such a specialized service.

192.    For the seven remaining houses of the sampled 14, the lack of any further related database entries reflected that the required lead abatement was never performed either by these

homeowners on their own behalf or for them by a certified contractor. Moreover, and perhaps most worryingly, the database for these properties indicated that one or more children either resided in the home or frequently visited it; and were, therefore, subject to potential and highly dangerous lead poisoning. More specifically, at the time the respective Lead Risk Assessment Reports were completed, three children ages 3, 4, and 5 were present at 202 North Montpelier Avenue owned by Anjum Malik; three children ages 2, 4, and 5 were present at 515 North New York Avenue owned by Shirley Brower; one child age 1 was present at 1428 North Ohio Avenue owned by George Irby; likewise, one child age 1 was present at 444 North New Jersey Avenue owned by Zaida Cordova; one child age 4 was present at 1516 North Arkansas Avenue owned by Ursula Martinez; one child age 3 was present at 107 North Columbia Avenue owned by Ziaur Rahman; and, lastly, one child also age 3 was present at 4509 Ventnor Avenue owned by Shamsul Huda. Accordingly, for these 14 sampled properties alone, 11 children were endangered by Defendants' unlawful failures to fulfill their contractual duties and legal and regulatory obligations to ensure that New Jersey's RREM Program was conducted in full compliance with binding lead-paint remedial procedures and abatements.

193.    In sum, by and through all the forgoing positions, activities and events, ICF and its fellow Defendants perpetrated numerous False Claims that were in essence submitted for payment to the United States Government or its designee through the Defendants' repeated practice of approving usage of CDBG-DR funds for the restoration, rebuilding and refurbishment of real properties in New Jersey that should have included – and by law were required to include – certain services, namely lead hazard risk assessments and/or lead abatement services. ICF and its co-Defendants nevertheless continually and intentionally failed to ensure  that such lead hazard risk assessments and/or lead abatement services were performed even though essentially billed to the Government, thereby defrauding the United States and United States taxpayers.

194.     More specifically, the critical duty to avoid lead poisoning of the citizenry; the specific and explicit legal and regulatory provisions requiring the performance of lead-based paint hazard assessments and lead abatements, where applicable, when managing and disbursing federal, disaster-relief funds; the Defendants' mandatory compliance with such legal and regulatory lead-based paint requirements; and the Defendants' express acknowledgements of and agreements to comply with those requirements when managing and disbursing the CDBG-DR monies at issue in this matter rendered such duties and compliance by the Defendants to be material obligations on their part in fulfilling the contracts they made with and/or through HUD and the State of New Jersey. Moreover, given the Government's explicit requirements of lead-paint regulatory compliance, based upon the significant dangers posed by potential lead-paint poisoning to the citizenry of New Jersey, in particular children under the age of six, who were all trying to recover from the devastation, havoc and suffering already caused by Superstorm Sandy's historic damage to life, limb and property, it is undoubted that payment would not have been made had officials either at HUD or in New Jersey been aware or advised of the Defendants' material noncompliance, fraud and attempted cover up.

195.     Accordingly, the Defendants' repeated failures to properly comply with all such legal and regulatory requirements as well as their explicit contractual duties while managing and disbursing the Superstorm Sandy HUD grants at issue here constituted multiple violations of the False Claim Act and the New Jersey False Claims Act. More specifically, Defendants' explicit assurances that they would comply – followed by their implicit assurances that they had complied – with lead paint detection, abatement and certification requirements pursuant both to binding laws and regulations as well as non-dischargeable contractual duties were material to the Government and were false when made and/or when included with claims for payment out of the CDBG-DR funds insofar as ICF, Gilbane and CB&I/Shaw had no intention of complying, and indeed did not

so comply, with the lead-based remediation requirements because they had determined that to do so would be too costly.

### The Defendants' Effectuation of Their False Claims
### to the United States and the State of New Jersey

196.    Relator is a private citizen with direct and independent knowledge of the allegations of this Amended Complaint, who has brought this action pursuant to 31 U.S.C. § 3729 *et seq*. and the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.* on behalf of himself, the United States and the State of New Jersey.

197.    On March 26, 2014, the Office of the Governor of the State of New Jersey issued a press release titled "Christie Administration Submits Plan To Federal Government For Use Of Second Round Sandy Recovery Funds: *Plan Proposes Allocation of an Additional $1.46 Billion To Address Unmet Housing Needs, Infrastructure Resiliency Projects and Other Critical Recovery Initiatives*). According to that press release, the Action Plan proffered by New Jersey to HUD, a plan quickly approved by the federal agency, earmarked "$390 million for the Reconstruction, Rehabilitation, Elevation & Mitigation (RREM) Program, which is the state's largest Sandy housing recovery initiative. The funding would be added to the $710 million provided in the first round." Accordingly, for just the first two of the three tranches of HUD funding provided to New Jersey for relief from Superstorm Sandy, $1.1 billion was set aside for the RREM Program alone, the utilization and disbursement of which was managed and administered principally by Defendants between 2014 and 2018.

198.    The State of New Jersey, using monies provided by the federal government through HUD, and by and through various state agencies, including the DCA and the RREM Program, paid numerous claims for such monies directly submitted or caused to be submitted by Defendants. These numerous claims were presented to the State (a) in connection with Defendants' various contracts executed with DCA and/or performed from 2013 through 2018; and (b) pursuant to their separate and collective responsibilities for the management and disbursement of certain CDBG-DR funds through the RREM Program in particular – a result intended by the Defendants.

199. Indeed, on information and belief, during the years 2014 onward up through 2018, Defendants were actually paying housing contractors and subcontractors with the federal funds received by the State, not simply submitting the contractors' and subcontractors' bills to New Jersey officials for payment. And for their own receipt of monies due for providing their management and administrative services to the State, Defendants were regularly presenting claims to and receiving payments out of governmental funds either of the United States or of the State of New Jersey or of both. Because many of those claims were false to the extent they purported to be owed in part because of ensured compliance with federal and State lead paint laws, they violated either the federal FCA or the NJFCA – or both FCA's.

200. In essence, in order to validly receive and disburse such governmental funds, the Defendants were required – yet failed to – to comply with the applicable lead-paint laws and regulations at both the federal and state levels, cited herein.

201. Numerous claims submitted to the RREM Program in connection with the Defendants' management and administration of that program therefore violated federal and state laws and regulations and should not have been paid. Moreover, each such claim included an express and/or implied certification of compliance with federal and State law, regulations and contracts. Each such certification was false because federal monies, specifically CDBG-DR funds, which same monies had been deposited into the coffers of the State of New Jersey, were being utilized and spent despite the fact that mandatory lead-paint hazards had knowingly, purposefully and fraudulently not been satisfied despite such compliance being a necessary condition precedent to the valid and lawful payment of any such claim.

202. Knowingly submitting or causing the submission of claims for reimbursement of housing restoration or rehabilitation through the RREM Program when such restoration or rehabilitation did not include any mandatory lead-paint hazard abatement creates liability under the federal FCA and the NJFCA. Thus, these claims to the State of New Jersey for reimbursement through CDBG-DR funds caused to be submitted by Defendants constitute violations of both the federal FCA and the NJFCA.

203.    Each false claim submitted for payment or approval or caused to be submitted for payment or approval by the Defendants, as well as each false record or statement made, used or caused to be made or used to get a claim paid by the Defendants constitutes a separate violation under 31 U.S.C. § 3729 *et seq*. and the NJFCA, N.J. Stat. § 2A:32C-1 *et seq*.

204.    The United States and the State of New Jersey were unaware of this fraud, its scope and effect, and could not have uncovered the Defendants' scheme absent this disclosure by the Relator.

205.    Had the United States or the State of New Jersey known that Defendants were violating the federal and state laws cited herein or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded CDBG-DR funds or were premised on false and/or misleading information, neither the United States nor the State of New Jersey would have paid the claims submitted by the Defendants.

206.    In Navigant's report for September 30, 2017 (on information and belief, the last one publicly available because of the apparent non-renewal of Navigant's contract with the New Jersey Department of Treasury), the total sums paid out of the federal and State CDBG-DR funds to the Defendants for their management and/or assistance with the RREM Program were as follows: $75,624,764 to Gilbane; $92,011,030 to CB&I/Shaw and $99, 170,934 to ICF, despite the failures of each company to meet, satisfy and or comply with their non-dischargeable statutory and regulatory obligations – as  well as their explicit, non-transferrable contractual duties – to ensure that the rebuilding of Sandy-damaged homes in New Jersey through the RREM Program be completed in such a way as to detect, abate and certify the mitigation of all lead paint hazards present in or at such homes.

207.    Moreover, that same Navigant report stated that the final contracts with Defendants to manage and/or assist with the expenditure of the CDBG-DR funds through the RREM Program were slated to carry through another nine months, until May 22, 2018 for Gilbane and CB&I/Shaw and until May 24, 2018 for ICF.

208.    On information and belief, not one of these companies, despite their submission of and payment for their false and fraudulent claims and despite their affirmative obligations both to

report and reimburse such false and fraudulent claims, ever returned even a single penny of the close to or more than $100 million paid out to each of them from the CDBG-DR funds.

## STATEMENT OF CLAIMS

### COUNT I
False Claims Act Violations, 31 U.S.C. §3729(a)(1)(A)
(Presenting False Claims)

209.    Relator hereby incorporates and re-alleges herein all of the previous paragraphs as if fully set forth herein.

210.    Defendants knowingly (as that term is defined in 31 U.S.C. § 3729 (b)(1)) presented or caused to be presented false or fraudulent claims for payment or approval to an officer, employee or agent of the United States, within the meaning of 31 U.S.C. §3729(a)(1)(A), which claims were paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(l)(A).

**211.**    Defendants' conduct was a substantial factor in causing damages in an amount subject to proof. The United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### COUNT II
False Claims Act Violations, 31 U.S.C. §3729(a)(1)(B)
(Making or Using False Records or Statements Material to
Payment or Approval of False Claims)

212.    Relator hereby incorporates and re-alleges herein all of the previous paragraphs as if fully set forth herein.

213.    Defendants knowingly (as that term is defined in 31 U.S.C. § 3729 (b)(1)) made, used or caused to be made or used false records or statements material to false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(l)(B).

214.    The false records or statements made by Defendants constituted a substantial factor in causing damages in an amount subject to proof. The United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### COUNT III
False Claims Act Violations, 31 U.S.C. §3729(a)(1)(G)
(Retention of Proceeds to Which Not Entitled)

215.    Relator hereby incorporates and re-alleges herein the all of the previous paragraphs as if fully set forth herein.

216.    Defendants knowingly (as that term is defined in 31 U.S.C. § 3729 (b)(1)) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

217.    Defendants' conduct violated 31 U.S.C. §3729(a)(1)(G) and was a substantial factor in causing damages in an amount subject to proof.

### COUNT IV
New Jersey False Claims Act Violations, N.J. Stat. § 2A:32C-1 *et seq.*

218.    Relator hereby incorporates and re-alleges herein the all of the previous paragraphs as if fully set forth herein.

219.    This is a *qui tam* action brought by Relator on behalf of the State of  New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.*

220.    N.J. Stat. § 2A:32C-3 provides, in part, liability for any person who:

a. Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b. Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

c. Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State; … or

g. Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

221.    Defendants violated New Jersey law, including <u>N.J. Stat. § 2A:32C-1</u> *et seq.* by: (a) knowingly causing thousands of false claims to be made, used and presented to the State; (b) causing false records or statements to get a false or fraudulent claim paid or approved by the State; (c) conspiring to defraud the State by getting a false or fraudulent claim allowed or paid; and (d) concealing the fraud.

222.    As a result of the Defendants' violations of federal and New Jersey law, the State has been damaged in an amount subject to proof.

223.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claims, and merely asserts separate damage to the State of New Jersey in the receipt, management and disbursement of the CDBG-DR funds provided by HUD.

## PRAYER

WHEREFORE, the Relator, on behalf of himself, the State of New Jersey and the United States Government, prays for judgment in its favor and against the Defendants, jointly and severally, and prays:

(a) That this Court adjudge and decree that the Defendants have violated the False Claims Act and the New Jersey False Claims Act;

(b) That, on Counts I through IV under the False Claims Act, this Court enter judgment against the Defendants, jointly and severally, in the amount equal to three (3) times the amount of damages the United States has sustained because of Defendants' action, plus a civil penalty of up to $21,916, s adjusted by the Federal Civil Penalties

Inflation Adjustment Act of 1990 (28 U.S.C. § 2461) for each false statement made to the United States government;

(d) That, on Count V under the New Jersey False Claims Act, this Court enter judgment against the Defendants, jointly and severally, and award damages as follows:

To the State of New Jersey:

(1) Three times the amount of actual damages which the State of New Jersey has sustained as a result of the Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which the Defendants caused to be presented to the State of New Jersey;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to N.J. Stat. § 2A:32C-1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) That Relator be awarded the maximum amount allowed as a Relator's Share under State law;

(4) An award of reasonable attorneys' fees and costs; and

(5) Such further relief as this Court deems equitable; and

(e) That, on Count VI for Unjust Enrichment, this Court enter judgment against the Defendants for the damages sustained and/or amounts by which the Defendants retained illegally obtained monies, plus interest, costs, and expenses, and such further relief as may be just and proper.

(f) That this Court award the Relator all costs and expenses incurred, and reasonable attorneys' fees;

(h) That in light of the decision by the United States Government not to intervene in this action, the Relator be awarded 30%, but in no event less than 25%, of the proceeds of the resulting judgment or settlement of this civil action; and

(i) That the United States Government and the Relator receive all relief, both at law and at equity, to which they may reasonably appear entitled.

## JURY DEMAND

Under Rule 38 of the Federal Rules of Civil Procedure, Relator demands a jury trial for all issues that can be triable by the jury.

Respectfully submitted,

/s/ Robert A Fagella
James R. Zazzali, Esq.
Bar No 216641963
jzazzali@zazzali-law.com
Robert A. Fagella, Esq.
Bar No. 01877197
rfagella@zazzali-law.com
Zazzali, Fagella, Nowak, Kleinbaum & Friedman
570 Broad Street, Suite 1402
Newark, New Jersey  07102
Telephone:  973.623.1822
Facsimile: 973 623.2209

John J. Beins, Esq.
JBeins@beinsgoldberg.com
(*pro hac vice* admission approved)
Seth D. Goldberg, Esq.
(*pro hac vice* admission approved)
sethg@beinsgoldberg.com
Beins Goldberg LLP
2 Wisconsin Circle, Suite 700
Chevy Chase, MD  20815
(240) 235-5040
(240) 235-5038 (f)

*Attorneys for Relator Lee Wasserman*